UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALTIMEO ASSET MANAGEMENT, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WUXI PHARMATECH (CAYMAN) INC., GE LI, EDWARD HU, NING ZHAO, XIAOZHONG LIU, ZHAOHUI ZHANG, NEW WUXI LIFE SCIENCE HOLDINGS LIMITED, NEW WUXI LIFE SCIENCE LIMITED, WUXI MERGER LIMITED, G&C PARTNERSHIP L.P., ABG II-WX LIMITED, BOYU CAPITAL FUND II, L.P., HILLHOUSE CAPITAL FUND II, L.P., PING AN LIFE INSURANCE COMPANY OF CHINA. LTD., TEMASEK LIFE SCIENCES PRIVATE LIMITED, G&C IV LIMITED, YINFU CAPITAL MANAGEMENT CO., YUNFENG II WX LIMITED, SEQUOIA CAPITAL CHINA GROWTH FUND III, L.P., CONSTANT CYPRESS LIMITED, and SPDB INTERNATIONAL HOLDINGS LIMITED,<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Altimeo Asset Management ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made

by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WuXi PharmaTech (Cayman) Inc. ("WuXi" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who sold WuXi securities between September 1, 2015 and December 10, 2015, both dates inclusive (the "Class Period") or purchased securities during the Class Period and held such shares through December 10, 2015, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      The Company was founded in 2000 and incorporated in China by Defendant Ge Li ("Li") as a chemistry services business which synthesized small molecules at the beginning of the drug discovery process. Over the years, the Company's has grown to become an integrated R&D services platform along the entire value chain of drug discovery and development, with one of the broadest integrated service and technology platforms in the life-science industry, from discovery to preclinical development to clinical development.

3.      On March 16, 2007, the Company reincorporated in the Cayman Islands in advance of its initial public offering ("IPO") of its American Depositary Shares ("ADS"), each representing eight ordinary shares, on the New York Stock Exchange ("NYSE"), in August 2007.

4.    Upon its reincorporation in the Cayman Islands, the Company became a holding company for its numerous pharmaceutical, biotechnology, and medical device research and development services companies operating in the United States and China. Among the Company's subsidiaries were WuXi AppTec, WuXi Biologics, and WuXi Next Code.

5.    Through WuXi AppTec, the Company provided comprehensive and FDA, OECD, CFDA, and GLP-compliant bioanalysis services to support preclinical and clinical development for small molecule drugs, biologics, vaccines and pharmacodynamic biomarkers.   WuXi Biologics was the Company's biologics services provider that offered comprehensive, integrated and highly customizable services through our teams of scientists, proprietary technology platform and know-how, state-of-the-art laboratories, and cGMP-compliant manufacturing facilities to pharmaceutical and biotechnology companies. WuXi Next Code is a leading genomic analysis and bioinformatics company with operations in the United States and Iceland, which the Company acquired on January 9, 2015, $65 million.

6.    On April 30, 2015, the Company announced that the day prior it had received a preliminary non-binding proposal letter to acquire all outstanding shares of the Company for $46.00 in cash per ADS. The take-private offer was made by a group of investors led by Wuxi's founder, chairman, and chief executive officer ("CEO"), Li and Ally Bridge Group Capital Partners ("Ally"), a global healthcare-focused investment group, founded and led by Mr. Frank Yu.

7.    On August 14, 2015, the Company announced that it had entered into a definitive Agreement and Plan of Merger (the "Merger Agreement") with New WuXi Life Science Limited ("Parent") and WuXi Merger Limited ("Merger Sub"), a wholly owned subsidiary of Parent, for approximately $3.62 billion, equal to $46 per ADS (the "Merger").

3

8.     The Company's extraordinary general meeting of shareholders where WuXi shareholders were asked to approve the acquisition was scheduled for November 25, 2015.  In support of the forthcoming shareholder vote, Defendants (defined below) issued numerous false and misleading statements, designed to undervalue the Company by omitting Defendants' intentions to spin-off and publicly list shares of its various subsidiaries in the People's Republic of China.

9.     Not long after WuXi was delisted from the NYSE on December 10, 2015, Defendants put their plan into action and started to spin-off off and/or publicly listed the securities of its subsidiaries, including WuXi Biologics, WuXi NextCODE, and WuXiAppTec, resulting in astronomical gains for Defendants within the short period since consummation of the Merger.

10.    On June 6, 2017, it was announced that Defendants had completed an IPO of its former subsidiary, WuXi Biologic, raising over $510 million, at a valuation of over $3 billion. In June 2018 it was reported in Asian financial media that Defendants (defined below) sold a 4.08% equity stake in WuXi Biologics for $505 million, equating to a total equity value of over $12.3 billion for the company.

11.    In September 2017, WuXi NextCODE raised $240 million in its series B financing round, valuing the company at $1.2 billion. One year later, on November 27, 2018 WuXi NextCODE announced that it closed its series C financing round, raising an additional $200 million.

12.    Lastly, On May 8, 2018, WuXiAppTec completed its A-share initial public offering and listing on the Shanghai Stock Exchange, after receiving fast-track approval by China's securities regulator. The offering raised $354 million, at a $3.5 billion valuation.

13.     After seeing its stock price on the Shanghai Stock Exchange more than triple since its IPO, in July 2018, WuXi AppTec filed a prospectus in Hong Kong to become dual listed. On December 12, 2018, WuXi AppTec announced that it raised $1.01 billion in its Hong Kong debut listing. WuXi AppTec's Honk Kong IPO valued Wuxi's former subsidiary at $10.2 billion, approximately three times the value Defendants paid for the entire Company barely two years prior.

14.     As of the date of this filing, WuXi Biologics and WuXiAppTec alone had a combined market capitalization of approximately $24.7 billion, nearly *7 times* greater than the Merger valuation.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

18.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  During the Class Period WuXi securities were traded on New York Stock Exchange ("NYSE"), located within this Judicial District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.     Plaintiff is an independent portfolio management company based in France and approved by the French Financial Authority, with significant assets under management. As set forth in the attached Certification and the Assignment appended thereto, a fund affiliated with Altimeo sold WuXi's securities during the Class Period, and purchased and held Wuxi securities at the end of the Class Period, and was damaged upon the revelation of the alleged corrective disclosures.

21.     Defendant WuXi is incorporated under the jurisdiction of the Cayman Islands with its principal executive offices located at  288 Fute Zhong Road, China (Shanghai) Pilot Free Trade Zone, Shanghai, 200131, China.  WuXi's ADS were trade in an efficient market on the NYSE under the ticker symbol "WX."

22.     Defendant Li served as WuXi's CEO since the Company was founded in 2000 and as Chairman since early 2004. Li is one of the founders of the Company. He was responsible for operations, strategic planning and business development.

23.     Defendant Edward Hu ("Hu") served as WuXi's Chief Financial Officer and Chief Investment Officer since April 2014. Hu joined WuXi in August 2007 and served as Executive Vice President of Operations before becoming Chief Operating Officer. He served as the Company's acting Chief Financial Officer from February 2009 to April 2010 and in August 2010 was reappointed Chief Financial Officer in addition to serving as Chief Operating Officer since February 2008.

24.     Defendant Ning Zhao ("Zhao") served as a director of WuXi since February 2009. Prior to the Merger, Zhao, one of the Company's co-founders, served as Senior Vice President of Operations and Head of Corporate Human Resources. Zhao was Vice President of the Company's analytical services department from 2004 to 2008 and also established its bioanalytical services, core analytical services and analytical development services departments.

25.     Defendant Xiaozhong Liu ("Liu") served as WuXi's Executive Vice President since 2001 and as a director since 2005. Liu is one of the founders of the Company. He was responsible for the Company's project and engineering departments and China healthcare initiatives.

26.     Defendant Zhaohui Zhang ("Zhang") served as WuXi's Vice President of Domestic Marketing since 2002 and a director since 2005. Zhang is one of the founders of the Company.

27.     The Defendants Li, Hu, Zhao, and Zhang are sometimes referred to herein as the "Individual Defendants."

28.     The Individual Defendants possessed the power and authority to control the contents of WuXi's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations

being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

29.    Defendant New WuXi Life Science Holdings Limited ("HoldCo") is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

30.    Defendant Parent is an exempted company with limited liability incorporated under the laws of the Cayman Islands and a wholly owned subsidiary of Holdco.

31.    Defendant Merger Sub is an exempted company with limited liability incorporated under the laws of the Cayman Islands and a wholly owned subsidiary of Parent.

32.    Defendant  G&C Partnership L.P., us an exempted limited partnership formed under the laws of the Cayman Islands ("G&C LP").

33.    Defendant ABG II-WX Limited ("ABG") is an affiliate of Ally, and a company limited by shares incorporated under the laws of the British Virgin.

34.    Defendant Boyu Capital Fund II, L.P. ("Boyu") is an exempted limited partnership formed under the laws of the Cayman Islands.

35.    Defendant Hillhouse Capital Fund II, L.P. ("Hillhouse") is an exempted limited partnership formed under the laws of the Cayman Islands.

36.    Defendant Ping An Life Insurance Company of China. Ltd. ("Ping An") is a joint stock limited company incorporated under the laws of the People's Republic of China.

37.    Defendant Temasek Life Sciences Private Limited ("Temasek") is a company incorporated under the laws of Singapore.

38.    Defendant G&C IV Limited ("G&C IV") is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

39.     Defendant Yinfu Capital Management Co., Ltd. ("Co-Founder Equity LP") is a limited liability company incorporated under the laws of the People's Republic of China.

40.     Defendant Yunfeng II WX Limited ("Yunfeng"), is a company incorporated under the laws of the British Virgin Islands

41.     Defendant Sequoia Capital China Growth Fund III, L.P. ("Sequoia") is an exempted limited partnership formed under the laws of the Cayman Islands.

42.     Defendant Constant Cypress Limited ("Legend Capital") is a company incorporated under the laws of the British Virgin Islands.

43.     Defendant SPDB International Holdings Limited ("SPDBI") is a company incorporated under the laws of Hong Kong.

44.     Defendants G&C LP, ABG, Boyu, Hillhouse, Ping An, Temasek, G&C IV, Co-Founder Equity LP, Yunfeng, Sequoia, and Legend Capital are collectively referred to as the "Sponsors".

45.     Collectively, the defendants referenced above in ¶¶ 21-26 and 29-43 are sometimes referred to herein as the "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Company Background

46.     The Company was founded in 2000 and incorporated in China by Defendant Li as a business which provided chemistry services to synthesize small molecules at the beginning of the drug discovery process. Over the years, the Company's has grown to become an integrated R&D services platform along the entire value chain of drug discovery and development, purporting to have one of the broadest integrated service and technology platforms in the life-science industry, from discovery to preclinical development to clinical development.

47.     On March 16, 2007, the Company reincorporated in the Cayman Islands in advance of its IPO of its ADS, each representing eight ordinary shares, on the NYSE, in August 2007.

48.     Upon its reincorporation in the Cayman Islands, the Company became a holding company for its numerous pharmaceutical, biotechnology, and medical device research and development services companies operating in the United States and China. Among the Company's subsidiaries were WuXi AppTec, WuXi Biologics, and WuXi Next Code.

49.     Through WuXi AppTec, the Company provided comprehensive and FDA, OECD, CFDA, and GLP-compliant bioanalysis services to support preclinical and clinical development for small molecule drugs, biologics, vaccines and pharmacodynamic biomarkers.   WuXi Biologics was the Company's biologics services provider that offered comprehensive, integrated and highly customizable services through our teams of scientists, proprietary technology platform and know-how, state-of-the-art laboratories, and cGMP-compliant manufacturing facilities to pharmaceutical and biotechnology companies. WuXi Next Code is a leading genomic analysis and bioinformatics company with operations in the United States and Iceland, which the Company acquired on January 9, 2015, $65 million.

50.     On April 30, 2015, the Company announced that the day prior it had received a preliminary non-binding proposal letter to acquire of all outstanding shares of the Company not already owned by members of the Consortium for $46.00 in cash per ADS.   The take-private offer was made by a group of investors led by Wuxi's founder, chairman, and CEO, Li and Ally, a global healthcare-focused investment group, founded and led by Mr. Frank Yu.

**Background to the Merger**

10

51.     Defendant Li first considered making a proposal to acquire the Company on or about March 5, 2015.

52.     Between March 14, 2015 and April 29, 2015, Defendant Li held a number of preliminary discussions with a representative of Ally about the possibility of making a going-private proposal to the Company.

53.     On April 29, 2015, Defendant Li and Ally jointly delivered to the Board a preliminary non-binding letter that proposed a going-private transaction by a buyer group led by Defendant Li and Ally to acquire the Company. In the letter, the buyer group proposed to acquire all of the outstanding shares of the Company not already owned by the members of the buyer group for $46.00 in cash per ADS, or $5.75 in cash per ordinary share. The offer equated to a total equity value for the Company of $3.62 billion.

54.     On April 30, 2015, the Company issued a press release regarding its receipt of the letter and the proposed transaction. Defendant Li also met that day with approximately 50 members of the Company's senior management to discuss the proposal.

55.     On August 14, 2015, the Company's Board of Directors unanimously approved the transaction, and declared it advisable, to enter into the merger agreement and the transaction agreements contemplated by the merger agreement and approved the execution, delivery and performance of the merger agreement and the transaction agreements contemplated by the merger agreement and the consummation of the transactions contemplated thereby, including the merger, and directed that the authorization and approval of the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, be submitted to a vote at an extraordinary general meeting of the shareholders with the recommendation of the Board that the shareholders of the Company authorize and approve the

merger agreement, the plan of merger and the consummation of the transactions contemplated

thereby, including the merger.

56.    Later  that day, the Company issued a press release announcing the execution of

the Merger Agreement, stating in relevant part:

> SHANGHAI, Aug. 14, 2015 /PRNewswire/ -- WuXi PharmaTech (Cayman) Inc. ("WuXi" or the "Company") (NYSE: WX), a leading open-access R&D capability and technology platform company serving the pharmaceutical, biotechnology, and medical device industries with operations in China and the United States, today announced that it has entered into a definitive Agreement and Plan of Merger (the "Merger Agreement") with New WuXi Life Science Limited ("Parent") and WuXi Merger Limited ("Merger Sub"), a wholly owned subsidiary of Parent.
>
> Pursuant to the Merger Agreement, Parent will acquire the Company for cash consideration equal to US$5.75 per ordinary share of the Company (each, a "Share")  and US$46 per American Depositary Share of the Company, each representing eight Shares (each, an "ADS"), or approximately US$3.3 billion in aggregate cash consideration. This represents a 16.5% premium over the closing price of US$39.50 per ADS as quoted by the New York Stock Exchange (the "NYSE") on April 29, 2015, and a premium of 18.9% and 20.1%, respectively, over the Company's 30- and 60- trading day volume-weighted average price as quoted by the NYSE prior to April 29, 2015, the last trading day prior to the Company's announcement on April 30, 2015 that it had received a non-binding "going private" proposal.
>
> Immediately following the consummation of the transactions contemplated by the Merger Agreement, Parent will be beneficially owned by a consortium (the "Buyer Group") comprised of:
>
> > (i) new investors which include affiliates of or funds managed or advised by Ally Bridge Group Capital Partners ("Ally Bridge"), Boyu Capital ("Boyu Capital"), Temasek Life Sciences  Private Limited ("Temasek") and Ping An Insurance ("Ping An");
> >
> > (ii) Hillhouse Fund II, L.P. ("Hillhouse", and together with Ally Bridge, Boyu Capital, Temasek,  Ping An and additional sponsors that may be admitted to the Buyer Group, the  "Sponsors"), an existing shareholder of the Company and an affiliate of Hillhouse Capital;  and
> >
> > (iii) the following founders and executive officers of the Company who have elected to roll-over their interest in the Company in connection with the Merger (together with entities through  which

such individuals own their Shares (including Shares represented by ADSs) (the Founders")): Dr. Ge Li, the chairman and chief executive officer, Mr. Xiaozhong Liu, an executive vice president and a director, Mr. Zhaohui Zhang, a senior vice president of operations, the head of domestic marketing and a director, and Dr. Ning Zhao, a senior vice president of operations, the head of corporate human resources and a director.

As of the date of the Merger Agreement, Hillhouse and the Founders (together, the "Rollover Shareholders") beneficially own in aggregate approximately 4.5% of the issued and outstanding Shares.

Subject to the terms and conditions of the Merger Agreement, at the effective time of the Merger, Merger Sub will merge with and into the Company, with the Company continuing as the surviving corporation and a wholly owned subsidiary of Parent (the "Merger"), and each of the Shares issued and outstanding immediately prior to the effective time of the Merger (including Shares represented by ADSs) will be cancelled in consideration for the right to receive US$5.75 per Share or US$46.00 per ADS, in each case, in cash, without interest and net of any applicable withholding taxes, except for (i) Shares (including Shares represented by ADSs) held immediately prior to the effective time of the Merger by the Rollover Shareholders, Parent, the Company (or any of Parent or the Company's respective subsidiaries) or by the Company's ADS depositary and reserved for future issuance under the Company's stock option plan, which Shares will be cancelled without payment of any consideration or distribution therefor, and (ii) Shares owned by holders who have validly exercised and not effectively withdrawn or lost their rights to dissent from the Merger pursuant to Section 238 of the Companies Law of the Cayman Islands, which Shares will be cancelled at the effective time of the Merger for the right to receive the fair value of such Shares determined in accordance with the provisions of Section 238 of the Companies Law of the Cayman Islands.

The Buyer Group intends to fund the Merger through a combination of (i) cash contributions from the Sponsors and the Rollover Shareholders pursuant to equity commitment letters, and (ii) the proceeds from committed and underwritten loan facilities contemplated by debt commitment letters, each dated August 14, 2015, pursuant to which Shanghai Pudong Development Bank Co., Ltd. and Ping An Bank Co., Ltd. have agreed as underwriters and mandated lead arrangers to underwrite and arrange an aggregate of US$1.1 billion in debt financing for the Merger, subject to certain conditions.

The Company's board of directors, acting upon the unanimous recommendation of the special committee formed by the board of directors

(the "Special Committee"), unanimously approved the Merger Agreement and the transactions contemplated by the Merger Agreement, including the Merger, and resolved to recommend that the Company's shareholders authorize and approve the Merger Agreement and the transactions contemplated by the Merger Agreement, including the Merger. The Special Committee, which is composed solely of independent directors of the Company who are unaffiliated with Parent, Merger Sub or any member of the Buyer Group or management of the Company, exclusively negotiated the terms of the Merger Agreement with the Buyer Group with the assistance of its independent financial and legal advisors.

The Merger, which is currently expected to close during the fourth quarter of 2015, is subject to shareholder approval as well as certain other customary closing conditions. Pursuant to the Merger Agreement, adoption of the Merger Agreement by the Company's shareholders requires both (i) a special resolution in accordance with Cayman Islands law by the affirmative vote of holders of Shares representing at least two-thirds of the Shares present and voting in person or by proxy as a single class at a meeting of the Company's shareholder, and (ii) an affirmative vote of holders of a majority of the Shares that are unaffiliated with Parent, the Founders or the Sponsors and present and voting in person or by proxy as a single class at a meeting of the Company's shareholders.

57.    On November 25, 2015, the Company announced that at an extraordinary general meeting of shareholders held today, the Company's shareholders voted in favor of the proposal to authorize and approve the previously announced Merger Agreement.

58.    On December 10, 2015, the Company announced that it had completed its Merger with Parent and Merger Sub. That same day at the close of trading, the Company's ADS were delisted from the NYSE.

**Materially False and Misleading Statements Issued During the Class Period[1]**

59.    On September 1, 2015, the Company filed a Schedule 13E-3 containing a Preliminary Proxy Statement with the SEC in connection with the Merger, attached as Exhibit 99(a)-(1). In the Preliminary Proxy Statement, Defendants described their "Plans for the

---

[1] Emphasis added throughout unless stated otherwise.

Company after the Merger", which explicitly omitted any reference to their intentions to spin-off

the Company's subsidiaries and list their securities outside of the United States:

> Following the completion of the merger, Parent will own 100% of the equity interest in the Surviving Company. ***The buyer group anticipates that the Company will continue to conduct its operations substantially as they are currently being conducted, except that it will (i) cease to be a publicly traded company and will instead be a wholly owned subsidiary of Parent and (ii) have substantially more debt than it currently has.*** The increase in debt for the Company following the completion of the merger reflects the borrowing of $800 million under a senior secured credit facility as part of the financing by the buyer group of the funds necessary to complete the merger and the related transactions at the time of closing of the merger, including for the payment of the merger consideration to the Unaffiliated Holders. Although the borrower under such credit facility as of the date of the definitive documents governing such credit facility will be Merger Sub, after the completion of the merger, the Surviving Company will become the borrower and will be responsible for the payment of principal, interest and other amounts due under such credit facility.

> ***Following the completion of the merger and the anticipated deregistration of the Shares and ADSs, the Company will no longer be subject to the Exchange Act and the compliance and reporting requirements of the NYSE and the related direct and indirect costs and expenses, and may experience positive effects on profitability as a result of the elimination of such costs and expenses***.

> Except as set forth in this proxy statement and transactions already under consideration by the Company, ***the buyer group does not have any current plans, proposals or negotiations that relate to or would result in any of the following:***

> - ***an extraordinary corporate transaction, such as a merger, reorganization*** or liquidation, involving the Company or any of its subsidiaries;

> - the sale or transfer of a material amount of the assets of the Company or any of its subsidiaries; or

> - ***any other material changes in the Company, including with respect to the Company's corporate structure*** or business.

60.    The Preliminary Proxy Statement further discussed in great details "Alternatives

to the Merger", which did not mention the possibility of accretive spin-offs of the Company's

subsidiaries:

The Special Committee was formed on May 13, 2015 in response to the receipt of the proposal letter from the buyer group (which at the time comprised Dr. Li and ABG) on April 29, 2015. In light of (i) the buyer group's express intention to work together exclusively in pursuit of any acquisition of the Company and its combined beneficial ownership of approximately [●]% of the issued and outstanding Shares (as of [●], 2015); (ii) the fact that, in the market check Credit Suisse conducted under the direction of the Special Committee, all nine of the parties deemed to be potentially interested in acquiring the Company and contacted by Credit Suisse declined or failed to respond to requests to engage in discussions with the Special Committee regarding any such acquisition; and (iii) the fact that, since the announcement of the proposed transaction, no party other than the members of the buyer group has contacted the Company or the Special Committee expressing an interest in exploring an alternative transaction with the Company, the Special Committee determined that there was no viable alternative transaction to the proposed sale of the Company to the buyer group.

***In addition, the Special Committee and the Board considered, as an alternative to the merger, remaining as a public company. However***, based on the considerations set forth in the section entitled "Special Factors—Reasons for the Merger and Recommendation of the Special Committee and the Board" beginning on page 29, ***the Special Committee and the Board have concluded that it is more beneficial to the Unaffiliated Holders to enter into the merger agreement and pursue the consummation of the transactions, including the merger, and become a private company rather than to remain a public company.***

The Special Committee also took into account that, prior to the receipt of shareholder approval, the Company, subject to compliance with the terms and conditions of the merger agreement, can terminate the merger agreement in order to accept an alternative transaction proposed by a third party that is a superior proposal, subject to the payment of a termination fee of $50,000,000, as provided in the merger agreement. In this regard, the Special Committee recognized that it has flexibility under the merger agreement to respond to an alternative transaction proposed by a third party that constitutes, or could reasonably be expected to result in, a superior proposal, including the ability to provide information to and engage in discussions and negotiations with such party (and, if such proposal is a superior proposal, recommend such proposal to the Company's shareholders).

61.     The Preliminary Proxy Statement further warned investors that "***there will be no trading market for the Surviving Company's equity securities***" "and no certainty that an opportunity to sell its shares in the Surviving Company at an attractive price, or that dividends paid by the Surviving Company will be sufficient to recover its investment."

62.     On September 23, 2015, the Company filed its first amendment to the Preliminary Proxy Statement on Form SC 13-E3/A with the SEC, which contained substantively identical statements to those detailed above in ¶¶ 59-61.

63.     On October 9, 2015, the Company filed its second amendment to the Preliminary Proxy Statement on Form SC 13-E3/A with the SEC, which contained substantively identical statements to those detailed above in ¶¶ 59-61.

64.     On October 20, 2015, the Company filed its third amendment to the Preliminary Proxy Statement on Form SC 13-E3/A with the SEC, which contained substantively identical statements to those detailed above in ¶¶ 59-61.

65.     On November 20, 2015, the Company filed its fourth amendment to the Preliminary Proxy Statement on Form SC 13-E3/A with the SEC, which incorporated the Proxy Statement of the Company, dated October 20, 2015.

66.     On December 10, 2015, the Company filed its fifth amendment to the Preliminary Proxy Statement on Form SC 13-E3/A with the SEC, which stated:

On November 25, 2015, an extraordinary general meeting of the shareholders of the Company was held at 10:00 a.m. (Shanghai time), at the executive offices of the Company located at 288 Fute Zhong Road, China (Shanghai) Pilot Free Trade Zone, Shanghai, 200131, People's Republic of China. At the extraordinary general meeting, the shareholders of the Company (including holders of a majority of the Shares (including Shares represented by ADSs) that are unaffiliated with the buyer group) voted to approve the merger agreement and the transactions contemplated thereby, including the merger, and the proposal to authorize the directors to do all things necessary to give effect to the merger agreement.

On December 10, 2015, the Company and Merger Sub filed a plan of merger with the Cayman Islands Registrar of Companies, pursuant to which the merger became effective on December 10, 2015. As a result of the merger, the Company ceased to be a publicly traded company and became wholly owned by Parent.

At the effective time of the merger, each Share, par value $0.02 per Share, issued and outstanding immediately prior to the effective time of the merger was

cancelled and converted into the right to receive US$5.75, and because each of the Company's ADSs represents eight Shares, each ADS issued and outstanding immediately prior to the effective time of the merger was cancelled and represents the right to surrender such ADS in exchange for US$46.00 (less $0.05 per ADS cancellation fees), in each case, in cash, without interest and net of any applicable withholding taxes. Notwithstanding the foregoing, the following Shares (including such Shares represented by ADSs) were cancelled at the effective time of the merger but were not converted into the right to receive the consideration described in the immediately preceding sentence:

> 1,177,079 ADSs held by Hillhouse, 651,892 Shares and 49,514 ADSs held by Mr. Liu, and 5,778,304 Shares held by Mr. Zhang (together with the Shares and ADSs held by Hillhouse and Mr. Liu, the "Rollover Shares"), any Shares held by Parent, the Company or any of their subsidiaries, and any Shares (including Shares represented by ADSs) held by the ADS depositary and reserved for issuance and allocation pursuant to the Share Incentive Plan, in each case issued and outstanding immediately prior to the effective time, were cancelled without payment of any consideration or distribution therefor.

The Company did not receive any notice of objection from any shareholder prior to the vote to approve the merger, which is required for exercising any dissenters' rights.

In addition to the foregoing, at the effective time, (i) each option to purchase Shares granted under the Company's 2007 Employee Share Incentive Plan (the "Share Incentive Plan") that was outstanding and unexercised immediately prior to the effective time, whether or not vested or exercisable, was cancelled and converted into the right to receive, as soon as practicable after the effective time (and in any event no more than five business days after the effective time), cash equal to the product of (a) the excess, if any, of the per Share merger consideration over the exercise price of such option and (b) the number of Shares underlying such option, provided that, if the exercise price of any such option was equal to or greater than the per Share merger consideration, such option was cancelled without any payment therefor, (ii) each restricted share and certain restricted stock units awarded under the Share Incentive Plan (those issued to certain non-management employees and those that would otherwise be vested on or prior to December 31, 2016) that was outstanding immediately prior to the effective time was cancelled and converted into the right to receive, as soon as practicable after the effective time (and in any event no more than five business days after the effective time), an amount equal to the per Share merger consideration, in cash, and (iii) each other restricted stock unit awarded under the Share Incentive Plan that was outstanding immediately prior to the effective time was converted into the right to receive an amount equal to the per Share merger consideration, in cash, without interest and net of any applicable withholding

taxes, subject to vesting and the other terms of the second amendment to the merger agreement.

As a result of the merger, the ADSs will no longer be listed on any securities exchange or quotation system, including the New York Stock Exchange ("NYSE") and the ADS program for the Shares will terminate. The NYSE has filed an application on Form 25 with the SEC to remove the ADSs from listing on the NYSE and withdraw registration of the Shares under the Exchange Act. The deregistration will become effective 90 days after the filing of the Form 25 or such shorter period as may be determined by the SEC. In addition, the Company intends to suspend its reporting obligations under the Exchange Act by filing a certification and notice on Form 15 with the SEC in approximately ten days. The Company's reporting obligations under the Exchange Act will be suspended immediately as of the filing date of the Form 15 and will terminate once the deregistration becomes effective.

67.     Each of the above public filings was signed by the Defendants.

68.     The statements referenced in ¶¶ 59-67 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's public statements misrepresented and/or omitted material information that was necessary for Company shareholders to make an informed decision concerning whether to vote in favor of the Merger; (ii) Defendants had plans to spin-off and publicly list the Company's various subsidiaries, in a series of highly accretive transactions; and (iii) as a result, the Company's statements about its business, operations, and prospects lacked a reasonable basis.

**The Truth Begins to Emerge**

69.     Shortly after the Company's ADS were delisted from the NYSE, Defendants' plans to spin-off off and/or publicly listed the securities of its subsidiaries, including WuXi Biologics, WuXi NextCODE, and WuXiAppTec, and the true value of the Company's securities was slowly revealed to former WuXi ADS-holders.

70.     On June 6, 2017, it was announced that Defendants had completed an IPO of its former subsidiary, WuXi Biologic, raising over $510 million, at a valuation of over $3 billion. In June 2018 it was reported in Asian financial media that Defendants sold a 4.08% equity stake in WuXi Biologics for $505 million, equating to a total equity value of over $12.3 billion for the company.

71.     In September 2017, WuXi NextCODE raised $240 million in its series B financing round, valuing the company at $1.2 billion. One year later, on November 27, 2018 WuXi NextCODE announced that it closed its series C financing round, raising an additional $200 million.

72.     Lastly, On May 8, 2018, WuXiAppTec completed its A-share initial public offering and listing on the Shanghai Stock Exchange, after receiving fast-track approval by China's securities regulator. The offering raised $354 million, at a $3.5 billion valuation.

73.     After seeing its stock price on the Shanghai Stock Exchange more than tripe since its IPO, in July 2018, WuXi AppTec filed a prospectus in Hong Kong to become dual listed. On December 12, 2018, WuXi AppTec announced that it raised $1.01 billion in its Hong Kong debut listing. WuXi AppTec's Honk Kong IPO valued Wuxi's former subsidiary at $10.2 billion, approximately three times the value Defendants paid for the entire Company barely two years prior.

74.     In a report published on the industry website *Bio Space* on December 11, 2018, it was revealed "[t]hat [the] privatization [of WuXi in 2015] was part of a long-term strategy for the then-parent company to spin off three separate companies with specific, dedicated goals: WuXi Biologics, WuXi NextCODE and WuXiAppTec."

75.     Defendant Li's undisclosed strategy proved to be extremely rewarding, at the expense of the Company's public investors. As of the date of this filing, WuXi Biologics and WuXiAppTec alone had a combined market capitalization of approximately $24.7 billion, nearly *7 times* greater than the Merger valuation

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who sold WuXi securities during the Class Period (the "Class") or purchased securities during the Class Period and held such shares through December 10, 2015; and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

77.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, WuXi securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by WuXi or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

78.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

79.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

80.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of WuXi;

- whether the Individual Defendants caused WuXi to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of WuXi securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

81.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

82.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- WuXi securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class who sold WuXi securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

83.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

84.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

85.     Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

86.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of WuXi securities; and (iii) cause Plaintiff and other members of the Class to sell WuXi securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

88.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for WuXi securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about WuXi's finances and business prospects.

89.     By virtue of their positions at WuXi, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

90.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of WuXi, the Individual Defendants had knowledge of the details of WuXi's internal affairs.

91.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of WuXi.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to WuXi's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of WuXi securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning WuXi's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class sold or otherwise acquired WuXi

securities at artificial depressed prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

92.     During the Class Period, WuXi securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of WuXi securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have sold said securities, or would not have sold them at the prices that were paid.  At the time of the sales by Plaintiff and the Class, the true value of WuXi securities was substantially higher than the prices sold by Plaintiff and the other members of the Class.   The market price of WuXi securities increased sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

93.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

94.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## **COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

95.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     During the Class Period, the Individual Defendants participated in the operation and management of WuXi, and conducted and participated, directly and indirectly, in the conduct of WuXi's business affairs.  Because of their senior positions, they knew the adverse non-public information about WuXi's misstatement of income and expenses and false financial statements.

97.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to WuXi's financial condition and results of operations, and to correct promptly any public statements issued by WuXi which had become materially false or misleading.

98.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which WuXi disseminated in the marketplace during the Class Period concerning WuXi's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause WuXi to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of WuXi within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of WuXi securities.

99.     Each of the Individual Defendants, therefore, acted as a controlling person of WuXi.  By reason of their senior management positions and/or being directors of WuXi, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, WuXi to engage in the unlawful acts and conduct complained of herein.  Each of the Individual

Defendants exercised control over the general operations of WuXi and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

100.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by WuXi.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 21, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan D.  Lindenfeld

28

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com
Email: jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*