UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALTIMEO ASSET MANAGEMENT, Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>            v.<br><br>WUXI PHARMATECH (CAYMAN) INC., GE LI, EDWARD HU, NING ZHAO, XIAOZHONG LIU, ZHAOHUI ZHANG, G&C PARTNERSHIP L.P., ABG II-WX LIMITED, BOYU CAPITAL FUND II, L.P., HILLHOUSE CAPITAL FUND II, L.P., PING AN LIFE INSURANCE COMPANY OF CHINA. LTD., TEMASEK LIFE SCIENCES PRIVATE LIMITED, G&C IV LIMITED, YINFU CAPITAL MANAGEMENT CO., YUNFENG II WX LIMITED, SEQUOIA CAPITAL CHINA GROWTH FUND III, L.P., CONSTANT CYPRESS LIMITED, and SPDB INTERNATIONAL HOLDINGS LIMITED,<br><br>                              Defendants. | Case No.  1:19-cv-01654-AJN<br><br>CLASS ACTION<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................. 1

II.     JURISDICTION AND VENUE ............................................................................ 6

III.    PARTIES .............................................................................................................. 7

       A.     Lead Plaintiff ........................................................................................... 7

       B.     Defendants ................................................................................................ 7

            1.     The Individual Defendants ........................................................... 7

            2.     The Sponsor Defendants .............................................................. 9

IV.     SUBSTANTIVE ALLEGATIONS .................................................................... 10

       A.     Overview of WuXi's Business ................................................................ 10

       B.     History of the Merger ............................................................................. 14

       C.     Credit Suisse's Analysis of the Merger ................................................. 23

       D.     The Misleading Proxy Materials ............................................................ 26

            1.     False Assurances That no Relisting was Contemplated ........................ 27

            2.     False Reasons for and Descriptions of the Merger ................................. 28

       E.     Dissenting From the Merger Was Difficult and Discouraged ............................ 31

       F.     The Shareholder Vote and Completion of the Merger ............................................ 33

       G.     Defendants Planned All Along to Spin-off and Relist WuXi's Subsidiaries ........ 34

       H.     Defendants Undervalued WuXi in the Merger .................................................... 44

            1.     WuXi Had More Value as Separate Entities ............................................. 45

            2.     WuXi Would Trade at a Higher Valuation in the Hong Kong and Chinese Markets ................................................................. 48

            3.     The Buyer Group Admitted that it Undervalued WuXi in the Merger ..... 53

|  | 4. | WuXi's Performance Immediately Following the Merger Confirms Defendants' Scheme | 55 |

| V. | | DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD | 59 |
| | A. | The Announcement of the Merger | 62 |
| | B. | WuXi's Second Quarter 2015 Earnings Call | 63 |
| | C. | The Preliminary Proxy Materials | 64 |
| | | 1. Statements Concerning Intention Not to Relist | 64 |
| | | 2. Statements Concerning Lack of Alternatives to the Merger | 66 |
| | | 3. False Representations that the Merger Was "Fair" | 67 |
| | | 4. Promotion of the Merger Price | 74 |
| | | 5. Statements Concerning Defendants' Reasons for the Merger | 75 |
| | | 6. Defendants Specifically Guaranteed the Accuracy of Their Statements and That They Complied With Law | 76 |
| | D. | The Amended Proxy Materials | 78 |
| | E. | The Second Amended Proxy Materials | 79 |
| | F. | The Third Amended Proxy Materials | 79 |
| | G. | The November 3, 2015 Investor Presentation | 80 |
| | H. | The Fourth Amended Proxy Materials | 81 |
| VI. | | CONTROL PERSON ALLEGATIONS | 82 |
| VII. | | ADDITIONAL SCIENTER ALLEGATIONS | 85 |
| | A. | Defendants Li, Zhao, Liu, and Zhang, and the Sponsor Defendants, Had the Motive and Opportunity to Commit Fraud | 86 |
| | B. | Defendants' Statements Show that the Buyer Group Intended All Along to Relist WuXi's Subsidiaries | 88 |
| | C. | The Restructuring of WuXi Biologics Prior to the Merger Shows that Defendants Planned to Relist that Subsidiary All Along | 91 |

D.      The History of the Merger Shows Defendants' Scienter ..................................... 91

VIII.   LOSS CAUSATION ........................................................................................... 92

IX.     ALLEGATIONS OF INSIDER TRADING ..................................................... 94

X.      NO SAFE HARBOR ......................................................................................... 97

XI.     CLASS ACTION ALLEGATIONS ................................................................. 98

XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-
        MARKET AND AFFILIATED UTE PRESUMPTIONS ............................... 101

COUNT I ...................................................................................................................... 103

COUNT II ..................................................................................................................... 105

COUNT III .................................................................................................................... 106

XIII.   PRAYER FOR RELIEF .................................................................................. 108

XIV.    DEMAND FOR JURY TRIAL ....................................................................... 108

Lead Plaintiff Altimeo Asset Management ("Altimeo") ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by and through Lead Plaintiff's undersigned counsel, allege the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, (a) a review of the Defendants' public documents, conference calls and announcements made by Defendants; (b)  United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WuXi PharmaTech (Cayman) Inc. ("WuXi" or the "Company"); (c) analysts' reports and advisories about the Company; (d) consultation with an expert in Chinese, Hong Kong, and United States M&A and capital markets transactions; and (f) information readily obtainable on the Internet.  Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This action arises out of Defendants' scheme to depress the price of WuXi ADS and stock (together, "WuXi Securities") in order to avoid paying a fair price to WuXi Securityholders during a transaction to take the Company private in 2015 (the "Merger"). Defendants executed this scheme by publishing false and misleading statements about the Merger.

2.      Defendants falsely told the market that they had no plans at the time of the Merger to relist WuXi or any of its subsidiaries on any other stock exchange after the Merger.  In fact, Defendants had a plan all along to reap substantial profits by spinning off and relisting WuXi's subsidiaries on the Chinese and Hong Kong stock exchanges.

3.      Defendants made many statements after the Merger closed that revealed this plan. For example, on December 11, 2015—the day after the Merger closed—the Chinese publication *Yicai* published an article that divulged that in August 2015, a WuXi senior manager "revealed in private that after privatization PharmaTech intended to return to the Chinese A-share market." The article also stated that an insider close to WuXi's high-level management informed the *Yicai* journalist on the day the article was published that now that WuXi had completed privatization, "it was extremely likely that the next step would be to spin off its subsidiary sectors into three major companies and separately relist them in China."

4.       By February 2016—less than three months after the Merger closed—Defendants had already lined up investment banks to assist with relisting WuXi Biologics (one of WuXi's main subsidiaries).  When WuXi Biologics then relisted in Hong Kong in June 2017, its CEO stated that WuXi's privatization in 2015 "was part of a long-term strategy for the then parent company to spin off three separate entities with dedicated focuses, which later became WuXi Biologics, WuXi NextCODE and WuXi Apptech."

5.      Many other statements that Defendants made and actions that they took in connection with the relisting of WuXi's subsidiaries that are described further below also make clear that the group of Defendants that bought WuXi in the Merger planned all along to relist the Company in Hong Kong and China at a great profit, to the detriment of WuXi Securityholders that sold their securities at deflated prices in the Merger.

6.      Defendants also made misrepresentations that misled WuXi Securityholders as to the reasons for the Merger.  In addition to affirming that they had no plans to relist the Company following the Merger, Defendants claimed that they sought to take WuXi private because it

could better invest in its business as a private company.  Defendants blatantly contradicted this story when they turned around and relisted WuXi's subsidiaries following the Merger.

7.    On April 30, 2015, WuXi announced that it received a preliminary offer from a consortium led by Defendant Ge Li—WuXi's Founder and CEO—to acquire the Company at a price of $46 per ADS or $5.75 per ordinary share.  This offer stated that the consortium members, including Defendant Li, agreed to work together exclusively on pursing the proposed transaction.

8.    On August 14, 2015—the first day of the Class Period—WuXi announced that the Company's Board of Directors, acting upon the recommendation of the Special Committee that was formed to evaluate the Merger, unanimously approved of the proposed transaction and entered into a definitive merger agreement.  The Merger was expected to close in the fourth quarter of 2015, subject to shareholder approval.

9.    Between September 1, 2015 and November 20, 2015, in order to convince WuXi Securityholders to vote in favor of the Merger, Defendants authorized the filing of materially false and misleading Proxy Materials with the SEC, in violation of Sections 10(b) and 20(a) of the Exchange Act

10.    Defendants did not disclose in any of these documents that the group that was purchasing WuXi in the Merger planned to spin-off and relist its subsidiaries in China and Hong Kong at much higher values than what they agreed to pay WuXi Securityholders to take the Company private in the Merger.

11.    On November 25, 2015, WuXi announced that the Merger passed at the shareholder vote that was held that day and that the Merger was expected to close the following month.  The Merger proceeded to close on December 10, 2015, at which point WuXi became a

privately held company and its ADS were no longer publicly traded on the New York Stock Exchange.

12.     Defendants had a strong financial motive to mislead WuXi Securityholders as to Defendants' true intentions for the Company following the Merger.  In addition to failing to disclose their plan to relist WuXi's subsidiaries in Hong Kong and China, Defendants misrepresented the Company's true value.  First, it is well-known that companies are often worth more when their subsidiaries are carved out from the main company.  This was particularly true for WuXi because the Company's overall financial metrics that Defendants disclosed in the Proxy Materials obscured the performance and expectations of the Company's subsidiaries.  Yet Defendants failed entirely to disclose subsidiary-specific information in connection with the Merger.

13.     Second, companies such as WuXi that outsource research and development services (also known as contract research organizations) are valued far more in China and other markets in that geographic region than in the United States.

14.     Third, Defendants failed to disclose in the Proxy Materials their true valuation for WuXi and its subsidiaries.  Statements that Defendants made after the Merger closed reveal how their private, undisclosed assessment of the Company differed substantially from how the Proxy Materials described the value of the Company.  Ally Bridge Group, one of the leading private equity firms that bought WuXi in the Merger, explained after the Merger that the Buyer Group valued WuXi Biologics based on financial analysis and projections that were not disclosed to WuXi Securityholders in the Proxy Materials.  Defendants took advantage of WuXi Securityholders by buying the Company at a time when investors did not have sufficient information about the Company's true growth potential.  Defendants' misrepresentation of

WuXi's true value was then confirmed by the performance of WuXi Biologics and WuXi AppTec immediately following the Merger.  Those subsidiaries brought in substantially more revenue and earned astonishingly more profit than Defendants projected in the Merger.

15.    Had investors known that WuXi's main subsidiaries would be spun off and relisted in Hong Kong and China, and how Defendants truly valued WuXi in the Merger, they would not have voted to sell their shares in the Merger for the price that Defendants offered.

16.    The Defendants that purchased WuXi in the Merger have reaped enormous profits from their fraudulent scheme.  Collectively, they turned an ownership stake of less than 3% percent of the Company into full ownership of 100% of the Company following the Merger. They paid $3.3 billion for the Company and funded at least one-third of their purchase with debt. Immediately upon the relisting of WuXi Biologics in June 2017, that subsidiary was valued at over $3 billion—nearly the amount that the *entire Company* was valued at in the Merger.  When WuXi AppTec—the Company's other main subsidiary—went public in China in May 2018, it was valued at $3.5 billion, even higher than the entire Company was valued in the Merger.  Both WuXi Biologics and WuXi AppTec continued to surge in value after their initial offerings in Hong Kong and China.  WuXi also continued to own other businesses that remained private, including WuXi NextCODE.

17.    In June 2018, *Caixin*, the prominent Chinese newspaper, reported that the total market value of WuXi Biologics, WuXi AppTec, and WuXi NextCODE was $30.77 billion— *over nine times* the amount that Defendants paid for WuXi in the merger.  But only portions of WuXi Biologics and WuXi AppTec were relisted in Hong Kong and China.  The majority of those companies continued to be owned by Defendants through the WuXi parent entity that

survived the Merger.  Through their fraudulent scheme, Defendants have gained tens of billions of dollars in value beyond what they underpaid WuXi Securityholders for WuXi in the Merger.

## II.    JURISDICTION AND VENUE

18.    The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and Section 20A of the Exchange Act, 15 U.S.C. § 78t–1.

19.    This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. The Defendants engaged in a scheme that violated United States securities law. In doing so, Defendants engaged in conduct that was directed toward the United States. WuXi registered its ADS with the SEC pursuant to Section 12(b) of the Exchange Act and these securities traded on the New York Stock Exchange ("NYSE").

20.    Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  During the Class Period, WuXi securities were traded on New York Stock Exchange ("NYSE"), located within this Judicial District.

21.    JPMorgan Chase Bank, N.A. served as the ADS Depositary for WuXi's ADS. JPMorgan Chase Bank, N.A. is headquartered in New York, New York.  In addition, WuXi ADS holders were instructed to send their Voting Instruction Card for the Merger to JPMorgan Chase Bank, N.A., as WuXi's Depositary, to a post office box in St. Paul, Minnesota.

22.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE stock exchange.

## III.   PARTIES

### A.   Lead Plaintiff

23.     Altimeo is an institutional asset manager that manages investment assets through separate funds and is authorized to bring legal action on their behalves.  Prior to seeking appointment as Lead Plaintiff, Altimeo obtained valid assignments of the claims of the fund Altimeo Optimum.

24.     Altimeo, through Altimeo Optimum, purchased 192,148 WuXi securities (including ADS on the NASDAQ) during the Class Period.  After accounting for WuXi securities that Altimeo held prior to the start of the Class Period, it retained 292,013 WuXi securities (including ADS) through the Merger.  These 292,013 securities have now been paid in exchange for the Merger consideration.

### B.   Defendants

25.     Defendant WuXi is incorporated under the jurisdiction of the Cayman Islands with its principal executive offices located at 288 Fute Zhong Road, China (Shanghai) Pilot Free Trade Zone, Shanghai, 200131, China.  WuXi's common stock was not registered with the SEC. Rather, WuXi registered ADS that were listed and traded on the NYSE under the ticker symbol "WX."  The only public market for WuXi Securities was for the Company's NYSE-listed ADS. The Company's underlying stock was not listed on any stock exchange and the NYSE was the only stock exchange that listed the Company's ADS.  Each ADS was redeemable for eight shares of WuXi's ordinary stock.

#### 1.   The Individual Defendants

26.     Defendant Ge Li ("Li") served as WuXi's Chief Executive Officer since he founded the Company in 2000 along with several of the other Defendants, and as Chairman since

early 2004.  He ran the Company as a whole and was responsible for operations, strategic planning and business development.  Li is a U.S. citizen.

27.     Defendant Edward Hu ("Hu") served as WuXi's Chief Financial Officer and Chief Investment Officer since April 2014. Hu joined WuXi in August 2007 and served as its Executive Vice President of Operations before becoming Chief Operating Officer. He served as the Company's acting Chief Financial Officer from February 2009 to April 2010 and was reappointed as Chief Financial Officer in August 2010.  He also served as the Company's Chief Operating Officer from February 2008 to April 2014.   Hu is a U.S. citizen.

28.     Defendant Ning Zhao ("Zhao") served as a WuXi Director since February 2009. Zhao co-founded WuXi with Defendants Li, Liu, and Zhang.  At the time of the Merger, Zhao served as WuXi's Senior Vice President of Operations and Head of Corporate Human Resources. Zhao was Vice President of the Company's analytical services department from 2004 to 2008 and also established its bioanalytical services, core analytical services and analytical development services departments.  Zhao and Li are married to each other.  Zhao is a U.S. citizen.

29.     Defendant Xiaozhong Liu ("Liu") served as WuXi's Executive Vice President since 2001 and as a Director since 2005. Liu is one of the Company's co-founders. He was responsible for the Company's project and engineering departments and China healthcare initiative.

30.     Defendant Zhaohui Zhang ("Zhang") served as WuXi's Vice President of Domestic Marketing since 2002 and a Director since 2005.  Zhang is also one of the Company's co-founders.

31.     Defendants Li, Hu, Zhao, Liu, and Zhang are sometimes referred to herein as the "Individual Defendants."

### 2.     The Sponsor Defendants

32.     Defendant G&C Partnership L.P. ("G&C LP") is an exempted limited partnership formed under the laws of the Cayman Islands.

33.     Defendant ABG II-WX Limited ("ABG") is an affiliate of Ally Bridge Group Capital Partners ("Ally Bridge Group") and is a company limited by shares incorporated under the laws of the British Virgin Islands.

34.     Defendant Boyu Capital Fund II, L.P. ("Boyu") is an exempted limited partnership formed under the laws of the Cayman Islands.

35.     Defendant Hillhouse Capital Fund II, L.P. ("Hillhouse") is an exempted limited partnership formed under the laws of the Cayman Islands.

36.     Defendant Ping An Insurance Company of China Ltd. ("Ping An") is a joint stock limited company incorporated under the laws of the People's Republic of China.

37.     Defendant Temasek Life Sciences Private Limited ("Temasek") is a company incorporated under the laws of Singapore.

38.     Defendant G&C IV Limited ("G&C IV") is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

39.     Defendant Yinfu Capital Management Co., Ltd. ("Yinfu" or "Co-Founder Equity LP") is a limited liability company incorporated under the laws of the People's Republic of China.

40.     Defendant Yunfeng II WX Limited ("Yunfeng") is a company incorporated under the laws of the British Virgin Islands

41.     Defendant Sequoia Capital China Growth Fund III, L.P. ("Sequoia") is an exempted limited partnership formed under the laws of the Cayman Islands.

42.     Defendant Constant Cypress Limited (also called Legend Capital) is a company incorporated under the laws of the British Virgin Islands.

43.     Defendant SPDB International Holdings Limited ("SPDBI") is a company incorporated under the laws of Hong Kong.

44.     Defendants G&C LP, ABG, Boyu, Hillhouse, Ping An, Temasek, G&C IV, Co-Founder Equity LP, Yunfeng, Sequoia, Constant Cypress Limited, and SPDBI, which are referenced in ¶¶ 32-43 above, are collectively referred to as the "Sponsor Defendants" or the "Sponsors."

45.     Collectively, the Defendants referenced in ¶¶ 25-44 above are referred to herein as the "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Overview of WuXi's Business

46.     Defendant Li founded WuXi in 2000 and has served as its CEO since that time. He originally incorporated the Company in China as a business that provides chemistry services to synthesize small molecules at the beginning of the drug discovery process.  The Company began offering its pharmaceutical and biotechnology research and development ("R&D") outsourcing services in 2001. Companies that offer this type of R&D outsourcing are known as "contract research organizations" (or "CROs").

47.     Li is married to Defendant Zhao, with whom he co-founded the Company.  In addition, Defendants Liu and Zhang co-founded WuXi with Li and Zhao.

48.     On March 16, 2007, WuXi reincorporated in the Cayman Islands in advance of the August 2007 initial public offering ("IPO") of its ADS on the NYSE.

49.     Upon WuXi's reincorporation in the Cayman Islands, the Company became a holding company for its pharmaceutical, biotechnology, and medical device R&D-services companies operating primarily in the United States and China.   Several of WuXi's main subsidiaries were registered or incorporated in the United States, including WuXi AppTec, WXAT Holding, WuXi PharmaTech Investment Holdings (Cayman) Inc., NextCode Health USA, Xenobiotic Laboratories, LabNetwork, Chemdepo, and Abgent.

50.     In 2011, WuXi formed WuXi Venture Fund, a corporate venture fund used to facilitate RMB and U.S. dollar investments focusing on life sciences companies.   Through 2014, WuXi Venture Fund invested approximately $63 million in 18 life sciences companies.   In March 2015, WuXi's Board of Directors approved a new venture fund with an anchor investment commitment of up to $50 million and expected total commitments of approximately $200 million.

51.     WuXi describes itself as a contract research organization that offers "a wide range of R&D services to life-science customers as external vendors, thereby modifying the traditional model of life-science companies performing such services themselves."   According to the Company, its labor costs are "significantly below the cost of similar labor in developed countries" because "China offers highly educated, highly trained and productive scientists at reasonable cost."   WuXi thus "establish[ed] operations in China that provide high-quality discovery, preclinical and clinical services to life-science companies efficiently and cost-effectively."

52.     At the time of the Merger, the Company divided its operations into two main segments: Laboratory Services and Manufacturing Services.   Between these segments, WuXi provided a "broad and integrated portfolio of laboratory and manufacturing services throughout

11

the drug and medical device R&D process to our customers, which include many of the world's premier pharmaceutical, biotechnology and medical device companies."  Its 2,400 customers through 2014 included most of the world's largest pharmaceutical companies.

53.     Key parts of WuXi's operations are conducted in the United States, including testing services for biologic products and medical devices.  The Company's United States offerings include the testing of biologics and medical devices, cell-therapy manufacturing, DMPK/ADME services, bioanalytical services, genomics and bioinformatics.

54.     As noted above, WuXi originally focused on the "research and development of small-molecule pharmaceuticals, chemical synthesis and other discovery chemistry services that involve substantial labor inputs."  Over the years, WuXi grew to become an integrated R&D services platform along the entire value chain of drug discovery and development with one of the broadest integrated service and technology platforms in the life-science industry.  At the time of the Merger, WuXi viewed itself as well-positioned to capitalize on the global trend toward greater R&D outsourcing by emphasizing its  experience, capabilities, quality, responsiveness, protection of customer intellectual property, and reliability.

55.     WuXi developed to also provide discovery and development services in other areas, including large-molecule biologic products, "biology, medicinal chemistry, DMPK/ADME, formulation, analytical development services, process research, research manufacturing, toxicology, bioanalytical services, clinical research, genomics and bioinformatics."  At the time of the Merger, WuXi described itself as "among the largest employers of chemists in the worldwide pharmaceutical industry."

56.     In 2014, WuXi's China-based operations provided services to approximately 1,100 pharmaceutical and biotechnology customers, and the Company's U.S.-based operations

served approximately 1,300 medical device, biotechnology and pharmaceutical companies. WuXi generated most of its net revenues from sales to customers headquartered in the United States. The only customer to account for over 10% of WuXi's net revenues in 2013 or 2014 was Merck, which accounted for 11.4% of net revenues in 2013.

57.     WuXi has developed capabilities beyond the outsourcing functions of a traditional CRO. In addition to providing these outsourcing services to other life sciences companies, WuXi develops products and services (such as gene sequencing, bioinformatics, and diagnostic products) directly for healthcare providers and their patients. In its 2014 Annual Report, which WuXi incorporated into the Proxy Materials (as defined below), WuXi stated that "[t]o date we have developed capabilities in three main areas outside of traditional CRO services: genomics / bioinformatics, mobile technologies and China healthcare initiatives."

58.     In 2014, the last full year before the Merger, WuXi had total net revenues of approximately $674 million. WuXi disclosed in the Proxy Materials for the Merger, over the course of late 2015, that it projected its revenue in 2015 to be $802 million.

59.     WuXi conducts substantially all of its business through its operating subsidiaries and joint ventures in China and the United States. WuXi's main subsidiaries include WuXi AppTec, WuXi Biologics, and WuXi NextCODE.

60.     Through WuXi AppTec, WuXi provides comprehensive and regulatory-compliant (including FDA-compliant) R&D services to support preclinical and clinical development and manufacturing of small molecule drugs, cell and gene therapy, and other pharmaceutical and biotechnology products. WuXi AppTec also conducts medical device testing and provides other services that assist its pharmaceutical, biotechnology, and medical device clients in developing their products and bringing them to market.

61.     WuXi Biologics was originally established in 2010 as one of WuXi AppTec's business units.   WuXi Biologics offers comprehensive, integrated and highly customizable services to pharmaceutical and biotechnology companies that assist in the discovery, development, testing, and manufacturing of biologics products.   The FDA describes biologics products (as distinct from more traditional pharmaceutical drugs) as generally complex mixtures of substances, sometimes including living entities such as cells and tissues, that are used in a wide range of products such, as vaccines, blood and blood components, allergenics, somatic cells, gene therapy, tissues, and recombinant therapeutic proteins.   Examples of WuXi Biologics' services, as WuXi Biologics described after its relisting, include the "full spectrum of discovery services for the generation, characterization and selection of high potency novel antibody therapeutics" and the manufacturing of monoclonal and bispecific antibodies, fusion proteins, antibody drug conjugates and other recombinant proteins.

62.     WuXi NextCODE is a leading genomic analysis and bioinformatics company with operations in the United States and Iceland.   WuXi NextCODE added NextCODE Health, which WuXi acquired on January 9, 2015 for $65 million, into the Company's pre-existing genomics and bioinformatics capabilities.

   **B.     History of the Merger**

63.     Defendant Li initiated and led the Merger process.   Through the Merger, Li and the other founders of the Company would increase their combined ownership stake from under 3% to over 14% of the Company.   In addition, investment vehicles that they controlled would own over 28% of the Company following the Merger.

64.     According to the Proxy Materials, Defendant Li first considered making an offer to acquire WuXi in March 2015, through a going-private transaction, "following the market's

negative reaction to the Company's announcement of its financial results for the fourth quarter and full year of 2014 on March 5, 2015."

65.     Li then discussed the potential transaction with Ally Bridge Group, a private equity company that would provide necessary funding for the Merger.  Ally Bridge Group describes itself as "the firm that led the delisting" of WuXi in 2015.[1]

66.     On April 25, 2015, after discussions with Ally Bridge Group and Temasek (another investment company), Li discussed the potential transaction with Defendants Hu, Zhang, Liu, and Zhao.  On April 29, 2015, Li discussed with Ally Bridge Group the formation of a consortium of investors that would participate in the going-private transaction (the "Consortium").

67.     On April 27, 2015, Ally Bridge Group signed a confidentiality agreement with the Company allowing Ally Bridge Group to access WuXi's confidential, non-public information. Just two days later, on April 29, 2015, Defendant Li and Ally Bridge Group jointly delivered to the Board a preliminary non-binding letter that proposed a going-private transaction by a buyer group led by Li and Ally Bridge Group.  The buyer group proposed to acquire all of WuXi's outstanding shares not already owned by the buyer group for $46.00 in cash per ADS, or $5.75 in cash per ordinary share.

68.     On April 30, 2015, the Company issued a press release regarding its receipt of the offer made by the group of investors led by Defendant Li and Ally Bridge Group. Defendant Li also met that day with approximately 50 members of the Company's senior management to discuss the proposal.

---

[1] News Release, ABG News (May 24, 2017) (*available at* http://www.ally-bridge.com/wuxi-biologics-wuxi-apptechs-ipos-could-benefit-from-scarcity-value-ally-bridge-founder-frank-yu/).

69.     Defendant Li, ABG Capital Partners II GP, L.P. (an affiliate of Ally Bridge Group), and Boyu entered into a consortium agreement on May 11, 2015 regarding their agreement to act as a group in connection with the Merger.   They agreed to deal exclusively with each other for six months in pursuing the proposed transaction.

70.     At this time, WuXi's Board of Directors formed the three-member Special Committee "to exclusively evaluate and, if appropriate, negotiate the proposed transaction (or any other alternative transaction) on behalf of the Company" (the "Special Committee").  Mr. Walter T. Kwauk, one of the Company's independent directors, served as Chairman of the Special Committee.  Kwauk had served on WuXi's Board since August 2014.

71.     The Special Committee engaged  Credit Suisse Securities (USA) LLC ("Credit Suisse") to serve at its financial advisor in connection with the Merger.

72.     WuXi's Board delegated to the Special Committee the Board's exclusive power and authority to, among other things:

    (i)      establish and direct the process and procedures related to the review and evaluation of the proposed transaction and any alternative transaction, including the authority to determine not to proceed with, and/or to terminate, any such process,

    (ii)     respond to any communications, inquiries or proposals relating to such transactions,

    (iii)    review, evaluate, investigate, pursue and negotiate any such transactions,

    (iv)    solicit expressions of interest or other proposals for alternative transactions,

    (v)     determine on behalf of the Board and the Company whether the proposed transaction or any alternative transaction is advisable and in the best interests of the Company and its shareholders,

    (vi)    recommend that the Board reject or approve the proposed transaction or any alternative transaction,

    (vii)        recommend to the Board the consummation of the proposed transaction or any alternative transaction, and

   (viii)        review, analyze, evaluate and monitor all proceedings and activities of the Company related to the proposed transaction or any alternative transaction.

73.    Following their April 29, 2015 offer to buy the Company, the investment companies participating in the Merger joined the Consortium agreement and signed confidentiality agreements allowing them to access confidential, non-public information about WuXi in connection with their due diligence efforts.

74.    On May 25 and 26, 2015, representatives of the buyer group, the Special Committee, and their advisors attended a presentation by WuXi's management at the Company's offices in Shanghai, China.  At the meeting, Company management reviewed WuXi's "historical financial statements, its business model, and its new businesses, and answered questions from the Consortium and its advisors."

75.    As the transaction progressed, additional investors joined the Consortium to participate in the Merger.

76.    On July 2, 2015, Temasek, Hillhouse Fund II, L.P., and Ping An Insurance (Group) Company of China. Ltd. joined the Consortium and amended the consortium agreement accordingly.

77.    On August 14, 2015, the consortium agreement was further amended to include G&C LP in the Consortium.  This amendment also replaced ABG Capital Partners II GP, L.P., Hillhouse Fund II, L.P. and Ping An Insurance (Group) Company of China. Ltd. with their affiliates, Defendants ABG, Hillhouse, and Ping An, as members of the Consortium.

78.     On October 20, 2015, the consortium agreement was amended again, this time to admit G&C IV, Co-Founder Equity LP, Yunfeng, Sequoia, Legend Capital, and SPDBI as additional Consortium members.

79.     The final group of parties in the Consortium thus included the Sponsor Defendants (G&C LP, ABG, Boyu, Hillhouse, Ping An, Temasek, G&C IV, Co-Founder Equity LP, Yunfeng, Sequoia, Legend Capital, and SPDBI), and Defendant Li.

80.     The Sponsor Defendants consisted of (1) third-party investment companies that joined with Defendants Li, Liu, Zhang, and Zhao to take over the Company and (2) investment vehicles that Defendants Li, Liu, Zhang, and Zhao owned and controlled.

81.     The group of parties purchasing WuXi in the Merger included the Sponsor Defendants, Defendants Li, Liu, Zhang, and Zhao, and entities called Holdco, Parent, and Merger Sub.  Holdco, Parent, and Merger Sub were created for purposes of effectuating the Merger and were owned by the other parties to the transaction.  All of the individuals and entities referenced in this paragraph are, collectively, the "Buyer Group" that purchased WuXi in the Merger.

82.     G&C LP, which is an  exempted limited partnership formed under the laws of the Cayman Islands, was one of the Sponsors that was an investment vehicle owned and controlled by Defendants Li, Liu, Zhang, and Zhao.  G&C LP's general partner is Group & Cloud Limited ("G&C"), which is an exempted limited liability company incorporated under the laws of the Cayman Islands whose sole shareholder is Defendant Li.  Defendants Liu and Zhang are the limited partners of G&C LP.  G&C LP served as a vehicle into which Defendants Liu and Zhang would roll over their shares in the Company so that they would continue to own a portion of the Company following its privatization in the Merger.

83.    Other Sponsors that were owned and controlled by Defendants Li, Liu, Zhang, and Zhao, and that served as investment vehicles for their stakes in the Company following the Merger, include G&C IV and Co-Founder Equity LP.[2]

84.    As a result of the Merger, and through their ownership of the entities that were created to effectuate the Merger (*i.e.*, Holdco, Parent, and Merger Sub), G&C, G&C LP, ABG, Boyu, Hillhouse, Ping An, Temasek, G&C IV, Co-Founder Equity LP, Yunfeng, Sequoia, Legend Capital and SPDBI would beneficially own approximately 11.0%, 1.4%, 11.0%, 23.7%, 9.3%, 7.4%, 12.1%, 8.8%, 7.4%, 1.9%, 1.9%, 1.9% and 2.2%, respectively, of the equity interest in the Company following the Merger.  Defendants Li, Zhao, Liu, and Zhang would own interests of 8.3%, 2.8%, 1.1%, and 2.1%, respectively, through their interests in the G&C Entities and Co-Founder Equity LP.  The following chart shows Defendants' ownership interests in the Company following the Merger:[3]

| Name | $'000 | % |
| --- | --- | --- |
| Dr. Ge Li | 64,150.7 | 8.3 |
| Mr. Xiaozhong Liu | 8,501.9 | 1.1 |
| Mr. Zhaohui Zhang | 16,230.9 | 2.1 |
| Dr. Ning Zhao | 21,641.2 | 2.8 |
| Hillhouse | 71,879.7 | 9.3 |
| ABG | 85,019.0 | 11.0 |
| Boyu | 183,177.3 | 23.7 |
| Temasek | 93,520.9 | 12.1 |
| Ping An | 57,194.6 | 7.4 |
| G&C IV | 68,015.2 | 8.8 |
| Co-Founder Equity LP | 57,194.6 | 7.4 |
| Yunfeng | 14,685.1 | 1.9 |
| Sequoia | 14,685.1 | 1.9 |
| Legend Capital | 14,685.1 | 1.9 |
| SPDBI | 17,003.8 | 2.2 |
| G&C | 85,019.0 | 11.0 |
| G&C LP | 10,820.6 | 1.4 |

[2] G&C, G&C LP, and G&C IV Limited are collectively referred to as the "G&C Entities."

[3] These percentages add up to 100% after accounting for the interests that Defendants Li, Zhao, Liu, and Zhang held in the G&C Entities and Co-Founder Equity LP.

85.     Defendants Li, Zhao, Liu, and Zhang thus owned approximately 14.3% of the Company following the Merger and the G&C Entities and Co-Founder Equity LP owned approximately 28.6% of the Company following the Merger.

86.     After completion of the Merger, Defendant Li continued to serve as Chairman of the Board of Directors of the surviving Company.  WuXi's other executive officers continued to hold positions with the surviving Company that were substantially similar to their pre-Merger positions.

87.     As of the date of the Final Proxy Statement, Defendants Li, Zhao, Liu, Zhang, and Hillhouse owned an aggregate of 25,844,198 WuXi shares (including shares represented by ADS), which represented approximately 4.5% of the total issued and outstanding shares in the Company.  Because of tax-planning reasons, Defendants Li and Zhao did not rollover their pre-existing shares into the surviving Company following the Merger.  The Buyer Group therefore beneficially owned an aggregate of 16,477,340 WuXi shares (including shares represented by ADS), representing approximately 2.9% of WuXi's total issued and outstanding shares, that they rolled over into their ownership of the Company following the Merger.[4]

88.     Based on the Merger price, the Buyer Group would require approximately $3.3 billion to complete the Merger.  The Buyer Group agreed to provide those funds through a combination of equity and debt financing.

89.     Although G&C agreed to provide $300 million as part of the equity financing for the Merger, that entire amount was to be funded by separate debt financing.  As Ally Bridge

---

[4] Those 16,477,340 Shares were comprised of 1,177,079 ADS owned by Hillhouse, 651,892 Shares and 49,514 ADSs owned by Defendant Liu and 5,778,304 Shares owned by Defendant Zhang.

Group reported on June 15, 2017, Defendants "Li and his wife secured $300 million in financing to invest in the deal."[5]

90.    The Merger was solely a result of Defendant Li's plan to join with the Sponsors and Defendants Zhao, Liu, and Zhang to take the Company private for far-below the value that they could realize by spinning off and relisting its subsidiaries following the Merger.  The Special Committee determined that there were no viable alternatives to the Merger based on the Buyer Group's "express intention to work together exclusively in pursuit of any acquisition of the Company and its combined beneficial ownership of approximately 4.5% of the issued and outstanding Shares."

91.    The Sponsors were essential to this scheme based on the Buyer's Group's agreement to work exclusively with each other and "Dr. Li's express intent not to sell his Shares or ADSs to any third party other than the Consortium."  Prior to the Merger, Dr. Li owned only 1.4% of WuXi Securities and Defendants Li, Zhao, Liu, and Zhang together owned only 2.8% of the Company.   Their combined ownership stake could not have prevented alternative transactions based on its size, since these Defendants owned such a small portion of the Company prior to the Merger. Rather, the Special Committee's deference to the Buyer Group highlights the extent to which the Buyer Group—working together exclusively and under Li's leadership—controlled the Merger process for their own benefit and to the detriment of unaffiliated WuXi Securityholders.  Furthermore, Defendants Li, Zhao, Liu, and Zhang's small ownership stake in the Company prior to the Merger underscores the essential role that the Sponsors played in completing the transaction.

---

[5] *PE-backed WuXi Biologics completes Hong Kong re-listing*, Ally Bridge Group (June 15, 2017), available at http://www.ally-bridge.com/pe-backed-wuxi-biologics-completes-hong-kong-re-listing/.

92.     The only price negotiation in the Merger involved the Special Committee's meeting with Defendant Li on August 12, 2015—just two days before the Special Committee approved the Merger—"to request that the buyer group increase its proposed merger consideration."  Defendant Li "responded that the buyer group believed its initial proposal was designed to be a fair price to the Company's shareholders, and that the buyer group would not agree to any increase."  The Merger price thus remained the same as the initial price that Defendant Li and Ally Bridge Group proposed on April 29, 2015, after only "preliminary discussions" about the proposed Merger.  The Special Committee's halfhearted negotiation with the Buyer Group over the transaction price shows that either the Special Committee did not take its obligations to WuXi Securityholders seriously or that it simply did not know what the Company was truly worth because of all of the information that Defendants failed to provide to the Special Committee and Credit Suisse.

93.     On August 13, 2015, Credit Suisse gave its opinion to the Special Committee that the Merger consideration was "fair, from a financial point of view" to WuXi Securityholders that were unaffiliated with the Buyer Group.

94.     The Special Committee then unanimously (i) determined that the Merger was fair to and in the best interests of the Company and its shareholders and ADS holders that were unaffiliated with the Buyer Group; (ii) approved the Merger and declared it advisable; and (iii)  recommended that the Board authorize and approve the Merger.

95.     On August 14, 2015, the first day of the Class Period, the Company's Board of Directors, acting upon the unanimous recommendation of the Special Committee, unanimously (i) determined that it was fair to, advisable and in the best interests of the Company and its Securityholders unaffiliated with the Buyer Group to consummate the Merger; (ii) authorized

and approved the Merger; and (iii) resolved to recommend the authorization and approval of the Merger to the shareholders of the Company and directed that the Merger be submitted to a vote of the shareholders of the Company for authorization and approval.

96.     Defendants Li, Zhao, Liu, and Zhang, who stood to own a substantial portion of the Company following the Merger, were all members of WuXi's Board that reached this determination, with Defendant Li serving as Chairman of the Board.  These four Individual Defendants comprised half of the Board's eight Directors.  They were therefore able to exert undue influence over the Company's approval of the Merger.

97.     Later on August 14, 2015, Wuxi issued a press release announcing the execution of the Merger Agreement.

**C.     Credit Suisse's Analysis of the Merger**

98.     On August 13, 2015, Credit Suisse gave its oral and written opinion to the Special Committee that the Merger consideration (of $46.00 in cash per ADS, or $5.75 in cash per ordinary share) was fair from a financial point of view to WuXi Securityholders that were unaffiliated with the Buyer Group.

99.     In arriving at its opinion, Credit Suisse:

a.   reviewed the final Merger agreement;

b.   reviewed certain publicly available business and financial information relating to the Company;

c.   reviewed other information relating to the Company, including financial forecasts prepared and provided to Credit Suisse by management of the Company and management's assessment of the VC/JV Investments Value;

d.   discussed with the Company's management the business and prospects of the Company;

e.   considered certain financial and stock market data of the Company and compared that data with similar financial and stock market data for other companies with publicly traded equity securities in businesses Credit Suisse deemed similar to that of the Company

23

f.  considered, to the extent publicly available, the financial terms of certain other transactions; and

g.  considered such other information, financial studies, analyses and investigations and financial, economic and market criteria which Credit Suisse deemed relevant

100.  In reviewing these materials, Credit Suisse did not independently verify any of the information.  Instead, **Credit Suisse assumed and relied on such information being complete and accurate in all respects, including the financial information that Company management provided to it**.

101.  In addition, "Credit Suisse's opinion **did not address the relative merits of the merger as compared to alternative transactions or strategies that might have been available to the Company nor did it address the Company's underlying decision to proceed with the merger and not pursue other strategic, financial or other business alternatives**."  (Emphasis added.)

102.  Credit Suisse stated in its opinion letter to the Special Committee:

a.  In connection with our review, we have not independently verified any of the foregoing information and have assumed and relied on such information being complete and accurate in all respects. In addition, management of the Company has advised us, and we have assumed, that the Company Projections and the VC/JV Investments Value have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the Company's management as to the future financial performance of the Company and management of the Company's assessment of the fair value of the Company's venture capital and joint venture investments, respectively. . . .

b.  Our opinion only addresses the fairness, from a financial point of view, to the Unaffiliated Shareholders of the applicable Merger Consideration to be received by such Unaffiliated Shareholders in the Merger pursuant to the Merger Agreement and does not address any other aspect or implication of the Merger or any other agreement, arrangement or understanding entered into in connection with the Merger or otherwise . . . .

c.  [W]ith your consent, we have relied upon, without independent verification, the assessment of management of the Company with respect to: (i) the timing and risks associated with the development, marketability and commercial viability of the Company's intellectual property, products and services; (ii) the ownership, rights to license and validity of, and risks associated with, the Company's intellectual property;

and (iii) the risks associated with, the Company's existing and future products and services and business model.

d.    Our opinion does not address the relative merits of the Merger as compared to alternative transactions or strategies that may be available to the Company nor does it address the Company's underlying decision to proceed with the Merger and not pursue other strategic, financial or other business alternatives.

103.    In addition to advising the Special Committee, Credit Suisse has provided investment banking and other financial services to various members of the Buyer Group. Credit Suisse received approximately $28 million for other services that it provided to Temasek (which had a 12.1% stake in the Merger) during the two years prior to Credit Suisse's work on the Merger and $1 million for its work for Ping An (which had a 7.4% stake in the Merger).

104.    The Special Committee relied upon Credit Suisse's financial analysis in reaching the conclusion that the Merger was fair to WuXi Securityholders that were unaffiliated with the Company or the Buyer Group, and that the Board should authorize and approve the Merger. The Special Committee therefore recommended that the Company's Board approve the Merger.

105.    WuXi's Board of Directors—half of which was comprised of Defendants Li, Zhao, Liu, and Zhang—in turn, approved the Merger agreement and determined that the Merger was fair, advisable, and in the best interests of the Company and its unaffiliated Securityholders.

106.    The Special Committee and the Board also based their conclusions on their determinations, "after a thorough, independent review, that the merger is more favorable to the Unaffiliated Holders than the potential value that might result from other alternatives available to the Company." Their view that there was "no other alternative reasonably available to the Company" was based in part on "Dr. Li's express intent not to sell his Shares or ADSs to any third party other than the Consortium."

107.    The Buyer Group then determined that the Merger was fair to the unaffiliated shareholders based on the fact that "the Special Committee and, based in part upon the

unanimous recommendation of the Special Committee, the Board unanimously determined that the merger agreement and the transactions, including the merger, are fair to, advisable and in the best interests of the Unaffiliated Holders" and that the Special Committee retained independent financial advisors [*i.e.*, Credit Suisse] and legal counsel to assist it in negotiations with the buyer group and in its evaluation of the merger."

108.   Defendants, however, knew that Credit Suisse's analysis and opinion were plainly inadequate because they were based on the misinformation that the Company fed to Credit Suisse and because Credit Suisse did not consider alternatives to the Merger.

### D.   The Misleading Proxy Materials

109.   Between September 1, 2015 and November 20, 2015, in order to convince WuXi Securityholders to vote in favor of the Merger, Defendants authorized the filing of materially false and misleading Proxy Materials with the SEC, in violation of Sections 10(b) and 20(a) of the Exchange Act.

110.   On September 1, 2015, WuXi published the initial transaction statement for the Merger on Schedule 13E-3, which attached the Company's Preliminary Proxy Statement and other supporting documents for the Merger (collectively, the "Preliminary Proxy Materials").

111.   WuXi then published an amended version of the Proxy Materials on September 23, 2015 (the "Amended Proxy Materials," which included a revised proxy statement (the "Amended Proxy Statement")).   On October 9, 2015, Defendants published a second amended version of the Proxy Materials (the "Second Amended Proxy Materials") that included a further amended version of the proxy statement (the "Second Amended Proxy Statement").

112.   On October 20, 2015, WuXi published a third amended version of the Proxy Materials (the "Third Amended Proxy Materials") that included the final version of the proxy

statement that WuXi Securityholders relied on at the November 25, 2015 shareholder vote on the Merger (the "Final Proxy Statement").

113.    On November 20, 2015, WuXi published a fourth amended version of the Proxy Materials (the "Fourth Amended Proxy Materials") that amended certain financing details for the Merger and incorporated an Investor Presentation that WuXi had filed with the SEC on November 3, 2015.  The Fourth Amended Proxy Materials also incorporated the Final Proxy Statement that WuXi had filed with the SEC on October 20, 2015.

114.    As described further below, the Proxy Materials contained materially false and misleading statements and failed to provide all material information related to the Merger.  (*See infra* Section V for more information on Defendants' false and misleading statements.)

### 1.    False Assurances That no Relisting was Contemplated

115.    Defendants' most fundamental misleading action was hiding its plan to spin-off and relist WuXi's subsidiaries in Hong Kong and China following the Merger.  To further this goal, the Proxy Materials expressly disclaimed the notion that any such transactions were already being contemplated.

116.    For example, the Proxy Materials assured WuXi Securityholders that, among other things, "[i]f the merger is completed, the Company will continue its operations as a privately held company"; and "the buyer group does not have any current plans, proposals or negotiations that relate to or would result in . . . an extraordinary corporate transaction . . . involving the Company or any of its subsidiaries . . . [or] any other material changes in the Company."

117.    The Proxy Materials also affirmed "that there was no viable alternative" to the Merger while omitting the alternative of relisting the Company's subsidiaries that Defendants were already planning to conduct following the Merger.

118.    These assurances that Defendants made in the Proxy Materials that no relisting was contemplated and that there were no alternatives to the Merger are described in further detail below.  (*See infra* Section V.)

## 2.    False Reasons for and Descriptions of the Merger

119.    Defendants conducted the Merger so that they could reap the rewards of relisting WuXi's subsidiaries in Hong Kong and China following the Company's privatization.  But not only did the Proxy Materials fail to disclose this motivation—they also provided other, false reasons for the Merger that contradicted Defendants' true motivations and encouraged WuXi Securityholders to vote in favor of the Merger under false pretenses.

120.    The Proxy Materials stated that Defendant Li "first considered making a proposal to acquire the Company on or about March 5, 2015, following the market's negative reaction to the Company's announcement of its financial results for the fourth quarter and full year of 2014 on March 5, 2015."  The Proxy Materials went on to describe the "primary benefits of the merger to the buyer group" as including that:

- The Company will no longer have continued pressure to meet quarterly forecasts set by analysts. In contrast, as a publicly traded company, the Company currently faces pressure from public shareholders and investment analysts to make decisions that may produce better short-term results, but which may not maximize equity value in the long term.

- The Company will have more freedom to focus on long-term strategic planning in a highly competitive business with increasing competition and regulation.

- The Company will have more flexibility to change its capital spending strategies without public market scrutiny or analysts' quarterly expectations.

- The Company will be able to introduce new products and services or change its pricing strategies to attract customers without public market scrutiny or the pressure to meet short-term forecasts

121.    In addition, the Proxy Materials exaggerated the Company's risks by telling investors that one of the main reasons that the Special Committee and the Board determined that

the Merger was beneficial to WuXi Securityholders was "the continued risk of holding ordinary shares, taking into account:  the uncertainty and risks associated with growing new businesses of the Company . . . [and] the uncertainty of achieving management's projections generally."  As explained below, however, Defendants failed to disclose their true projections that formed the basis for their actual valuation of the Company.

122.    Similarly, the Proxy Materials explained:

There is greater domestic competition in many of the segments in which the Company operates. These changes have increased the uncertainty and volatility inherent in the business models of companies similar to the Company. As a result, the buyer group is of the view that there is potential for considerably greater short- and medium-term volatility in the Company's earnings. Responding to current market challenges will require tolerance for volatility in the performance of the Company's business and a willingness to make business decisions focused on improving the Company's long-term profitability. The buyer group believes that these strategies would be most effectively implemented in the context of a private company structure. As a privately held entity, the Company's management will have greater flexibility to focus on improving long-term profitability without the pressures exerted by the public market's valuation of the Company and its emphasis on short-term period-to-period performance.

123.    Defendant Li gave this same explanation on WuXi's August 14, 2015 conference call discussing the Company's second quarter 2015 earnings.  He stated that "[w]e are choosing this time of strength both WuXi's operational and financial strengths and the rapid growth in China healthcare industry to invest aggressively in both established and the new business to drive long-term growth. As we previously announced, in light of the volatility and the risk associated with this investment and the impact on earnings, not only as best suited of a public company, a consortium of private investors, led by me made a non-binding preliminary offer on April 29, 2015 to WuXi's board of directors, who will acquire all of the outstanding shares of WuXi $46 per ADS in a going-private transaction."

124.    Along these lines, the Company explained in a November 3, 2015 Investor Presentation that it filed with the SEC in support of the Merger that "Business Transformation

Has Caused Share Price Volatility" and that one of the main risks that WuXi faced was the "[u]ncertainty associated with the Company's expansion into new lines of business," such as "biologics and genomics, which are projected to have revenue CAGRs of 34% and 54%, respectively, and represent over 35% of revenue by 2020." In the concluding slide of this presentation, WuXi noted that "[m]anagement forecast contains risk; calls for substantial near-term investment in capital expenditures."

125.    Defendants thus portrayed the Buyer Group's primary reason for the Merger as their being able to increase the Company's value as a private entity as the Company expended resources on expanding into new business lines, which the investing public would not reward.  A fundamental tenet of this narrative was, as the Proxy Materials stated, that "the Company will continue its operations as a privately held company" following the Merger and that "[t]he buyer group anticipates that the Company will continue to conduct its operations substantially as they are currently being conducted."

126.    That was not actually the Buyer Group's motivation.  Rather, the Buyer Group planned all along to extract value from the Company by spinning off its subsidiaries on the Hong Kong and Chinese public markets.  This plan was not only omitted entirely from the Proxy Materials, but was directly at odds with Defendants' stated plan to maintain WuXi as a private entity so that they could increase the Company's value without the pressures associated with being a public company.

127.    Defendants also misleadingly touted the Merger price as "fair" to WuXi Securityholders.  Credit Suisse's analysis and WuXi's November 3, 2015 Investor Presentation both described the premium that the Merger price represented as compared to the

pre-announcement price of WuXi Securities and as compared to other companies and transactions.

128. For example, the Investor Presentation noted that the "[t]ransaction price represented 18.9x LTM EBITDA multiple, substantially in excess of nearly all precedent transaction multiples." Credit Suisse based its analysis on a comparison of WuXi to publicly traded companies that it considered to be similar to WuXi, a comparison of the Merger to other transactions where the target companies were deemed similar to WuXi, WuXi's historical trading prices, the financial projections that WuXi's management provided to Credit Suisse, and the views of equity research analysts based on publicly available information. None of these considerations related to the Merger price that Credit Suisse or the Investor Presentation discussed accounted for the Buyer Group's undisclosed intent to spin-off and relist WuXi's subsidiaries in Hong Kong and China shortly after the Merger was complete, or the Buyer Group's true valuation of the Company.

**E.  Dissenting From the Merger Was Difficult and Discouraged**

129. Shareholders had a right to dissent from the Merger and to exercise their appraisal rights "to receive payment of the fair value of their Shares if the merger is completed, but only if they deliver to the Company, before the vote to approve the merger is taken, a written objection to the merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of dissenters' rights." But Defendants warned in the Proxy Materials that dissenting was a very risky proposition because "[t]he fair value of their Shares as determined under that statute could be more than, the same as, or less than the merger consideration they would receive pursuant to the merger agreement if they do not exercise dissenters' rights with respect to their Shares. These procedures are complex and you should consult your Cayman Islands legal counsel. If you do not fully and precisely satisfy

the procedural requirements of the Cayman Islands Companies Law, you will lose your Dissenters' Rights." Defendants further warned that "**[t]he provisions of Section 238 of the Cayman Islands Companies Law are technical and complex. If you fail to comply strictly with the procedures set forth in Section 238, you will lose your dissenters' rights. You should consult your Cayman Islands legal counsel if you wish to exercise dissenters' rights.**" (Emphasis in original.)[6]

130.    And dissenting was even more difficult because, as Defendants warned in the Proxy Materials, "**ADS HOLDERS WILL NOT HAVE THE RIGHT TO EXERCISE DISSENTERS' RIGHTS AND RECEIVE PAYMENT OF THE FAIR VALUE OF THE SHARES UNDERLYING THEIR ADSs. THE ADS DEPOSITARY WILL NOT ATTEMPT TO EXERCISE ANY DISSENTERS' RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO.**" (Emphasis in original.)  In addition, "[t]he ADS depositary will not exercise dissenters' rights on behalf of a holder of ADSs and any Notice of Dissent delivered to the ADS depositary will not be effective under the Cayman Islands Companies Law."  According to the Proxy Materials, in order to validly dissent, ADS holders were required to go through extra complicated procedural steps and bear the extra costs of doing so.

131.    These steps included surrendering ADS to the ADS Depositary; paying the ADS Depositary's fees required for cancelling ADS; providing instructions for the registration of the underlying shares in the Company's register of members; certifying that they would not give voting instructions for their ADS before the close of business in New York City on October 29,

---

[6] These steps are recounted here to explain what investors were told, but are not necessarily indicative of Lead Plaintiff's position as to the actual steps necessary to exercise appraisal rights under the applicable law.

2015; and becoming registered holders of shares by the close of business in the Cayman Islands on November 2, 2015.

132.    Investors were also told that after taking all of these difficult and costly steps, they would then be required to comply with the procedures and requirements for exercising dissenters' rights under Section 238 of the Cayman Islands Companies Law.

133.    The false and misleading Proxy Materials that Defendants issued in connection with the Merger convinced WuXi Securityholders that there was no reason for them to take the risk and burden of dissenting from the Merger.

       **F.**     **The Shareholder Vote and Completion of the Merger**

134.    On November 25, 2015, WuXi announced that at an extraordinary general meeting of shareholders held that day, the Company's shareholders voted in favor of the proposal to authorize and approve the previously announced Merger Agreement.

135.    The Company stated that 426,965,520 ordinary shares (including ordinary shares represented by ADS) were voted at the meeting, representing approximately 75.17% of the Company's total outstanding ordinary shares entitled to vote. Of those ordinary shares, approximately 97.49% were voted in favor of the Merger. The Merger proposal was also approved by 97.33% of ordinary shares present and voting that were held by holders that were unaffiliated with the Buyer Group, thereby satisfying the "majority of the minority" voting requirement set out in the Merger Agreement requiring that a majority of the shareholders that were unaffiliated with the Buyer Group vote in favor of the Merger.[7]

---

[7] Because the Buyer Group owned such a small portion of WuXi Securities prior to the Merger, a majority of unaffiliated WuXi Securityholders were required to vote in favor of the Merger anyway, regardless of the "majority of the minority" provision, for the Merger to pass the shareholder vote.

136.   On December 10, 2015, the Company announced that it had completed the Merger. That same day, at the close of trading, the Company's ADS were delisted from the NYSE.

**G.   Defendants Planned All Along to Spin-off and Relist WuXi's Subsidiaries**

137.   Following the completion of the Merger, Defendants continued their plan to extract greater value out of the Company by spinning off and relisting its subsidiaries at far-higher valuations than were disclosed in connection with the Merger.

138.   On February 25, 2016—less than three months after the Merger closed— *FierceBiotech* reported that "[j]ust months after taking the company private in a $3.3 billion deal, WuXi CEO Ge Li has begun setting the stage to spin out its rocketing biologics unit in an IPO that would value the business at $1.5 billion, according to a report from *Bloomberg*."[8] According to a *Bloomberg* article from the prior day citing individuals with knowledge of the deal that did not want to be identified because the information was private, Bank of America and Morgan Stanley were already brought on to work on WuXi Biologics' Hong Kong IPO.[9]

139.   This news in February 2016 did not reveal the fraud to WuXi Securityholders because this vague information did not tell them of the Buyer Group's full relisting plans or valuation of the Company.  Moreover, Defendant Li continued to deny these plans, consistent with Defendants' misrepresentations in the Proxy Materials.  In a February 24, 2016 interview with *Chemical & Engineering News* (which the publication excerpted in a March 14, 2016 article

---

[8] John Carroll, *Booming WuXi eyes $1.5B IPO for biologics unit: report*, FierceBiotech (Feb. 25, 2016), available at https://www.fiercebiotech.com/biotech/booming-wuxi-eyes-1-5b-ipo-for-biologics-unit-report.

[9] Natasha Khan, Vinicy Chan & Regina Tan, *WuXi Said to Tap Banks for IPO of $1.5 Billion Biologics Arm*, Bloomberg (Feb. 24, 2016), available at https://www.bloomberg.com/news/articles/2016-02-24/wuxi-said-to-tap-banks-for-spinoff-of-1-5-billion-biologics-arm.

titled "In Li's Words"), Defendant Li was asked whether WuXi delisted from the NYSE "to relist on a Chinese stock market." He protested, "No! No! It was absolutely not the reason. Not to arbitrage the value between the U.S. and China stock exchanges; no, that was totally not the reason." In this interview, Defendant Li continued to claim that the reason for the privatization was so that the Company could invest in its business without the short-term pressure that public-market investors impose.[10]

140.    On March 14, 2016, another *Chemical & Engineering News* article stated that Li "emphatically denie[d]" that he intended to relist WuXi "in China, where company valuations are generally higher than in the U.S." The article quoted Li's interview statement that "[t]he arbitrage value between the U.S. and China was totally not the reason" for WuXi's privatization. This article understood Li as "claim[ing] to have no intention of relisting WuXi in China." The article also noted that a "spokeswoman for WuXi, Hui Cai, declined to comment" on *Bloomberg*'s recent report that WuXi was already "preparing to raise $1.5 billion on the Stock Exchange of Hong Kong by listing shares of its biologics business."[11]

141.    On June 6, 2017, it was announced that Defendants had completed the IPO of WuXi Biologics, raising over $510 million, at a valuation of over $3 billion. Ally Bridge Group reported in a news release on its website that WuXi Biologics gained 38% on its Hong Kong trading debut and that it was valued at $4.14 billion at the close of trading on June 13, 2017.[12]

142.    In September 2017, shortly after its IPO on the Hong Kong Stock Exchange,

---

[10] Jean-Francois Tremblay, *In Li's Word's*, Chemical & Engineering News (Mar. 14, 2016), available at https://cen.acs.org/articles/94/i11/Lis-words.html.

[11] Jean-Francois Tremblay, *C&EN profiles WuXi AppTec. Chinese contract research giant*, available at Chemical & Engineering News (Mar. 14, 2016), https://cen.acs.org/articles/94/i11/CEN-profiles-WuXi-AppTec-Chinese.html.

[12] *PE-backed WuXi Biologics completes Hong Kong re-listing*, Ally Bridge Group (June 15, 2017), available at http://www.ally-bridge.com/pe-backed-wuxi-biologics-completes-hong-kong-re-listing/.

WuXi Biologics entered the Shenzhen-Hong Kong Stock Connect and the Shanghai-Hong Kong Stock Connect. These are channels that connect the Shangai and Shenzen Stock Exchanges to the Hong Kong Stock Exchange, so that investors in each market can trade shares on the other market using their local brokers and clearing houses.

143.    On June 22, 2018, the Chinese newspaper *Caixin* reported that WuXi Biologics was conducting its third major sale of shares in less than a year. *Caixin* stated that Defendant Li personally stood to gain HK$2.7 billion (or approximately US$346 million) from WuXi Biologics' share sales-to-date and that the holding company owned by the Buyer Group would still own 55.34% of WuXi Biologics following this offering.[13]  WuXi Biologics sold a 4.08% equity stake in this offering for $505 million, equating to a total equity value of over $12.3 billion for the company. That was nearly four times the value of the entire Company in the Merger for just its WuXi Biologics subsidiary, without even accounting for WuXi AppTec, WuXi NextCODE, and the Company's other businesses that it continued to own in their entirety.

144.    In September 2017, WuXi NextCODE raised $240 million in its series B financing round, valuing the company at $1.2 billion. One year later, on November 27, 2018 WuXi NextCODE announced that it closed its series C financing round, raising an additional $200 million.

145.    On May 8, 2018, WuXi AppTec completed its A-share initial public offering and listing on the Shanghai Stock Exchange. The offering raised $354 million, at a $3.5 billion valuation.

---

[13] Bonnie Wang, *Parent Sells Stake in WuXi Biologics for Third Time in Less Than Year*, Caixin (June 22, 2018), available at https://www.caixinglobal.com/2018-06-22/parent-sells-stake-in-wuxi-biologics-for-third-time-in-less-than-year-101274587.html.

146.    The Buyer Group planned to relist WuXi AppTec well in advance of its May 2018 IPO.  Ally Bridge Group published a news release on its website on May 24, 2017, stating that in early 2017, WuXi AppTec directed Huatai United Securities to lead its IPO in mainland China.  Another Ally Bridge Group news release from the following day similarly noted that the WuXi Biologics IPO "will be followed by the IPO of Wuxi Apptech" on "a Chinese mainland stock exchange."  This article also reported that "[t]he combined enterprise value of the two companies post listing is expected to be more than USD 12bn as reported by our sister equity capital markets [reporting] service."[14]

147.    This article published on Ally Bridge Group's website also makes clear that WuXi's privatization in the Merger followed by its relisting of WuXi Biologics and WuXi AppTec, were part and parcel of the same plan.  The article contained a "Wuxi take private and relisting timeline" that listed WuXi Biologics' January 4, 2017 filing for its Hong Kong IPO as the next step following the completion of the Merger on December 10, 2015.

148.    After seeing its stock price on the Shanghai Stock Exchange more than triple since its IPO, in July 2018, WuXi AppTec filed a prospectus in Hong Kong to become dual-listed in Hong Kong and China.

149.    Ally Bridge Group published a news release on September 19, 2018 noting that WuXi AppTec's Shanghai-listed shares had nearly quadrupled, giving the company a $13 billion market value.  Ally Bridge Group also reported that by that time, WuXi Biologics had risen nearly 250% percent since its Hong Kong IPO.[15]

---

[14] *Ally Bridge reaches 'inflection point' with Wuxi IPOs – Profiler*, Ally Bridge Group (May 25, 2017), http://www.ally-bridge.com/ally-bridge-reaches-inflection-point-with-wuxi-ipos-profiler/.

[15] *Ally Bridge Portfolio News – WuXi AppTec Said to File for $1 Billion-Plus Hong Kong Offering,* Ally Bridge Group (Sept. 19, 2018), http://www.ally-bridge.com/ally-bridge-portfolio-news-wuxi-apptec-said-file-1-billion-plus-hong-kong-offering/.

150.    On December 12, 2018, WuXi AppTec announced that it raised $1.01 billion in its Hong Kong debut listing. At the end of 2018, WuXi AppTec had a market capitalization of over $12 billion.

151.    The June 22, 2018 *Caixin* article noted above also reported that the total market valuation of WuXi's three subsidiaries that spun off from WuXi PharmaTech as of that date was $30.77 billion (as compared to the $3.3 billion price at which the Company was taken private in 2015).[16]  This was ***over nine times*** the amount that WuXi was valued in the Merger.  WuXi (as the Company that survived the Merger) and the Buyer Group continue to own substantial stakes in each of these subsidiaries because they have sold only portions of the equity in these entities, including through their offerings of WuXi Biologics and WuXi AppTec shares in the Chinese and Hong Kong public markets.

152.    Other information that was revealed after the Merger confirms that—contrary to Defendants' representations in the Proxy Materials—the Buyer Group intended all along to relist WuXi's subsidiaries after the Company's privatization.

153.    On December 11, 2015—the day after the Merger closed—the Chinese publication *Yicai* published an article titled "WuXi PharmaTech announces that privatization has been completed. It may spin off its three major services and separately relist them."  This article divulged that in August 2015, a WuXi senior manager "revealed in private that after privatization PharmaTech intended to return to the Chinese A-share market."  The article also stated that an insider close to WuXi's high-level management informed the *Yicai* journalist on the day the article was published that now that WuXi had completed privatization, "it was extremely likely

---

[16] Bonnie Wang, *Parent Sells Stake in WuXi Biologics for Third Time in Less Than Year*, Caixin (June 22, 2018), available at https://www.caixinglobal.com/2018-06-22/parent-sells-stake-in-wuxi-biologics-for-third-time-in-less-than-year-101274587.html.

that the next step would be to spin off its subsidiary sectors into three major companies and separately relist them in China."[17]

154.    Then, on December 16, 2015, an article in the Chinese publication *Sina Finance* quoted WuXi's COO Yang Qing as stating that "[w]hether to return to the Chinese A-share market is something that the company's management level and new investment capital will be thinking about. But all possibilities exist, and at this time it is not appropriate to reveal to the media the next step."  WuXi's representative tempered his comments knowing that they were for public consumption.  But this article also noted that the investment companies that took WuXi private included Ally Bridge Group, Boyu Capital, a subsidiary of Ping An Insurance, Temasek Holdings, and other venture capital firms.  The article commented that "[o]bviously all of the company's new investors"—namely, the Sponsor Defendants—"come from the Asia Pacific region, while the great majority of past investors were in Western countries."[18]

155.    On July 8, 2016, a well-known journalist and online blogger named Zhang Ji commented on *Zhihu*, a popular website, that WuXi's share structure prior to its delisting suggested that it planned to spin off Wuxi Biologics and list it in Hong Kong.  When asked to explain the logic of this argument, he responded: "look at the investors involved in privatization."[19]

156.    The following analysis of WuXi's changes to WuXi Biologics' corporate structure leading up to the Merger confirms this assessment:

---

[17] *WuXi PharmaTech announces the completion of privatization or the separation of the three major businesses,* Yicai (Dec. 11, 2015), available at https://www.yicai.com/news/4724199.html. Quotations in this Amended Complaint from Chinese-language sources such as *Yicai* are from English translations of the original versions.

[18] *WuXi PharmaTech completed privatization in four months and wanted to be a pharmaceutical company in Alibaba*, Sina Finance (Dec. 16, 2015), available at http://finance.sina.com.cn/chanjing/gsnews/2015-12-16/doc-ifxmszek7148187.shtml.

[19] *See* https://www.zhihu.com/question/48176806.

(a)     Filings with the Hong Kong Companies Registry show that on January 15, 2015, a WuXi subsidiary called Biologics Investments changed its share structure so that it became 99.9% owned by WuXi Biologics. These filings also show that by November 18, 2015, Biologics Investments had become 100% owned by WuXi Biologics.

(b)     Filings with the Hong Kong Stock Exchange from May 31, 2017 that were made in connection with WuXi Biologics' IPO show that in March 2015, just as Defendant Li first discussed the potential Merger with Ally Bridge Group, WuXi Biopharma (another WuXi subsidiary) was restructured so that it became 45% owned by Biologics Investments (which, in turn, was now owned by WuXi Biologics) and 55% owned by WuXi Enterprise (another subsidiary).

(c)     Filings with the Hong Kong Stock Exchange from December 3, 2018 that were made in connection with WuXi AppTec's Hong Kong listing show that on April 16, 2015, WuXi AppTec transferred all of its equity in WuXi Enterprise to Biologics Investments.

157.   These steps leading up to the Merger resulted in WuXi Biologics owning Biologics Investments, WuXi Enterprise, and WuXi Biopharma—none of which were subsidiaries of WuXi Biologics prior to 2015.  The following diagrams show this restructuring:

**Structure Prior to 2015**



**January 15, 2015 (Biologics Investments is transferred to WuXi Biologics)**



**March 2015 (WuXi Biopharma is transferred to Biologics Investments and WuXi Enterprise)**



**April 16, 2015 (WuXi AppTec transfers WuXi Enterprise to Biologics Investments, causing WuXi Biologics (through its subsidiaries) to own WuXi Biopharma)**



158.    These restructurings did not inform the market at the time of these corporate
actions of the Buyer Group's plan to relist WuXi Biologics following the Merger because
without more information, investors had no way of knowing why these restructurings took place.
In addition, this information was not accessible until the listings of WuXi Biologics and WuXi
AppTec that took place after the Merger.  But these restructurings show that as early as January
2015, WuXi internally was paving the way for the WuXi Biologics IPO by restructuring that
subsidiary so that it would wholly own the subsidiaries connected to the Company's biologics
business. The restructuring of WuXi Biologics prior to the Merger allowed it to be the standalone
subsidiary that the Buyer Group could then relist at a higher valuation.

159.    After the Merger closed, Ally Bridge Group described another restructuring that
allowed the Buyer Group to continue to own a substantial stake in WuXi Biologics following its
IPO.  A June 15, 2017 news release that Ally Bridge Group published on its website stated that
"[a]head of the relisting, WuXi was restructured so that the existing investors hold stakes in an
offshore entity, Biologics Holdings, which in turn holds 75.43% of the Hong Kong-listed
vehicle. The dual share structure of the offshore entity means that Li has a 20.83% position in
Biologics Holdings but a 56.82% voting interest.  The rest of Biologics Holdings – and the
minority voting interest – is held by a vehicle in which the PE investors that backed the take-
private have a 81.56% stake.  Boyu is the largest investor with 27.3%, followed by Temasek
(13.83%), Ally Bridge (12.58%), Hillhouse (10.65%), Ping An (8.38%), SPDB (2.52%),
Yunfeng (2.1%), Sequoia (2.1%), and Legend (2.1%). Other investors in the vehicle include a
fund set up by Li that has eight LPs."[20]

160.    Other sources have also confirmed that it was the Buyer Group's intention all

_____

[20] *PE-backed WuXi Biologics completes Hong Kong re-listing*, Ally Bridge Group (June 15, 2017), http://www.ally-bridge.com/pe-backed-wuxi-biologics-completes-hong-kong-re-listing/.

along to relist WuXi's subsidiaries at higher valuations following the Merger.  On June 13, 2017,

the *South China Morning Post* reported that "WuXi Biologics's debut has also come under the

spotlight due to its stellar lineup of shareholders, which included high profile firms such as Boyu

Capital founded by Jiang Zemin's grandson, and Yunfeng, an investment firm owned by Alibaba

chairman Jack Ma Yun."  This article cited Chris Chen, WuXi Biologics' CEO, as stating that

WuXi's privatization in 2015 "was ***part of a long-term strategy for the then parent company to***

***spin off three separate entities with dedicated focuses***, which later became WuXi Biologics,

WuXi NextCODE and WuXi Apptech."  (Emphasis added.)[21]

161.    Similarly, a report published on the industry website *Bio Space* on December 11,

2018, revealed "[t]hat [the] privatization [of WuXi in 2015] was part of a long-term strategy for

the then-parent company to spin off three separate companies with specific, dedicated goals:

WuXi Biologics, WuXi NextCODE and WuXiAppTec."[22]

### H.    Defendants Undervalued WuXi in the Merger

162.    WuXi (as the surviving Company following the Merger) and the Buyer Group

continue to own substantial stakes in each of WuXi's subsidiaries because they have offered to

the Chinese and Hong Kong markets only portions of the equity in WuXi Biologics and WuXi

AppTec, and have sold only a portion of WuXi NextCODE to other private investors.  As of July

2019, the WuXi PharmaTech Group still owned approximately 31% of Wuxi AppTec, 81% of

---

[21] Josh Ye, *WuXi Biologics surges 37 per cent in Honk Kong debut,* South China Morning Post (June 13, 2017), available at https://www.scmp.com/business/companies/article/2098171/wuxi-biologics-surges-37-cent-hong-kong-debut.

[22] Mark Terry, *WuXi Biologics and Oxford BioTherapeutics Expand Partnership With 5 More Antibody Compounds,* BioSpace (Dec. 11, 2018), available at https://www.biospace.com/article/wuxi-biologics-expands-collaboration-and-license-deals-with-oxford-biotherapeutics/.

WuXi Biologics, and the vast majority of the remainder of the Company (including WuXi NextCode).

163.    As noted above, at the time of the WuXi Biologics IPO, that subsidiary alone was valued at approximately the same value of WuXi as a whole in the Merger.  The value of WuXi Biologics quickly surged even higher immediately after its IPO. By June 2018, after WuXi AppTec's IPO, a fundraising round for WuXi NextCODE, and further offerings for WuXi Biologics, the combined Company was valued at *over nine times* the amount that WuXi was valued in the Merger.

164.    An expert in Chinese, Hong Kong, and United States M&A capital market transactions, whose analysis is discussed in the remainder of this Section of the Amended Complaint, has determined that the reasons for this dramatic increase in market value since the Merger are (1) the increased value that the Buyer Group was able to attain by breaking up WuXi and relisting its subsidiaries as separate entities; (2) the higher valuations attained by more comparable companies on the Chinese and other regional stock markets; and (3) Defendants' gross undervaluation of the Company in the Proxy Materials, as confirmed by evidence that was revealed after the Merger.

165.    The Buyer Group's plan to extract value in these ways was omitted from the Proxy Materials.  Had WuXi Securityholders known that this was the Buyer Group's plan, they would have demanded a higher price in the Merger, voted against the Merger, or exercised their appraisal rights.

### 1.    WuXi Had More Value as Separate Entities

166.    It is well known that when companies conduct IPOs for a portion of a subsidiary—also known as an "equity carveout"—as WuXi did with WuXi Biologics and WuXi AppTec following the Merger, the newly offered subsidiary is worth more than when it was

wholly owned by the parent company.  A 2012 paper by well-known professors of corporate finance that analyzed ten equity carveouts in Asia, Europe, and the United States confirm this phenomenon.[23]  Recent papers on corporate restructuring show similar results.[24]  Reasons for this phenomenon include that breaking up a company tends to lower information asymmetry and allows the more-focused companies that result to raise capital at a lower rate.

167.    This premium for breaking up a company's subsidiaries allowed Defendants to extract greater value out of WuXi by focusing investors on WuXi Biologics and WuXiAppTec as separate businesses.  Beyond any general value associated with this type of corporate restructuring, the benefit was particularly pronounced for WuXi because of concerns that Defendants expressed related to increased investments in WuXi's business.  By breaking the Company up into separate subsidiaries, Defendants could avoid the costs associated with one subsidiary dragging down the profits of another subsidiary.  Breaking WuXi up would also allow Defendants to highlight any differential in growth prospects that one subsidiary had over another.

168.    This dynamic also highlights the inadequacy of the information that Defendants disclosed in the Proxy Materials.  The financial projections that were disclosed in the Proxy Materials and that formed the basis for Credit Suisse's analysis of the Merger's fairness gave projections just for the Company as a whole.  They did not break out how WuXi's management expected WuXi Biologics or WuXi AppTec to perform as standalone entities.  When WuXi Securityholders evaluated the more general financial projections that were disclosed in the Proxy Materials for the Company as a whole they, had no way of knowing what management's

---

[23] Eckbo and Thorburn, *Foundations and Trends in Finance*, NOW, Vol. 7, No. 3 (2012).

[24] *See* Apostolos Dasilas & Stergios Leventis, *The Performance of European Equity Carve-outs*, Journal of Financial Stability, Vol. 34 (2018); Alexandros P. Prezas & Karen Simonyan, *Corporate Divestitures: Spin-offs vs. Sell-offs*, Journal of Corporate Finance, Vol. 34 (2015).

expectations were for WuXi Biologics and WuXi AppTec individually.  And when Credit Suisse conducted its valuation analysis based on management's projections for the Company as a whole, it had no way to analyze the value of those subsidiaries on a standalone basis.

169.    When the Buyer Group went on to relist WuXi Biologics and WuXi AppTec separately, they disclosed the financial data for each standalone subsidiary so that investors could value those entities based on their individual performance.  WuXi Securityholders had no way to make a similar assessment in the Merger because Defendants failed to disclose Company management's projections for each business separately.  This omission is particularly glaring because WuXi did report in the Proxy Materials and other financial statements, current financial results for its individual business lines, including "Laboratory Services," "Small Molecule Manufacturing Service," "Biologics Services," and "New Business and Others."  That categorization was missing entirely from the financial projections that the Company's management gave to Credit Suisse and that formed the basis for Credit Suisse's valuation of the Company.  Credit Suisse also did not consider alternatives to the Merger, such as what the Company would be worth if WuXi Biologics, WuXi AppTec, and WuXi NextCODE were spun off into separate entities.

170.    The Buyer Group's plan to relist WuXi's main subsidiaries as separate entities following the Merger made the subsidiaries more valuable than they were as part of the Company as a whole.  WuXi Securityholders, however, had no way to properly assess how that plan—or how each subsidiary's individual performance—affected the Company's true value.

## 2. WuXi Would Trade at a Higher Valuation in the Hong Kong and Chinese Markets

171.    The Buyer Group was able to extract even further value by relisting WuXi Biologics and WuXi AppTec in Hong Kong and China.[25]

172.    A company's price-to-earnings ("PE") ratio is a key financial metric that measures the company's share price relative to its per-share earnings.  A higher ratio generally suggests that investors expect the company to experience a greater amount of future growth.  Credit Suisse reviewed the PE ratios, and similar metrics, of comparable companies when valuing WuXi in the Merger.  But CROs listed in China and other markets in its geographic region—which Credit Suisse did not review—have far-higher PE ratios than CROs listed in the United States.

173.    Based on the Merger price of $46 per ADS and WuXi's trailing twelve months earnings per share of $1.19 as of September 2015, WuXi had a PE ratio of 38.6, even after accounting for the premium that the Buyer Group claimed to pay in the Merger.  Even though its price already benefited from the Buyer Group's agreement to purchase the Company at a premium to its recent trading price, WuXi's peer companies listed on the Shenzen Stock Exchange still had much higher PE ratios at the time.  This means that they were valued at higher amounts for the same amount of earnings.

174.    For example, on July 31, 2015, Tigermed (a CRO listed on the Shenzen Stock Exchange as 300374.SZ and discussed in a CRO special report prepared in 2016 by Zhongtai Securities Company (a well-known Chinese securities firm)) had a PE ratio of 116.73 based on

---

[25] As noted above, just two months after its Hong Kong IPO, WuXi Biologics entered the Shenzhen-Hong Kong Stock Connect and the Shanghai-Hong Kong Stock Connect.  This allowed investors in China—who do not have access to the U.S. markets—to trade in WuXi Biologics stock.

trailing twelve months earnings.  On that same date, Guangzhou Boji Medical (a CRO listed on the Shenzen Stock Exchange as 300404.SZ and also discussed in Zhongtai Securities' 2016 special report) had a PE ratio of 138.47.  The average PE ratio of CROs in China in July 2015, based on trailing twelve months earnings, was approximately 90.

175.    If a PE ratio of 90 were applied to WuXi at time of the November 25, 2015 shareholder vote on the Merger, the fair price for WuXi should have been $107.10 per ADS instead of the of $46 per ADS offered in the Merger.

176.    It was inappropriate for Credit Suisse and Defendants to use only United States-listed CROs as peer companies when valuing WuXi in the Merger.  Chinese and other regional CROs should also have been considered because WuXi is based in China, conducts a substantial part of its business there, and the Buyer Group planned to relist WuXi in China and Hong Kong.  A comparison to Chinese CROs therefore would have better reflected WuXi's true intrinsic value based on how investors in those markets would value the Company in comparison to more comparable peers from the region.

177.    BOCOM International Securities, a well-known securities firm that provides analyst coverage of companies listed on the Hong Kong Stock Exchange, commented in May 2018, when it initiated coverage of WuXi Biologics, that the company did not have any comparable companies listed in Hong Kong.  BOCOM viewed Korea-based Samsung Biologics as the most comparable company to WuXi Biologics.  At the time of the report, Samsung Biologics was trading at a PE multiple of 213 times its 2018 expected earnings.  BOCOM rated WuXi Biologics very highly with a "Buy" rating even at its May 2018 price.

178.    When WuXi relisted its subsidiaries in Hong Kong and China following the Merger, it too received a far-higher PE ratio than it had on the NYSE.  On June 6, 2017, WuXi

successfully completed its IPO of WuXi Biologics.  WuXi Biologics was valued at over \$3 billion in this IPO and immediately set out on an upward path from that point.  Data from Bloomberg shows that as of June 12, 2017, WuXi Biologics had a PE ratio based on trailing twelve months earnings of 120.18.  Its PE ratio surged to 164.78 the following day.  When WuXi Biologics sold an additional approximately 4% equity stake in a follow-on offering in June 2018—after it had entered the Shenzhen- and Shanghai-Hong Kong Stock Connects—it had a PE ratio of over 300 and a market capitalization of over \$12 billion.

179.    The June 13, 2017 *South China Morning Post* article referenced above noted that according to a stock exchange filing, "strong demand from retail investors [for WuXi Biologics] – who would have impacted first day trading in Hong Kong share offerings – resulted in an oversubscription of 37.5 times the number of shares available to Hong Kong investors. Underwriters allocated 30 per cent of the IPO to retail investors, as fewer shares became available for institutions."

180.    Then, on May 8, 2018, Wuxi successfully launched its IPO of WuXi AppTec on the A-shares of the Shanghai Stock Exchange in China.  This offering valued WuXi AppTec at \$3.5 billion.  WuXiAppTec then hit 16 daily price limits on the Shanghai Stock Exchange right after its IPO.  On May 25 2018, according to data from Bloomberg, WuXiAppTec's had a PE ratio of 85.  At the end of June 2018, also according to data from Bloomberg, WuXi AppTec had a market capitalization of approximately \$14.9 billion.

181.    WuXi's higher valuation through its main subsidiaries in the Chinese and Hong Kong markets was a result of the nature of the CRO industry in China and the higher valuations that this type of company garnered in these markets.  The higher valuations cannot be explained by changes in the CRO industry in the United States.  A review of the market for U.S.-listed

CROs from 2015 (when the Merger took place) to 2017 (when WuXi conducted the WuXi Biologics IPO in Hong Kong) shows that their PE ratios stayed relatively the same.

182.    The U.S. CRO market as a whole even *contracted* in 2016.  Credit Suisse Equity Research issued a CRO Industry Primer report on June 20, 2016, stating that the "[v]aluation for our CRO index has contracted 26%, YTD (14.2x CY17 P/E), a 20% discount to its historical average."  Credit Suisse Equity Research forecasted that the PE ratio for the CRO market in 2017 and 2018 would be *less than 15*.

183.    Similarly, WuXi's November 3, 2015 Investor Presentation noted that "[f]ollowing the transaction announcement, WuXi's CRO peers and the broader healthcare index have traded down" and had lower PE ratios.

184.    Moreover, the PE ratios and valuations of U.S.-listed CROs—including peer companies that Credit Suisse considered in its analysis that supported its fairness opinion in the Merger—did not increase from 2015 to 2017 anywhere near the amount that WuXi's valuation did between the Merger and when it conducted the IPOs for WuXi Biologics and WuXiAppTec in 2017 and 2018.  For example:

(a)    ICON plc's PE ratio on December 31, 2015 was less than 20.  On December 29, 2017, it was 26.8 and its projected PE ratios for 2019 and 2020 were both approximately 20.[26]  This company's market capitalization was $4.4 billion at the end of 2015.  By the end of 2017, it increased by only $6.1 million (or less than 1%).  Credit Suisse included ICON in its selected companies analysis.

(b)    LabCorp of America's PE ratio on December 29, 2017 was 19 and its projected PE ratio for 2019 and 2020 were 14.4 and 13.7 respectively.  Its market capitalization was $12.5 billion in at the end of 2015 and $16.2 billion at the end of 2017.[27]  This growth rate of less than 30% paled in comparison to WuXi's exponential increase in value from the time of the Merger to its subsequent relistings of its subsidiaries. Credit Suisse included LabCorp in its selected transactions analysis for LabCorp's 2014 acquisition of Covance.

---

[26] This data is based on a report published by Credit Suisse Equity Research on August 24, 2018.

[27] This data is based on a report published by Credit Suisse Equity Research on August 24, 2018.

(c)    PRA Health Sciences, Inc. had a 31.4 PE ratio on December 29, 2017 and at that time projected its PE ratios for 2019 and 2020 of 21.9 and 19.4, respectively. Its market capitalization was $6.02 billion at the end of 2015 and grew by only 5%, to $6.36 billion at the end of 2017.[28] Credit Suisse included PRA in its selected companies analysis.

(d)    Charles River Labs' PE ratio at the end of 2015 was approximately 25.6 and remained approximately the same at 26.55 as of June 30, 2017.[29] Its market capitalization was approximately $3.8 billion at the end of 2015 and grew to approximately $5.3 billion at the end of 2017. Even though this company increased significantly in value during that time, its PE ratio stayed the same. Its increase in value was a result of the Company's impressive growth, which was one of the highest growth rates of any U.S.-listed CRO. Even so, its change in value was still only a fraction of the increase that WuXi experienced as a result of relisting in Hong Kong and China. Credit Suisse included Charles River Labs in its selected companies analysis.

185.    When Credit Suisse conducted its analysis for the Merger and compared WuXi to peer companies and transactions, it failed to consider how similar companies are valued in China and surrounding markets. It also did not consider the alternative to the Merger of relisting WuXi's subsidiaries in those markets. Credit Suisse's analysis thus omitted entirely these sources of substantial value that the Buyer Group planned to extract at the expense of WuXi Securityholders. Rather, Credit Suisse compared WuXi only to U.S.-listed CROs. If Credit Suisse had instead applied to WuXi during the Merger process the assumptions that prevailed based on companies that existed in the Chinese and surrounding markets, it would have arrived at a much higher valuation.

186.    The November 3, 2015 Investor Presentation that WuXi provided to investors and filed with the SEC suffered from these same flaws. The presentation considered only U.S.-listed peer companies and valuations. For example, the presentation highlighted that "[a]t the time of

---

[28] This data is based on a report published by Credit Suisse Equity Research on August 24, 2018.
[29] This data is based on information for Charles River Laboratories, *available at* https://www.macrotrends.net.

the transaction announcement, CRO stocks were trading at historically high multiples."  But these other CROs were limited to U.S.-listed companies, including the ICON, Charles River Labs, and PRA Health Sciences companies noted above.

187.    Similarly, the Investor Presentation noted that the "[t]ransaction price represented 18.9x LTM [*i.e.*, last twelve months] EBITDA multiple, substantially in excess of nearly all precedent transaction multiples."   (An EBITDA multiple is a financial ratio that compares a company's Enterprise Value to its annual EBITDA.  EBITDA (or earnings before interest, taxes, depreciation, and amortization) can be stated either in historical terms or as an estimate of future performance.)  This multiple is used to determine the value of a company and compare it to the value of other, similar businesses  Again, the presentation focused on U.S.-based transactions. Chinese CROs—which the presentation did not consider—were valued at much higher earnings multiples.

### 3.    The Buyer Group Admitted that it Undervalued WuXi in the Merger

188.    Ally Bridge Group has confirmed that WuXi was not properly valued in the Merger because the Company was compared only to companies listed in the United States market.   On May 24, 2017, Ally Bridge Group published a news release on its website explaining that WuXi was valued in the Merger at a PE ratio of 29 based on the Company's 2015 expected earnings.  The article described that valuation as "several notches higher than a selected contract research organization (CRO) peer group's mean and median P/E multiple. According to Dealreporter analytics, peers Quintiles and Charles River were in 2Q15 trading with P/E

multiples of 23.96x and 23.71x, respectively."[30] That peer group, however, included only U.S.-listed CROs.

189.    This article revealed that WuXi's valuation in the Merger—and the projections that formed the basis for Credit Suisse's financial analysis—were not accurate.  The article stated:

> Should the biologics IPO come first, then it could trade in line with the consensus forward 2018E P/E multiple of around 20x for peer 3Sbio, which was delisted in 2013 from the US at USD 369m (equity value) and is today worth HKD 27.7bn (USD 3.56bn) in Hong Kong, based on analysis by this news service.  Last year this news service reported that Wuxi Biologics would look to raise USD 200m to USD 300m from the Hong Kong IPO and target a market value of around USD 1.3bn. This would require 2018 net income of around RMB 414m, which is around double its actual 2016 comparable figure. Wuxi Biologics draft financials indicate net income in 2016 grew around 200% from the previous year and this level of continued growth looks feasible based on the recent year-on-year earnings growth of peer 3Sbio. 3Sbio reported a net income of CNY 292m in 2014 on a revenue of CNY 1.1bn in revenue, compared with CNY 526m and CNY 1.7bn, respectively, in 2015. The biologics IPO will also provide some insight into the likely value for the future A-share company. Assuming the biologics unit trades post listing at around USD 1.2bn then a simple see-through calculation would value Wuxi Apptech at least USD 10bn on the A-share market.
>
> This looks eminently possible purely based on the fact that other Chinese ADRs to have delisted from the US and relisted on the mainland or in Hong Kong, such as Focus Media, Giant Interactive, 3SBio and Perfect World, today have a combined stock market value of more than USD 40bn compared with a combined value at delisting of less than USD 8bn.

190.    This article acknowledges, by referencing reporting from the prior year, that in 2016, WuXi Biologics was already expecting its net income in 2018 to be double its 2016 net income.  This projection was based on a comparison of WuXi Biologics to 3Sbio—which delisted from the United States in 2013 and relisted in Hong Kong in 2015. That analysis— including the WuXi Biologic-specific projections and the comparison to 3Sbio—was omitted

---

[30] *Wuxi Biologics, Wuxi Apptech's IPOs could benefit from scarcity value – Ally Bridge founder Frank Yu,* Ally Bridge Group (May 24, 2017), available at http://www.ally-bridge.com/wuxi-biologics-wuxi-apptechs-ipos-could-benefit-from-scarcity-value-ally-bridge-founder-frank-yu/

entirely from the Proxy Materials and WuXi's valuation that was disclosed to its Securityholders in the Merger. This shows that (1) the financial projections that WuXi's management provided to Credit Suisse in the Merger did not reflect Defendants' true valuation of the Company; (2) that Credit Suisse compared WuXi to an inappropriate set of peer companies; and (3) omitting Defendants' subsidiary-specific projections from the Proxy Materials and Credit Suisse's analysis caused WuXi to be severely undervalued in the Merger.

191.    Moreover, when WuXi AppTec conducted its Hong Kong listing in December 2018, Ally Bridge Group published another *BioCentury* article that explained that Frank Yu (Ally Bridge Group's founder and CEO) had told *BioCentury* in 2017 that "an investor base in China would likely be more receptive than Wall Street to the parent company's long-term growth plans, which involved investments in new facilities and R&D."[31] This rationale is consistent with CROs such as WuXi having higher valuations in the Chinese and Hong Kong markets. Defendants, however, failed to disclose that reasoning or plan to WuXi Securityholders in connection with the Merger.

### 4.    WuXi's Performance Immediately Following the Merger Confirms Defendants' Scheme

192.    Sure enough, WuXi proceeded to blow away the financial metrics that it disclosed to investors in connection with the Merger. Although Defendants deliberately hid their subsidiary-specific projections in the Proxy Materials, a comparison can be made using the company-wide projections that Defendants disclosed as compared to the sum total of the financial results that WuXi Biologics and WuXi AppTec reported after they were spun-off from the Company following the Merger. This comparison will, by necessity, understate the

---

[31] *Ally Bridge Portfolio News – Wuxi Apptec Successfully Prices Hong Kong Offering in Stormy market,* Ally Bridge Group (Dec. 8, 2018), available at http://www.ally-bridge.com/ally-bridge-portfolio-news-wuxi-apptec-successfully-prices-hong-kong-offering-stormy-market/.

Company's true financial performance following the Merger because it does not account for the financial results of the parts of the Company that were not spun-off into WuXi Biologics and WuXi AppTec.  Even so, this conservative comparison highlights the extent to which Defendants underplayed the Company's growth prospects in the Merger.

193.    The Proxy Materials projected that the Company's revenue for 2016 through 2018 (the first three years after the Merger) would be approximately $952 million, $1.138 billion, and $1.359 billion, respectively, using a 6.2 RMB to U.S. dollar exchange ratio.  The following chart shows the sum total of WuXi Biologics' and WuXi AppTec's revenue for those years and how those figures compare to what was projected in the Proxy Materials:

|  | 2016 | 2017 | 2018 |
|---|---|---|---|
| **WuXi Biologics** | 989 million RMB | 1.619 billion RMB | 2.534 billion RMB |
| **WuXi AppTec** | 6.116 billion RMB | 7.765 billion RMB | 9.613 billion RMB |
| **Total** | 7.105 billion RMB | 9.384 billion RMB | 12.147 billion RMB |
| **Total in USD[32]** | $1.146 billion | $1.514 billion | $1.959 billion RMB |
| *% increase over Proxy Materials* | *20%* | *33%* | *44%* |

194.    WuXi's gross profits ended up surpassing what was projected in the Proxy Materials by an even more astounding amount. The Proxy Materials projected that the Company's non-GAAP gross profit in 2016 through 2018 would be $331 million, $388 million, and $458 million, respectively (using the same 6.2 RMB to U.S.D. exchange ratio).  In contrast, WuXi Biologics and WuXi AppTec reported the following amount of gross profit in those years:

---

[32] Using the same 6.2 RMB to U.S. dollar conversion used in the Proxy Materials.

|  | **2016** | **2017** | **2018** |
|---|---|---|---|
| **WuXi Biologics** | 389 million RMB | 661 million RMB | 1.018 million RMB |
| **WuXi AppTec** | 2.482 billion RMB | 3.240 billion RMB | 3.777 billion RMB |
| **Total** | 2.871 billion RMB | 3.901 billion RMB | 4.795 billion RMB |
| **Total in USD[33]** | $463 million | $629 million | $773 million |
| ***%    increase    over Proxy Materials*** | ***40%*** | ***62%*** | ***69%*** |

195.    These vast discrepancies between what Defendants projected in the Proxy Materials and how WuXi's main subsidiaries ended up performing in the years immediately following the Merger confirm what ABG admitted in May 2017—that Defendants' actual projections for WuXi at the time of the Merger greatly exceeded what they disclosed to the Company's investors in the Proxy Materials. WuXi's actual growth prospects—which were more in line with what regional investors expected of a Chinese CRO—also explain why the Company's subsidiaries were able to earn a much higher PE ratio in their relistings than the ratio that Credit Suisse used in its valuation analysis for the Merger.

196.    These financial results also highlight the importance of Defendants' failure to break out their projections for WuXi's subsidiaries in the Proxy Materials.  For example, when WuXi Biologics announced its 2017 financial results, it touted "[r]obust revenue growth, increasing by 63.7%" year-over-year in 2017 as compared to 2016, and a 69.8% increase in gross profit.  These figures were more than triple the 20% revenue growth that the Proxy Materials predicted for WuXi as a whole from 2016 to 2017 and more than double the 34% growth in gross profit for the Company as a whole that the Proxy Materials projected.

---

[33] Using the same 6.2 RMB to U.S. dollar conversion used in the Proxy Materials.

197.    WuXi's actual growth trajectory is also consistent with the timing of the Merger. Defendant Li initiated the Merger at an opportune time for himself and the Buyer Group, when the market was not attuned to WuXi's true potential.  He admitted in the *Chemical Engineering & News* interview noted above that he decided to conduct the Merger in early 2015 because WuXi's stock price fell by approximately 20% after the Company surprised investors in March 2015 by announcing (along with its 2014 year-end results) that it would incur substantial costs because of increased investments in its business.  Because of those costs, WuXi disclosed that its 2015 earnings would be *lower* than its 2014 earnings.

198.    Although WuXi (through Defendants Li and Hu) also referenced its growth prospects in March 2015, it declined to give specific projections beyond 2015.  For example, when asked on the Company's earnings conference call on March 7, 2015 about the Company's three-year horizon, the most that Defendant Li disclosed was that he expected revenue from "new businesses" to be $100 million in 2017.  That figure was insignificant in comparison to the $1.138 billion in total revenue that the Proxy Materials projected for 2017, and even more inconsequential in comparison to the total $1.5 billion in revenue that WuXi Biologics and WuXi AppTec would actually earn in 2017.  Because of this opacity, Wells Fargo commented in an April 30, 2015 analyst report that shareholders would not be able to obtain a significantly larger premium than what the Buyer Group offered in the Merger "without a clearer line of sight to higher earnings than the current outlook suggests."

199.    Defendant Li thus used the precise moment when investors were fearful about the Company's financial performance to hide its true potential so that he and the Buyer Group could buy the Company on the cheap.  The Buyer Group was then able to conduct the IPOs for WuXi

Biologics and WuXi AppTec when investors in China and Hong Kong would see the superb financial results showing their true potential following the Merger.

200.    All of the evidence described in this Section IV.H demonstrates that Defendants plainly misrepresented the true value of WuXi to the Company's Securityholders in connection with the Merger. If WuXi Securityholders knew how the Buyer Group actually valued WuXi and its subsidiaries, or that the Buyer Group planned to split WuXi up and relist its subsidiaries in China and Hong Kong, these investors would have demanded a much higher price in the Merger, voted against the Merger, or exercised their appraisal rights.

201.    Lead Plaintiff still does not have access to WuXi management's and the Buyer Group's true projections for and valuation of the Company and its subsidiaries at the time of the Merger. The analysis in this Section therefore is provided to show that Defendants misrepresented their relisting plan and true valuation of the Company in the Merger, but does not preclude Lead Plaintiff from offering further assessments as to the specific amount by which Defendants undervalued WuXi in the Merger when more evidence becomes available through discovery in this action.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

202.    During the Class Period, Defendants made numerous materially false and misleading statements and omissions.  The specific false and misleading statements are detailed below and reference is made therein to the following subparagraphs, which explain the reasons those statements are false and misleading.[34]

(a)    **Statements Concerning Defendants' Intention Not to Relist.**

Defendants made statements throughout the Proxy Materials stating clearly that there were no

---

[34] Where parts of a statement are ***bolded and italicized*** in this section, those excerpts are alleged to be false and misleading.

plans in place for WuXi to undergo a transaction following the Merger that would cause the Company's structure to be changed in any way, such as through relisting its subsidiaries in the public markets in China or Hong Kong. These assurances provided to WuXi Securityholders were false and misleading because when these statements were made, the Buyer Group already planned to relist WuXi's subsidiaries at far-higher valuations. These statements also failed to disclose the reasons why the Buyer Group would be able to obtain those far-higher valuations in their planned relistings.

        (b)      **Statements That There Were no Viable Alternatives to the Merger.**
Defendants made statements throughout the Proxy Materials stating clearly that there were no alternatives to the Merger that would be more beneficial to WuXi Securityholders. These statements were false and misleading because they did not mention the alternative of including WuXi Securityholders in the Buyer Group's plan to spin-off and relist WuXi's subsidiaries or paying them fair value for that alternative plan.

        (c)      **Statements That Presented the Transaction in a Positive Light, or As "Fair."** These statements were false and misleading because they conveyed that the consideration of $46.00 per ADS (and $5.75 per share of common stock) was a fair price for the WuXi Securities when, in fact, the WuXi Securities were undervalued, causing the Merger price to be unfair. These statements were also false and misleading because the fairness assessment of the Merger price was based on Credit Suisse's financial analysis that failed to consider the value that WuXi's subsidiaries would have in the Hong Kong and Chinese markets that valued CROs such as WuXi at far-higher values. In addition, these statements were false and misleading because Defendants failed to disclose, and Credit Suisse failed to consider, (1) Defendants' true valuation for WuXi and its subsidiaries; (2) any projections broken out for the subsidiaries that

the Buyer Group planned to spin off after the Merger; and (3) WuXi's true value when compared to CROs listed in China and other markets in its geographic region.   Furthermore, these statements were false and misleading because they failed to consider alternatives to the Merger. These statements were also misleading because Defendants failed to disclose that the Buyer Group had already planned to relist WuXi's subsidiaries at much higher valuations in China and Hong Kong.

(d)   **Statements Concerning the Reasons for the Merger.**   To justify conducting the Merger without revealing their true motivation of relisting the Company's subsidiaries at a higher valuation, Defendants stated in the Proxy Materials that they preferred for WuXi to be a private company so that it would not face the pressures associated with the public markets.   They stated that being a private company would allow them to maximize WuXi's long-term value.   These statements were false because the Buyer Group did not intend for WuXi to remain a private Company.   Rather, they planned all along to relist the Company in the public markets in Hong Kong and China.   Those steps, which returned WuXi to the public markets, directly contradicted their statements that WuXi would be better served as a private company.   Defendants also exaggerated the business risks that WuXi faced so that they could capitalize on taking the Company private when investors did not have information concerning the Company's true growth potential.   Furthermore, to the extent that Defendants planed to relist WuXi's subsidiaries in Hong Kong and China because investors in those regions would value the Company differently, Defendants failed to disclose that rationale.

203.   To the extent that it is determined that any of the statements detailed below are statements of opinions, these opinion statements were false and misleading. Statements conveying that the Merger was fair or advisable, even if opinions, were false and misleading

because they were not actually held by Defendants and failed to disclose information that a reasonable shareholder would assume formed the basis for them. Rather, these statements were part of a fraudulent scheme to deprive WuXi Securityholders of the fair value of their securities.

### A.    The Announcement of the Merger

204.    On August 14, 2015, WuXi issued a press release announcing that the Company had agreed to the Merger.  WuXi filed this press release with the SEC that same day with an accompanying Form 6-K that was signed by Defendant Hu.  The Sponsors included in the Merger at this point included Ally Bridge Group Capital Partners, Boyu Capital, Temasek Life Sciences Private Limited, Ping An Insurance, and Hillhouse.

205.    This announcement promoted the Merger by disclosing the deal price and pointing to a premium as compared to WuXi's recent trading price, without also disclosing that the WuXi securities were worth far more than that deal price.  In particular, the press release explained that:

> Pursuant to the Merger Agreement, Parent will acquire the Company for cash consideration equal to US$5.75 per ordinary share of the Company (each, a "Share") and US$46 per American Depositary Share of the Company, each representing eight Shares (each, an "ADS"), or approximately US$3.3 billion in aggregate cash consideration. This represents a 16.5% premium over the closing price of US$39.50 per ADS as quoted by the New York Stock Exchange (the "NYSE") on April 29, 2015, and a premium of 18.9% and 20.1%, respectively, over the Company's 30- and 60- trading day volume-weighted average price as quoted by the NYSE prior to April 29, 2015, the last trading day prior to the Company's announcement on April 30, 2015 that it had received a non-binding "going private" proposal.

206.    These statements were false and misleading for the reasons stated in ¶ 202(c).

207.    The deal announcement further stated that the Merger had been approved by the Board upon recommendation by the Special Committee and that the Board recommended shareholders approve the Transaction. Specifically, the press release explained that:

> The Company's board of directors, acting upon the unanimous recommendation of the special committee formed by the board of directors (the "Special Committee"),

unanimously approved the Merger Agreement and the transactions contemplated by the Merger Agreement, including the Merger, and resolved to recommend that the Company's shareholders authorize and approve the Merger Agreement and the transactions contemplated by the Merger Agreement, including the Merger.

208.    These statements were false and misleading for the reasons stated in ¶ 202(c).

209.    Lastly, the press release intentionally conveyed to investors that there had been a robust negotiation by the Special Committee with the assistance of an independent financial advisor. Specifically, the press release stated that "[t]he Special Committee, which is composed solely of independent directors of the Company who are unaffiliated with Parent, Merger Sub or any member of the Buyer Group or management of the Company, exclusively negotiated the terms of the Merger Agreement with the Buyer Group with the assistance of its independent financial and legal advisors."

210.    These statements were false and misleading for the reasons stated in ¶ 202(c).  In particular, Defendants' reliance on the Special Committee and Credit Suisse as bolstering the fairness of the Merger was false and misleading because Defendants failed to disclose the facts described in ¶ 202(c).

### B.    WuXi's Second Quarter 2015 Earnings Call

211.    On August 14, 2015, WuXi held a conference call to discuss its earnings for the second quarter of 2015.  On this call, Defendant Li stated that "[w]e are choosing this time of strength[,] both WuXi's operational and financial strengths and the rapid growth in China healthcare industry[,] to invest aggressively in both established and the new business to drive long-term growth. As we previously announced, in light of the volatility and the risk associated with this investment and the impact on earnings, not only as best suited of a public company [sic], a consortium of private investors, led by me made a non-binding preliminary offer on April

29, 2015 to WuXi's board of directors, who will acquire all of the outstanding shares of WuXi $46 per ADS in a going-private transaction."

212.    These statements were false and misleading for the reasons stated in ¶ 202(d).

**C.    The Preliminary Proxy Materials**

213.    On September 1, 2015, WuXi filed with the SEC the Preliminary Proxy Materials on Form 13E-3 explaining the proposed Merger to holders of WuXi Securities. The Preliminary Proxy Statement was included as an exhibit to the Schedule 13E-3 Transaction Statement and was directed to all "Shareholders of WuXi PharmaTech (Cayman) Inc."

214.    The Preliminary Proxy Materials were signed by Defendants Li, Hu (on behalf of WuXi), Zhao, G&C LP (signed by Defendant Li), ABG, Boyu, Hillhouse, Ping An, and Temasek. These Defendants signed the Rule 13e-3 Transaction Statement, which incorporated the Preliminary Proxy Statement.   In addition, Defendant Li signed the Preliminary Proxy Statement itself.

215.    The Preliminary Proxy Materials included the misleading statements or omissions described in the following sections (1) through (6).

**1.    Statements Concerning Intention Not to Relist**

216.    The Preliminary Proxy Statement described the Company's plans following the Merger as follows, stating that there were no present plans or proposals involving changes to the Company's structure:

> *If the merger is completed, the Company will continue its operations as a privately held company* and will be beneficially owned by the buyer group, and, as the result of the merger, the Company's American Depositary Shares ("ADSs"), each representing eight Shares, will no longer be listed on the New York Stock Exchange (the "NYSE"), and the ADS program for Shares will terminate.

217.    These statements were false and misleading for the reasons stated in ¶ 202(a).

218.    The Preliminary Proxy Statement also affirmed the Buyer Group's plans for the

Company following the Merger as follows:

> Following the completion of the merger, Parent will own 100% of the equity
> interest in the Surviving Company. ***The buyer group anticipates that the
> Company will continue to conduct its operations substantially as they are
> currently being conducted,*** except that it will (i) cease to be a publicly traded
> company and will instead be a wholly owned subsidiary of Parent and (ii) have
> substantially more debt than it currently has.

219.    These statements were false and misleading for the reasons stated in ¶ 202(a).

220.    Similarly, the Preliminary Proxy Statement warranted that **"*[e]xcept as set forth**

***in this proxy statement and transactions already under consideration by the Company, the***

***buyer group does not have any current plans, proposals or negotiations that relate to or would***

***result in any of the following:***

- ***an extraordinary corporate transaction, such as a merger,
  reorganization or liquidation, involving the Company or any of its
  subsidiaries;***

- ***the sale or transfer of a material amount of the assets of the Company or
  any of its subsidiaries; or***

- ***any other material changes in the Company, including with respect to
  the Company's corporate structure or business.***

221.    These statements were false and misleading for the reasons stated in ¶ 202(a).

222.    The Preliminary Proxy Statement further stated that one of the primary detriments

of the Merger to the Buyer Group included that "[a]n equity investment in the Surviving

Company by Parent following the merger will involve substantial risk resulting from the limited

liquidity of such an investment since there will be no trading market for the Surviving

Company's equity securities" and that "Parent's investment in the Surviving Company will be

illiquid, with no public trading market for the Surviving Company's shares and no certainty that

an opportunity to sell its shares in the Surviving Company at an attractive price."

223. These statements were false and misleading for the reasons stated in ¶ 202(a).

224. The Preliminary Proxy Statement also noted the warranty that the Parent Parties made to the Company of "the absence of any undisclosed agreements between or among two or more of the following persons: any Rollover Shareholder, any Sponsor or any of their respective affiliates."

225. These statements were false and misleading for the reasons stated in ¶ 202(a).

226. The Preliminary Proxy Statement stated that "[t]he buyer group may consider re-listing the Company's equity on the Chinese or Hong Kong stock exchanges, which may have higher valuations."

227. These statements were false and misleading for the reasons stated in ¶ 202(a).  In particular, these statements were false and misleading because such relisting was not just a possibility that the Buyer Group might consider, but rather, was the Buyer Group's pre-ordained plan and its whole reason for the Merger.

## 2. Statements Concerning Lack of Alternatives to the Merger

228. The Preliminary Proxy Statement also discussed in great detail "Alternatives to the Merger," which did not mention the possibility of accretive spin-offs of the Company's subsidiaries.

229. In particular, "the Special Committee determined that there was no viable alternative transaction to the proposed sale of the Company to the buyer group."

230. These statements were false and misleading for the reasons stated in ¶ 202(b).

231. The Preliminary Proxy Statement also stated that the purpose of the Special Committee was "to exclusively evaluate and, if appropriate, negotiate the proposed transaction (or any other alternative transaction) on behalf of the Company."

232. These statements were false and misleading for the reasons stated in ¶ 202(b).

233.    The Preliminary Proxy Statement also stated that "[i]n the course of reaching their respective determinations, the Special Committee and the Board considered the following substantive factors and potential benefits of the merger, including the following, which are not listed in any relative order of importance:

- ***the belief of the Special Committee and the Board, after a thorough, independent review, that the merger is more favorable to the Unaffiliated Holders than the potential value that might result from other alternatives available to the Company, given the potential rewards, risks and uncertainties associated with those alternatives***, including remaining an independent company and pursuing the current strategic plan, or continuing to pursue a sale to a company in the same or a related industry;

- ***the belief that no other alternative reasonably available to the Company and Company shareholders would provide greater value to Company shareholders within a timeframe comparable to that in which the merger is expected to be completed.***

234.    These statements were false and misleading for the reasons stated in ¶ 202(b).

235.    The Preliminary Proxy Statement also stated that "[t]he buyer group believes that the merger is procedurally fair to the Unaffiliated Holders based on the following factors, which are not listed in any relative order of importance:"

- since the announcement of the receipt of the going-private proposal, no party other than the members of the buyer group has contacted the Company or the Special Committee expressing an interest in exploring an alternative transaction with the Company;

- the Company's ability, subject to compliance with the terms and conditions of the merger agreement, to terminate the merger agreement prior to the receipt of shareholder approval in order to accept an alternative transaction proposed by a third party that is a superior proposal.

236.    These statements were false and misleading for the reasons stated in ¶ 202(b).

### 3.    False Representations that the Merger Was "Fair"

237.    The Preliminary Proxy Statement included many false and misleading assertions that the Merger was "fair" or in the best interests of WuXi Securityholders who were unaffiliated with the Buyer Group.

238.    Defendants announced that the Special Committee declared the Merger to be fair.

According to the Preliminary Proxy Statement:

> At a meeting on August 14, 2015, the Special Committee reviewed and considered the terms and conditions of the merger agreement, the plan of merger and the consummation of the transactions, including the merger. The Special Committee, after due consideration, unanimously (i) ***determined that the merger agreement, the plan of merger and the consummation of the transactions, including the merger, are fair to and in the best interests of the Company and the Unaffiliated Holders***, (ii) approved and declared advisable the merger agreement, the plan of merger and the consummation of the transactions, including the merger, and (iii) recommended that the Board authorize and approve the merger agreement, the plan of merger and the consummation of the transactions, including the merger.

239.    These statements were false and misleading for the reasons stated in ¶ 202(c).

240.    WuXi's Board of Directors, in turn, determined that the Merger was fair and recommended that it be approved. According to the Preliminary Proxy Statement:

> At a meeting on August 14, 2015, the Board, acting upon the unanimous recommendation of the Special Committee, unanimously (i) ***determined that it is fair to, advisable and in the best interests of the Company and the Unaffiliated Holders to consummate the transactions, including the merger***, (ii) authorized and approved the execution, delivery and performance of the merger agreement, the plan of merger and the consummation of the transactions, including the merger, and (iii) ***resolved to recommend the authorization and approval of the merger agreement, the plan of merger and the consummation of the transactions, including the merger, by the shareholders of the Company*** and directed that the merger agreement, the plan of merger and the consummation of the transactions, including the merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

241.    These statements were false and misleading for the reasons stated in ¶ 202(c).

242.    The Preliminary Proxy Statement also affirmed that "[e]ach member of the buyer group believes that the merger is fair to the Unaffiliated Holders."

243.    These statements were false and misleading for the reasons stated in ¶ 202(c).

244.    The Preliminary Proxy Statement also stated that "***[t]he Board and management of the Company have been dedicated to maximizing shareholder value***. Taking into account the historical trading prices of ADSs and the current condition of the U.S. stock market, ***the Special***

*Committee and the Board believe that the per Share merger consideration and the per ADS merger consideration offered by the buyer group provide an attractive premium that appropriately reflects the intrinsic present value of Shares and ADSs*, while allowing sufficient potential for future growth to attract the buyer group to enter into the merger agreement and complete the merger."

245.    These statements were false and misleading for the reasons stated in ¶ 202(c).

246.    Then, at the conclusion of the section titled "Reasons for the Merger and Recommendation of the Special Committee and the Board," the Preliminary Proxy Statement stated that "[f]or the foregoing reasons, the Company believes that the merger agreement, the plan of merger and the consummation of the transactions, including the merger, are fair to, advisable and in the best interests of, the Company and the Unaffiliated Holders."

247.    These statements were false and misleading for the reasons stated in ¶ 202(c).

248.    The Preliminary Proxy Statement also stated that Credit Suisse's financial analyses and fairness opinion formed a basis for the Special Committee's determination that the Merger was fair to unaffiliated WuXi Securityholders, to approve the Merger, and to recommend the Merger to the Board.

249.    In addition, the Preliminary Proxy Statement stated as one of the "Reasons for the Merger and Recommendation of the Special Committee and the Board," that the Special Committee "considered the financial analyses reviewed and discussed with the Special Committee by representatives of Credit Suisse as well as the oral opinion of Credit Suisse rendered to the Special Committee on August 13, 2015 in the United States (which was subsequently confirmed in writing by delivery of Credit Suisse's written opinion dated August 13, 2015) as to, as of August 13, 2015 in the United States, the fairness, from a financial point of

view, to the Unaffiliated Holders of the per Share merger consideration and the per ADS merger consideration to be received by such Unaffiliated Holders in the merger pursuant to the merger agreement."

250.    The unanimous recommendation of the Special Committee, in turn, formed the basis for the Board's determination that the Merger was fair to unaffiliated WuXi Securityholders and its decision to approve and recommend the Merger.

251.    These statements referenced in ¶¶ 248-50 were false and misleading for the reasons stated in ¶ 202(c), particularly because Credit Suisse's analysis, which ultimately formed the basis for the Special Committee's and the Board's determinations, was tainted by Credit Suisse's failure to consider—and Defendants' failure to disclose—the Buyer Group's and WuXi's true valuations or projections for the Company and its subsidiaries, or their plan to relist the Company's subsidiaries in Hong Kong and China following the Merger.

252.    The Preliminary Proxy Statement also included Credit Suisse's opinion that the Merger was "*fair*."  While these statements were in some sense originally made by Credit Suisse, they are attributable to Defendants for two reasons: first, they are part of the Preliminary Proxy Statement, which was included with the Preliminary Proxy Materials that were signed by the Defendants referenced in ¶ 214; and second, Defendants relied on Credit Suisse's analysis as a basis for their conclusion that the Merger was fair to the Unaffiliated Security Holders and their recommendation that the Merger should be approved.

253.    These statements were false and misleading for the reasons stated in ¶ 202(c).

254.    The Preliminary Proxy Statement also prominently displayed the projections that formed the basis for Credit Suisse's valuation analysis, including:

| Company Projections as of May 24, 2015 | | | | | | |
|---|---|---|---|---|---|---|
| | | **Fiscal Year Ending December 31,** | | | | |
| | **2015E** | **2016E** | **2017E** | **2018E** | **2019E** | **2020E** |
| | | | (U.S. Dollars in millions) | | | |
| **Revenue** | $ 802 | $ 952 | $ 1,138 | $ 1,359 | $ 1,563 | $ 1,766 |
| *Revenue Growth%* | *19%* | *19%* | *20%* | *19%* | *15%* | *13%* |
| **Non-U.S. GAAP Adjusted Gross Profit** | 288 | 331 | 388 | 458 | 532 | 593 |
| *Gross Profit%* | *36%* | *35%* | *34%* | *34%* | *34%* | *34%* |

255.     These statements were false and misleading for the reasons stated in ¶ 202(c).

256.     The Preliminary Proxy Statement also warranted that its list of factors that the Buyer Group considered in determining that the Merger was fair and in the interests of WuXi shareholders was "believed by the buyer group to include all material factors considered by it."

257.     These statements were false and misleading for the reasons stated in ¶ 202(a)-(d).

258.     The Preliminary Proxy Statement also appended Credit Suisse's written fairness opinion, which concluded that the Merger was fair from a financial point of view, stating specifically that "[b]ased upon and subject to the foregoing, it is our opinion that, as of the date hereof, the applicable Merger Consideration to be received by the Unaffiliated Shareholders in the Merger pursuant to the Merger Agreement is fair, from a financial point of view, to such Unaffiliated Shareholders."

259.     These statements were false and misleading for the reasons stated in ¶ 202(c).

260.     The Preliminary Proxy Statement described Credit Suisse's comparison of WuXi to other companies in Credit Suisse's "selected companies" and "selected transactions" analyses.

261.     The Preliminary Proxy Statement stated that Credit Suisse's "selected companies analysis indicated an implied valuation reference range of $30.90 to $38.60 per ADS, as compared to the proposed merger consideration in the merger pursuant to the merger agreement of $46.00 per ADS."

262.    In addition, Preliminary Proxy Statement stated that Credit Suisse's "selected transactions analysis indicated an implied valuation reference range of $30.29 to $39.35 per ADS as compared to the proposed merger consideration of $46.00 per ADS in the merger pursuant to the merger agreement."

263.    These statements concerning Credit Suisse's "selected companies" and "selected transactions" analyses were false and misleading for the reasons stated in ¶ 202(c).

264.    The Preliminary Proxy Statement also described Credit Suisse's "discounted cash flow analysis" whereby Credit Suisse "*calculate[ed] the estimated net present value of the projected after-tax, unlevered free cash flow of the Company based on the Company Projections*, which assumed a constant 6.2 RMB per US dollar exchange rate over the forecast period. *Credit Suisse applied a range of terminal value multiples of 10.0x to 14.0x to the Company's estimated CY 2020E EBITDA and discount rates ranging from 8.5% to 10.5%. The discounted cash flow analysis of the Company based on the Company Projections indicated an implied valuation reference range of $38.51 to $56.38 per ADS*, as compared to the proposed merger consideration of $46.00 per ADS in the merger pursuant to the merger agreement."

265.    These statements concerning Credit Suisse's "discounted cash flow analysis" were false and misleading for the reasons stated in ¶ 202(c).

266.    In addition, the Preliminary Proxy Statement stated that the Buyer Group believed the merger was substantively fair to unaffiliated WuXi Securityholders based on the Buyer Group's "knowledge and analysis of available information regarding the Company, as well as discussions with the Company's senior management regarding the Company and its business and the factors considered by, and findings of, the Special Committee and the Board discussed under

72

the section entitled '—Reasons for the Merger and Recommendation of the Special Committee and the Board.'"

267.    These statements were false and misleading for the reasons stated in ¶ 202(a)-(d).

268.    Similarly, the Preliminary Proxy Statement stated that the Buyer Group believed the Merger was substantively fair to unaffiliated WuXi Securityholders because "the Special Committee and, based in part upon the unanimous recommendation of the Special Committee, the Board unanimously determined that the merger agreement and the transactions, including the merger, are fair to, advisable and in the best interests of the Unaffiliated Holders."

269.    These statements were false and misleading for the reasons stated in ¶ 202(a)-(d).

270.    The Buyer Group also represented that the Merger was "procedurally fair" to unaffiliated WuXi Securityholders based on many aspects of the Special Committee's involvement in the Merger process, including:

- *the consideration and negotiation of the merger agreement was conducted entirely under the control and supervision of the Special Committee*, which consists of three independent directors, each of whom is an outside, non-employee director, and that no limitations were placed on the Special Committee's authority;

- in considering the transaction with the buyer group, *the Special Committee acted solely to represent the interests of the Unaffiliated Holders*, and the Special Committee had independent control of the extensive negotiations with the buyer group on behalf of the Unaffiliated Holders;

- *the Special Committee retained independent financial advisors* and legal counsel to assist it in negotiations with the buyer group and in its evaluation of the merger;

- *the Special Committee was empowered to consider, attend to and take any and all actions in connection with the written proposal from the buyer group and in connection with the transactions from the date the Special Committee was established, and no evaluation, negotiation or response regarding the transaction in connection therewith from that date forward was considered by the Board for approval unless the Special Committee had recommended such action to the Board*;

- *the terms and conditions of the merger agreement were the product of extensive negotiations between the Special Committee and its advisors, on the one hand, and the buyer group and its advisors, on the other hand*;

- ***the Special Committee was empowered to exercise any power or authority of the Board that the Special Committee determined was necessary or advisable in carrying out and fulfilling its duties and responsibilities***;

- ***the buyer group did not participate in or have any influence over the deliberative process of, or the conclusions reached by, the Special Committee or the negotiating positions of the Special Committee***;

271.    These statements were false and misleading for the reasons stated in ¶ 202(a)-(d).

### 4.    Promotion of the Merger Price

272.    The Preliminary Proxy Statement promoted the Merger by touting the Merger consideration of $46.00 per ADS and $5.75 per common share to WuXi Securityholders.

273.    The Preliminary Proxy Statement further promoted the Merger by describing the Merger consideration as a favorable premium to the recent price of WuXi Securities and the Special Committee's and the Board's "belief that the trading price of ADSs is not likely to reach or exceed the per ADS merger consideration in the near future, and that, therefore, the per ADS merger consideration represents a significant premium to Company shareholders, which belief is based on a number of factors, including:

- the Special Committee's knowledge and understanding of the Company and the industry in which the Company operates;
- the fact that the going-private proposal was at a premium to the trading price of ADSs, which was at a relatively high level at the time that the going-private proposal was announced; and
- the review by the Special Committee of the financial projections of the Company[.]

274.    These statements were false and misleading for the reasons stated in ¶ 202(c).

275.    The Preliminary Proxy Statement also touted the Merger price by describing it as a premium over recent trading prices while failing to disclose how it compared to the price that the Company or its subsidiaries would actually be worth on the Chinese or Hong Kong markets.

276.    In particular, the Preliminary Proxy Statement stated that the Merger price " represented a 16.2% premium over the closing price of the ADSs on the NYSE on April 28,

2015, a premium of 24.1% to the volume-weighted average closing price of the ADSs during the prior 180 trading days and a premium of 8.7% to the ADSs 52-week high closing price."

277.    These statements were false and misleading for the reasons stated in ¶ 202(c).

**5.    Statements Concerning Defendants' Reasons for the Merger**

278.    The Preliminary Proxy Statement included many false and misleading statements concerning the reasons for the Merger.  These statements suggested that WuXi would be able to maximize its value as a private company without the pressures of the public markets.

279.    In particular the Preliminary Proxy Statement represented that Defendant Li "first considered making a proposal to acquire the Company on or about March 5, 2015, following the market's negative reaction to the Company's announcement of its financial results for the fourth quarter and full year of 2014 on March 5, 2015."

280.    These statements were false and misleading for the reasons stated in ¶ 202(d).

281.    In addition, the Preliminary Proxy Statement described the "primary benefits of the merger to the buyer group" as including that::

- The Company will no longer have continued pressure to meet quarterly forecasts set by analysts. In contrast, as a publicly traded company, the Company currently faces pressure from public shareholders and investment analysts to make decisions that may produce better short-term results, but which may not maximize equity value in the long term.

- The Company will have more freedom to focus on long-term strategic planning in a highly competitive business with increasing competition and regulation.

- The Company will have more flexibility to change its capital spending strategies without public market scrutiny or analysts' quarterly expectations.

- The Company will be able to introduce new products and services or change its pricing strategies to attract customers without public market scrutiny or the pressure to meet short-term forecasts.

282.    These statements were false and misleading for the reasons stated in ¶ 202(d).

283.     Similarly, the Proxy Materials explained that one of the main "Purposes of and Reasons for the Merger" to the Buyer Group was:

> There is greater domestic competition in many of the segments in which the Company operates. These changes have increased the uncertainty and volatility inherent in the business models of companies similar to the Company. As a result, the buyer group is of the view that there is potential for considerably greater short- and medium-term volatility in the Company's earnings. Responding to current market challenges will require tolerance for volatility in the performance of the Company's business and a willingness to make business decisions focused on improving the Company's long-term profitability. ***The buyer group believes that these strategies would be most effectively implemented in the context of a private company structure. As a privately held entity, the Company's management will have greater flexibility to focus on improving long-term profitability without the pressures exerted by the public market's valuation of the Company and its emphasis on short-term period-to-period performance***.

284.     These statements were false and misleading for the reasons stated in ¶ 202(d).

285.     In addition, the Proxy Materials exaggerated the Company's risks by telling investors that one of the main reasons that the Special Committee and the Board determined that the Merger was beneficial to WuXi Securityholders was "the continued risk of holding ordinary shares, taking into account:  the uncertainty and risks associated with growing new businesses of the Company . . . [and] the uncertainty of achieving management's projections generally."

286.     These statements were false and misleading for the reasons stated in ¶ 202(d).

### 6.     Defendants Specifically Guaranteed the Accuracy of Their Statements and That They Complied With Law

287.     Each Defendant that signed Rule 13e-3 Transaction Statement in the Preliminary Proxy Materials (*i.e.*, Defendants Li, Hu (on behalf of WuXi), Zhao, G&C LP (signed by Defendant Li), ABG, Boyu Capital Fund II, L.P., Hillhouse Capital Fund II, L.P., Ping An Life Insurance Company of China. Ltd., and Temasek Life Sciences Private Limited) affirmed that "***[a]fter due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.***"

288.     These statements were false and misleading for the reasons stated in ¶ 202(a)-(d).

289.    In addition, the Merger Agreement, which was included with the Proxy Materials, warranted that "[e]ach of Parent, Merger Sub and the Company agrees, as to itself and its respective Affiliates or Representatives, that ***none of the information supplied or to be supplied by Parent, Merger Sub or the Company, as applicable, expressly for inclusion or incorporation by reference in the Proxy Statement, the Schedule 13E-3 or any other documents filed or to be filed with the SEC in connection with the Transactions, will, as of the time such documents (or any amendment thereof or supplement thereto) are mailed to the holders of Shares, at the time of the Shareholders' Meeting or at any time prior to the Effective Time, contain any untrue statement of a material fact, or omit to state any material fact required to be stated therein in order to make the statements therein, in light of the circumstances under which they were made, not misleading***. Each of Parent, Merger Sub and the Company further agrees that ***all documents that such party is responsible for filing with the SEC in connection with the Merger will comply as to form and substance in all material respects with the applicable requirements of the Securities Act, the Exchange Act and any other applicable Laws and that all information supplied by such party for inclusion or incorporation by reference in such document will not contain any untrue statement of a material fact, or omit to state any material fact required to be stated therein in order to make the statements therein, in light of the circumstances under which they were made, not misleading***."

290.    These statements were false and misleading for the reasons stated in ¶ 202(a)-(d).

291.    The Merger Agreement further warranted that "[i]f at any time prior to the Shareholders' Meeting, any information relating to the Company, Parent, Merger Sub or any of their respective Affiliates, officers or directors, is discovered by the Company, Parent or Merger

Sub which should be set forth in an amendment or supplement to the Proxy Statement and/or the Schedule 13E-3 so that the Proxy Statement and/or the Schedule 13E-3 shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading, the party which discovers such information shall promptly notify the other parties hereto and the Company shall file an appropriate amendment or supplement describing such information with the SEC and, to the extent required by applicable Law, disseminate to the shareholders of the Company."

292.    These statements were false and misleading for the reasons stated in ¶ 202(a)-(d).

**D.     The Amended Proxy Materials**

293.    On September 23, 2015, WuXi filed the Amended Proxy Materials with the SEC as an amendment to WuXi's earlier-filed Form 13E3.  The Amended Proxy Statement was included as an exhibit to the amended Schedule 13E-3 Transaction Statement that was filed on September 23, 2015 and was directed to all "Shareholders of WuXi PharmaTech (Cayman) Inc."

294.    The Amended Proxy Materials were signed by Defendants Li, Hu (on behalf of WuXi), Zhao, Liu, Zhang, G&C LP (signed by Defendant Li), ABG, Boyu, Hillhouse, Ping An, and Temasek.

295.    These Defendants signed the Amended Rule 13e-3 Transaction Statement, which incorporated the Amended Proxy Statement.  In addition, Defendant Li signed the Amended Proxy Statement itself.

296.    The Amended Proxy Materials continued Defendants' fraudulent scheme by reproducing the false and misleading statements that were originally included in the Preliminary Proxy Materials, as described in Section V.C above.

### E.    The Second Amended Proxy Materials

297.    October 9, 2015, WuXi filed the Second Amended Proxy Materials with the SEC as an amendment to its earlier-filed Form 13E3.  The Second Amended Proxy Statement was included as an exhibit to the Second Amended Schedule 13E-3 Transaction Statement that was filed on October 9, 2015 and was directed to all "Shareholders of WuXi PharmaTech (Cayman) Inc."

298.    The Second Amended Proxy Materials were signed by Defendants Li, Hu (on behalf of WuXi), Zhao, Liu, Zhang, G&C LP (signed by Defendant Li), ABG, Boyu, Hillhouse, Ping An, and Temasek.

299.    These Defendants signed the Second Amended Rule 13e-3 Transaction Statement, which incorporated the Second Amended Proxy Statement.  In addition, Defendant Li signed the Second Amended Proxy Statement itself.

300.    The Second Amended Proxy Materials continued Defendants' fraudulent scheme by reproducing the false and misleading statements that were originally included in the Preliminary and the Amended Proxy Materials, as described in Sections V.C-D above.

### F.    The Third Amended Proxy Materials

301.    October 20, 2015, WuXi filed the Third Amended Proxy Materials with the SEC as an amendment to its earlier filed Form 13E3.  The Final Proxy Statement was included as an exhibit to the third amended Schedule 13E-3 Transaction Statement that was filed on October 20, 2015 and was directed to all "Shareholders of WuXi PharmaTech (Cayman) Inc."

302.    The Third Amended Proxy Materials were signed by Defendants Li, Hu (on behalf of WuXi), Zhao, Liu, Zhang, G&C LP (signed by Defendant Li), ABG, Boyu, Hillhouse, Ping An, Temasek, G&C IV (signed by Defendant Li), Yinfu, Sequoia, Constant Cypress Limited, and SPDBI.

79

303.    These Defendants signed the Third Amended Rule 13e-3 Transaction Statement, which incorporated the Final Proxy Statement.  In addition, Defendant Li signed the Final Proxy Statement itself.

304.    The Third Amended Proxy Materials continued Defendants' fraudulent scheme by reproducing the false and misleading statements that were originally included in the Preliminary, Amended, and Second Amended Proxy Materials, as described in Sections V.C-E above.

### G.    The November 3, 2015 Investor Presentation

305.    On November 3, 2015, WuXi filed with the SEC an Investor Presentation as an exhibit to a Form 6-K that was signed by Defendant Hu.

306.    This Investor Presentation continued to tout the supposed benefits of the Merger to WuXi Securityholders while failing to disclose WuXi's true value or that Defendants planned to relist WuXi's subsidiaries at higher valuations following the Merger.

307.    For example, the Investor Presentation noted several factors that supported the Merger, concluding that "[c]ash consideration delivers immediate and certain value to WuXi shareholders" and that the Merger provided a "16.5% premium to pre-announcement price, when WuXi's stock price and peer valuation multiples were at historic highs."

308.    These statements were false and misleading for the reasons stated in ¶ 202(c).

309.    The Investor Presentation also contained several comparisons of WuXi to other U.S.-listed CROs and the U.S. CRO market in general.

310.    The Investor Presentation contained a slide comparing WuXi and CRO trading multiples, concluding that "[a]t the time of the transaction announcement, CRO stocks were trading at historically high multiples."

311.    The Investor Presentation also contained a slide showing "CRO Peer Share Price Performance Since Transaction Announcement," concluding that "[f]ollowing the transaction announcement, WuXi's CRO peers and the broader healthcare index had traded down."

312.    The Investor Presentation also contained a slide showing "Selected Precedent Transactions," concluding that "[t]ransaction price represented 18.9x LTM EBITDA multiple, substantially in excess of nearly all precedent transaction multiples."

313.    These statements comparing WuXi to other CROs, the CRO market in general, and other transactions were false and misleading for the reasons stated in ¶ 202(c).

314.    The Investor Presentation also based its analysis on WuXi's "Projected Financial Performance," which incorporated the Company's projections that it gave to Credit Suisse in the Merger.

315.    These statements were false and misleading for the reasons stated in ¶ 202(c).

316.    The Investor Presentation also noted that "[m]anagement forecast contains risk; calls for substantial near-term investment in capital expenditures."   These risks included "the Company's expansion into new lines of business," such as "biologics and genomics, which are projected to have revenue CAGRs of 34% and 54%, respectively, and represent over 35% of revenue by 2020."

317.    These statements were false and misleading for the reasons stated in ¶ 202(c)-(d).

**H.    The Fourth Amended Proxy Materials**

318.    On November 20, 2015, WuXi filed the Fourth Amended Proxy Materials with the SEC as an amendment to its earlier filed Form 13E3.  The Fourth Amended Proxy Materials incorporated the November 3, 2015 Investor Presentation and the October 20, 2015 Final Proxy Statement.

319.    The Fourth Amended Rule 13e-3 Transaction Statement that was part of the Fourth Amended Proxy Materials was signed by Defendants Li, Hu (on behalf of WuXi), Zhao, Liu, Zhang, G&C LP (signed by Defendant Li), ABG, Boyu, Hillhouse, Ping An, Temasek, G&C IV (signed by Defendant Li), Yinfu., Sequoia, Constant Cypress Limited, SPDBI, and Yunfeng.

320.    The Fourth Amended Proxy Materials continued Defendants' fraudulent scheme by reproducing the false and misleading statements that were originally included in the Final Proxy Statement and the Investor Presentation that are discussed in Sections V.F-G above.

## VI.    CONTROL PERSON ALLEGATIONS

321.    The Individual Defendants, by virtue of their senior positions at WuXi, directly participated in the management and oversight of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential, proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. As set forth below, the distribution of misleading information and the failure to convey material information to the public was the result of their collective actions and knowing inactions.

322.    As WuXi's Chairman, CEO, and Founder, Defendant Li was closely involved in all aspects of the Company's business operations. Defendant Li had control over WuXi during the Class Period, through these positions and his stake in the Company.

323.    Defendant Li also had control over the Merger and Buyer Group.  The Merger was his idea and he led the Buyer Group in making its proposal to buy the Company.  Defendant Li held a number of preliminary discussions with Ally Bridge Group Capital Partners in March and April 2015 about the possibility of making a going-private proposal to the Company.  This led to the consortium of Sponsors that agreed to work exclusively with each other in pursuing the

Merger.  In addition, one of the reasons that the Special Committee and the Board determined that there was "no other alternative reasonably available to the Company" was Defendant "Li's express intent not to sell his Shares or ADSs to any third party other than the Consortium."

324.    The other Individual Defendants also had control over WuXi and the Merger.

325.    Defendant Hu served as WuXi's Chief Financial Officer and Chief Investment Officer since April 2014.  In addition to his duties managing the Company's affairs, he regularly served a public representative of the Company.

326.    Defendant Zhao served as a director of WuXi since February 2009, co-founded the Company, and shares the financial interests in the Company with Defendant Li, her spouse. Prior to the Merger, Zhao served as Senior Vice President of Operations and Head of Corporate Human Resources.

327.    Defendant Liu served as WuXi's Executive Vice President since 2001 and as a director since 2005. Liu is also one of the Company's Founders.

328.    Defendant Zhang served as WuXi's Vice President of Domestic Marketing since 2002 and a director since 2005.  Zhang is also one of the Founders of the Company.

329.    Furthermore, Defendants Li, Liu, Zhang, and Zhao would own substantial stakes in the Company following the merger, amounting to 8.3%, 1.1%, 2.1%, and 2.8% of the Company, respectively.

330.    Defendants Li, Zhao, Liu, and Zhang were also all Directors of the Company. They comprised half of the Board's eight seats and voted in favor of the Board supporting the Merger.  Through their actions they were able to control the activities and vote of the Board to support the Merger.

331.    In addition, the Individual Defendants, because of their positions of control and authority as senior executive officers and directors of WuXi, were able to, and did, control the content of the SEC filings, press releases, and other public statements issued by WuXi, the Special Committee, the Board, and the Buyer Group during the Class Period. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the facts specified herein had not been disclosed to, and were being concealed from, the public, and that the representations which were being made were then materially false and/or misleading.

332.    Moreover, the Individual Defendants signed SEC filings that contained the material misstatements or omissions at issue here.  Accordingly, they are responsible for the accuracy of the public statements detailed herein.

333.    The Individual Defendants are also liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on the Class members by disseminating materially false and misleading statements and/or concealing material information. Each of the Individual Defendants were culpable for this deceit insofar as they acted with the requisite scienter, as explained throughout, and especially in the following Section.

334.    The Individual Defendants are further liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

335.    At all relevant times, the Individual Defendants acted with scienter in making the materially false and misleading statements and omissions alleged herein. The Individual Defendants had actual knowledge that the statements and omissions made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions. The Individual Defendants' intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter.

336.    In addition, Defendants WuXi and the Sponsor Defendants acted with scienter because they have the knowledge of their employees, principals, and representatives.  These corporate defendants therefore knew of the fraud insofar as any of their employees, principals, or representatives knew of the fraud.

337.    WuXi, the G&C Entities, and Co-Founder Equity LP also acted with scienter insofar as any of the Individual Defendants knew of the fraud.

338.    Furthermore, several of WuXi's other high-ranking employees (in addition to the Individual Defendants) would have known that the financial projections that were disclosed in connection with the Merger and that formed a basis for Credit Suisse's assessment of the fairness of the transaction were inaccurate and incomplete.  These high-ranking employees also would have known that the Buyer Group was already planning to relist WuXi's subsidiaries when the Proxy Materials were issued.  All of these facts were misstated or improperly omitted from the Proxy Materials.

339.    The Sponsor Defendants other than the G&C Entities and Co-Founder Equity LP (which were discussed in ¶ 337) also acted with scienter because each of the Sponsors participated in the Buyer Group's due diligence leading up to the Merger.  In the course of those

efforts, the Sponsors signed confidentiality agreements that allowed them to access WuXi's confidential financial and business data, worked closely with Defendant Li to complete the Merger, and obtained confidential, non-public information form WuXi's management concerning the Company's financial performance.

340.   For example, on May 25 and 26, 2015, representatives of the Buyer Group, its advisors, Kwauk (the Chairman of the Special Committee), and Credit Suisse, attended a management presentation at WuXi's offices in Shanghai, China, where "representatives of the Company's management reviewed the Company's historical financial statements, its business model, and its new businesses, and answered questions from the Consortium and its advisors." The Buyer Group, including the Sponsors, also had access to an electronic data room that contained WuXi's confidential materials that the Buyer Group reviewed in connection with its due diligence for the Merger.

341.   In addition, after Defendant Hu reviewed WuXi's financial projections with the Special Committee and Credit Suisse on July 8, 2015, the Special Committee "determined to allow the Company's management to provide the Company Projections to the buyer group because it determined that it was appropriate to provide management's then most recent forecast of the business and evaluation of its prospects to such parties in connection with their diligence review of the Company."

### A.   Defendants Li, Zhao, Liu, and Zhang, and the Sponsor Defendants, Had the Motive and Opportunity to Commit Fraud

342.   Defendants Li, Zhao, Liu, Zhang, and the Sponsor Defendants had a strong motive to commit fraud because they received substantial stakes in WuXi following the Merger. The following chart shows the portions of the Company that they each received in the Merger:

| Name | $'000 | % |
|---|---|---|
| Dr. Ge Li | 64,150.7 | 8.3 |
| Mr. Xiaozhong Liu | 8,501.9 | 1.1 |
| Mr. Zhaohui Zhang | 16,230.9 | 2.1 |
| Dr. Ning Zhao | 21,641.2 | 2.8 |
| Hillhouse | 71,879.7 | 9.3 |
| ABG | 85,019.0 | 11.0 |
| Boyu | 183,177.3 | 23.7 |
| Temasek | 93,520.9 | 12.1 |
| Ping An | 57,194.6 | 7.4 |
| G&C IV | 68,015.2 | 8.8 |
| Co-Founder Equity LP | 57,194.6 | 7.4 |
| Yunfeng | 14,685.1 | 1.9 |
| Sequoia | 14,685.1 | 1.9 |
| Legend Capital | 14,685.1 | 1.9 |
| SPDBI | 17,003.8 | 2.2 |
| G&C | 85,019.0 | 11.0 |
| G&C LP | 10,820.6 | 1.4 |

343.  As noted above, immediately upon WuXi Biologics' IPO in June 2017, WuXi as a whole was valued at a far-higher amount than it was in the Merger.  By June 2018, WuXi was valued at $30.77 billion, as compared to the just $3.3 billion that the Buyer Group paid for the Company in the Merger.  The Buyer Group obtained the majority of that amount because they continued to own substantial portions of WuXi Biologics, WuXi AppTec and WuXi NextCODE after small portions of those subsidiaries were relisted or sold to private investors.

344.  In addition to reaping a windful of tens of billions of dollars by underpaying for the Company in the Merger, the Buyer Group profited even further because they funded much of the purchase price with debt rather than their own cash or pre-existing shares of the Company. The Buyer Group rolled over shares that represented just 2.9% of the Company prior to the Merger.  In addition, the Buyer Group paid for the Company using $800 million in debt financing, plus an additional $300 million loan that Defendants Li, Zhao, Liu, Zhang (through G&C) used to pay for a large portion of their equity commitment.

87

345.    The Buyer Group has already started to cash out on their purchase of the Company through their sales of portions of its subsidiaries.  It has been reported that Defendant Li alone received $346 million just from the offering of a small portion of WuXi Biologics' equity in the public markets in Hong Kong and China through June 2018.  That does not account for any profits he has received from the offerings of WuXi AppTec shares.  Moreover, the Buyer Group continues to own a substantial portion of WuXi and its subsidiaries at a far higher valuation than what they paid for it in the Merger.

### B.    Defendants' Statements Show that the Buyer Group Intended All Along to Relist WuXi's Subsidiaries

346.    Defendants made many statements after the Merger that revealed that it was their plan all along to take WuXi private so that they could relist its subsidiaries in Hong Kong and China at far higher valuations following the Merger.

347.    On December 11, 2015—the day after the Merger closed—*Yicai* published an article disclosing that in August 2015, a WuXi senior manager "revealed in private that after privatization PharmaTech intended to return to the Chinese A-share market."  The article also stated that an insider close to WuXi's high-level management stated that now that WuXi had completed privatization, "it was extremely likely that the next step would be to spin off its subsidiary sectors into three major companies and separately relist them in China."

348.    Then, on December 16, 2015, an article in *Sina Finance* quoted WuXi's COO Yang Qing as stating that "[w]hether to return to the Chinese A-share market is something that the company's management level and new investment capital will be thinking about. But all possibilities exist, and at this time it is not appropriate to reveal to the media the next step."  This article also suggested that the fact that the Sponsors "come from the Asia Pacific region, while the great majority of past investors were in Western countries," supported that plan.

349.    On June 13, 2017, the *South China Morning Post* cited Chris Chen, WuXi Biologics' CEO, as stating that WuXi's privatization in 2015 "was part of a long-term strategy for the then parent company to spin off three separate entities with dedicated focuses, which later became WuXi Biologics, WuXi NextCODE and WuXi Apptech."

350.    Similarly, a report published on the industry website *Bio Space* on December 11, 2018, revealed "[t]hat [the] privatization [of WuXi in 2015] was part of a long-term strategy for the then-parent company to spin off three separate companies with specific, dedicated goals: WuXi Biologics, WuXi NextCODE and WuXiAppTec."

351.    Defendants' actions following the Merger also expose their true intent. By February 2016, just three months after the Merger closed, the Buyer Group, led by Defendant Li, already began engaging third parties to assist with relisting WuXi Biologics in Hong Kong, including hiring Bank of America and Morgan Stanley to work on the IPO.  This timing shows that the WuXi Biologics relisting was part of the Buyer Group's plan all along so that they could capture the higher valuation that the Company would receive as separate entities in the Hong Kong and Chinese markets.

352.    The clear inconsistency of Defendant Li's and the Buyer Group's explanation for why they wanted to take the Company private, as compared to their actions following the Merger, also highlights their true intent.  Defendant Li and the Buyer Group attempted to portray the Merger as an effort to avoid the pressure of the public market while the Company was investing so heavily in certain efforts.  If that was truly their motivation, they would not have started the relisting process right after the Merger closed.

353.    Similarly, Frank Yu, Ally Bridge Group's Founder and CEO, told the publication *BioCentury* in 2017 that "an investor base in China would likely be more receptive than Wall

Street to the parent company's long-term growth plans, which involved investments in new facilities and R&D." This statement revealed that the Buyer Group's goal in conducting the Merger was to relist WuXi where the regional Chinese investor base would be able to invest in it. If the Buyer Group's motivation for the Merger was that those investors would take a different approach to the Company than U.S. investors, they should have explained that when describing their reasons for the Merger in the Proxy Materials.

354.    The Second Amended and Restated Consortium Agreement between the Sponsors and Defendant Li, which was filed with the SEC on October 20, 2015 with the Third Amended Proxy Materials, listed Yu as the contact person for notices on behalf of ABG.

355.    ABG describes itself as the leading private investor that took WuXi private in the Merger. Several news releases that ABG published on its website make clear that the Buyer Group had a master plan all along to relist both WuXi Biologics and WuXi AppTec. These articles reported that even though WuXi AppTec's IPO did not occur until 2018, WuXi had directed Huatai United Securities in early 2017 to lead the IPO in mainland China. These articles also discussed the WuXi Biologics and WuXi AppTec IPOs as part of the same plan to relist the Company's main subsidiaries following the Merger.

356.    Articles from ABG's website also discuss how WuXi Biologics' greater valuation in the Hong Kong market was justified when compared to 3Sbio—another company that relisted from the United States market and relisted in Hong Kong. That analysis, including financial projections for WuXi Biologics that supported the valuation, was omitted entirely from the Proxy Materials.

357.    Defendants' gross undervaluation of WuXi in the Proxy Materials is also confirmed by how WuXi's main subsidiaries proceeded to perform in the years immediately

following the Merger.  Those entities earned inordinately more revenue and profits than what Defendants projected in the Proxy Materials.

### C. The Restructuring of WuXi Biologics Prior to the Merger Shows that Defendants Planned to Relist that Subsidiary All Along

358.    WuXi's extensive restructuring of WuXi Biologics leading up to the Merger also indicates that the Individual Defendants were planning on relisting WuXi Biologics as a standalone entity following the Merger.  Over the course of 2015, the Company took several complicated steps to restructure multiple subsidiaries so that they would be under the control of WuXi Biologics.  These actions paved the way for WuXi Biologics' subsequent relisting.  The Individual Defendants, as high-level executives, would have been involved in these significant changes to the Company's corporate structure.  The Sponsors also would have had knowledge of these actions because the Merger could not have been completed without their participation.

### D. The History of the Merger Shows Defendants' Scienter

359.    The history of the Merger shows that it was part of an orchestrated plan by Defendants to take WuXi private at a price far below what they knew it was worth.  The Merger was Defendant Li's idea.  He then worked exclusively with the Sponsors to pursue the transaction.

360.    The timing of the Merger reveals their scheme.  Defendants used a time when investors were fearful of the increased costs that WuXi would incur to downplay the Company's true growth prospects so that he and the Buyer Group could purchase the Company at far-below its true value.

361.    The control that Defendants exerted over the Merger process also shows their scienter in pushing the Merger through without adequate consideration of alternatives.  One of the key reasons that the Special Committee and the Board determined that there were no

reasonable alternatives to the Merger was "Dr. Li's express intent not to sell his Shares or ADSs to any third party other than the [Sponsors that were part of the] Consortium." But prior to the Merger, Dr. Li owned only 1.4% of the Company. His share ownership was therefore not a reasonable barrier to alternative transactions if not for the fact that he and the other Defendants sought to use their influence over the Company to prevent the consideration of such alternatives.

362.    The fact that Defendants Li, Zhao, Liu, and Zhang occupied four of the eight seats on WuXi's Board of Directors when it voted to approve the Merger further shows the extent to which Defendants were able to promote the Merger based on false pretenses and without the consideration of alternatives.

## VIII.  LOSS CAUSATION

363.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the price of WuXi Securities and operated a fraud or deceit on Class members by failing to disclose and misrepresenting the facts detailed herein. This course of conduct misled the Class members and caused them, in reliance on the misrepresentations and on the market price of WuXi Securities during the Class Period, to sell their shares at a depressed price. The far higher price that the Company was valued at in the relistings of its subsidiaries shows that the Class members did not receive fair value for their shares in the Merger. Class members who sold their WuXi Securities during the Class Period were damaged thereby because they sold their shares at prices that were lower than the true value of the Company (i.e., Class members suffered damages under the federal securities laws).

364.    Those Class members who sold their WuXi Securities during the Class Period and prior to the Merger being completed on December 10, 2015 suffered economic loss because their Securities were sold at a depressed value. Defendants' fraud caused WuXi's ADS to trade at

artificially deflated levels throughout the Class Period and caused the holders of WuXi Securities to be deprived of the true value of their shares. According to data on Bloomberg, the closing price of WuXi's ADS on each date during the Class Period ranged from $42.20 per ADS to $45.90 per ADS.  The Class members who sold their WuXi Securities prior to the completion of the Merger on December 10, 2015, were deprived of the fair value of their shares through this fraudulent depression of the price of their securities by Defendants' false and misleading statements and omissions.

365.    With respect to those Class members who sold their WuXi Securities prior to December 10, 2015, but for the fraud, the market price for WuXi Securities would have more closely reflected its true value, including because the ability to dissent from the Merger and seek appraisal as a remedy would have prevented the deal price from serving as a ceiling limiting the upper-price of the WuXi Securities.

366.    In addition, Defendants' false and misleading statements caused WuXi Securityholders to (1) vote in favor of the Merger and (2) forego their right to dissent prior to the shareholder vote and exercise their appraisal rights.  Defendants' false and misleading statements concealed the true value of WuXi Securities and therefore prevented WuXi Securityholders from making an informed decision as to whether they should dissent and seek appraisal. Defendants' descriptions in the Proxy Materials of how difficult it would be for WuXi Securityholders to cancel their ADS and register their corresponding shares before they would be able to exercise their dissenting rights further deterred them from dissenting absent knowledge of Defendants' fraud.

367.    Class members who held their WuXi Securities through the close of the Class Period ultimately sold their WuXi Securities in the Merger for either $46.00 per ADS or $5.75

per common share. Each of these holders of WuXi Securities was deprived of the fair value of their securities through the fraudulent depression of the value of their securities by Defendants' false and misleading statements and omissions. These securities were worth far more than the transaction price, as evidenced by the fact that WuXi has been valued at multiple times the Merger price since the relisting of its subsidiaries in Hong Kong and China.

368. Members of the Class both sold ADS during the Class Period at a deflated price and were injured thereby and held ADS through the close of the Merger, and ultimately sold those ADS by tendering them for the deflated Merger consideration.

## IX. ALLEGATIONS OF INSIDER TRADING

369. Defendants WuXi, Li, Zhao, Liu, and Zhang, and the Sponsor Defendants (the "Insider Trading Defendants," *i.e.*, all Defendants other than Hu) engaged in insider trading to the detriment of the Class members, who were forced to tender their shares in the Merger or who voluntarily sold their shares contemporaneously with these Defendants. Through this insider trading, these Defendants are liable under Section 20A of the Exchange Act, 15 U.S.C. § 78t–1, as explained in Count 2 below. Furthermore, to the extent that WuXi is liable for insider trading, the Individual Defendants are liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and as expressly permitted by Section 20A(b)(3) of the Exchange Act, 15 U.S.C. § 78t–1(b)(3), as explained in Count 3 below.

370. According to a Schedule 13E-3 filed by WuXi with the SEC on December 10, 2015, the Merger "became effective" on that day. This is referred to by WuXi as the "Effective Time." WuXi explained that as of the Effective Time, each share of its stock, including shares represented by ADS, was "cancelled and converted into the right to receive US$5.75, and because each of the Company's ADSs represents eight Shares, each ADS issued and outstanding immediately prior to the effective time of the merger was cancelled and represents the right to

surrender such ADS in exchange for US$46.00 (less $0.05 per ADS cancellation fees), in each case, in cash, without interest and net of any applicable withholding taxes."

371.    Through the Merger, the Insider Trading Defendants purchased the shares that were sold by Class members through the Merger.   As laid out in Section 2.04 of the Merger Agreement, which was approved at the extraordinary shareholders meeting held on November 25, 2015, the Parent entity in the Merger was responsible for depositing the Merger funds with a "Paying Agent."   As promptly as applicable following the Effective Time, the Company (in its surviving form following the Merger) would then cause the Paying Agent to mail to WuXi shareholders "instructions for use in effecting the surrender of any issued share certificates . . . and/or such other documents as may be required in exchange for the Per Share Merger Consideration."

372.    In addition, the Paying Agent would transmit the total Merger consideration to the ADS Depositary (*i.e.*, JPMorgan Chase Bank, N.A.) following the Effective Time and the Depositary would "distribute the Per ADS Merger Consideration to holders of ADSs pro rata to their holdings of ADSs (other than ADSs representing or that are Excluded Shares) upon surrender by them of the ADSs."   As the Proxy Materials explained to ADS holders, "[i]f your ADSs are represented by certificates, also referred to as American depositary receipts ('ADRs'), unless you have surrendered your ADRs to the ADS depositary for cancellation prior to the effective time, upon your surrender of the ADRs (or an affidavit and indemnity of loss in lieu of the ADRs) together with a duly completed letter of transmittal (which will be supplied to you by the ADS depositary after the effective time), the ADS depositary will send you cash for the per ADS merger consideration of $46.00 (less $0.05 per ADS cancellation fees pursuant to the terms

of the ADS deposit agreement), without interest, for each ADS represented by the ADRs, in exchange for the cancellation of your ADRs after the completion."

373.    The Proxy Materials further explained that "[a]fter the merger is completed, you will be sent a form of letter of transmittal with detailed written instructions for exchanging your Share certificates for the merger consideration. Please do not send in your certificates now. Similarly, you should not send in the ADRs that represent your ADSs at this time. Promptly after the merger is completed, the ADS depositary will call for the surrender of all ADRs for delivery of the merger consideration. ADR holders will be receiving a similar form of letter of transmittal and written instructions from the ADS depositary relating to the foregoing."

374.    At the Effective Time, upon purchasing the shares thereafter, and at all times during the Class Period, Defendants were in possession of material non-public information about the Buyer Group's plans to relist the Company's subsidiaries following the Merger at far-higher valuations. Furthermore, Defendants were aware of the truth regarding each of the misstatements described herein and were aware of the material omissions detailed herein.

375.    By virtue of possessing material non-public information, the Insider Trading Defendants had a duty to either disclose that information before trading on the basis of that information or abstain from trading. By trading while in possession of such information, they violated this duty and infringed upon the relationship of trust and confidence that they had with WuXi's investors.

376.    Moreover, Cayman Islands corporations, like WuXi, have a duty to provide investors with sufficient information to adequately understand the Merger that they are called upon to consider.

377.    By failing to disclose the material non-public information prior to trading, the Insider Trading Defendants caused selling investors in WuXi Securities to suffer economic losses. In addition, by trading with WuXi Securityholders who were acting in reliance on the material misrepresentations made by Defendants described throughout this Amended Complaint, they caused selling investors in WuXi Securities to suffer economic loss. By purchasing the WuXi Securities from Lead Plaintiff and other Class members, Defendants experienced an unlawful and unjust enrichment, since they were able to acquire these securities for less than their fair value.

## X.    NO SAFE HARBOR

378.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Amended Complaint. As the Company acknowledged in the Proxy Materials, the Merger was a "going private" transaction under the SEC rules governing such transactions and, therefore, the statements made in connection with the Merger are not subject to the PSLRA's safe harbor. *See* 15 U.S.C.A. § 78u-5(b)(E).

379.    Furthermore, even if the statements were not covered by this exemption, the statements at issue would not be protected by the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons, including the following.  First, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions and, therefore, are not protected by the Safe Harbor. Second, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not

mention important factors of similar significance to those actually realized. Fourth, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

## XI. CLASS ACTION ALLEGATIONS

380. Lead Plaintiff bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all owners and former owners of WuXi Securities who sold shares, and were damaged thereby, during the period from August 14, 2015 through December 10, 2015, inclusive, and all owners and former owners of WuXi Securities who owned shares as of the Effective Time of the Merger and have tendered those shares for the Merger consideration, except as excluded below (the "Class").

381. For the avoidance of doubt, the Class includes those WuXi Securityholders who held WuXi ADS on December 10, 2015 or purchased WuXi ADS any time after August 14, 2015, redeemed those ADS for WuXi common stock during the Class Period, and then tendered those shares for the Merger consideration, in accordance with the instructions that Defendants provided in connection with the Merger.

382. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of the Individual Defendants and the directors and officers of WuXi and the Sponsors; (iii) any entity in which Defendants have a controlling interest; (iv) any person who was an officer or director of WuXi or the Sponsors during the Class Period; (v) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (i)-(v) of this paragraph.

383.    The members of the Class are so numerous that joinder of all members is impracticable.  WuXi had approximately 561.2 million ordinary shares and 70.15 million ADS outstanding as of December 10, 2015.  In addition, WuXi stated in the Proxy Materials that it was expected to have 568,032,632 shares outstanding as of November 2, 2015 (the record date for determining the shareholders entitled to vote on the Merger).  WuXi's ADS actively traded on the NYSE.

384.    While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, it is likely that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained either by WuXi or by WuXi's ADS Depository and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

385.    Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

386.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

387.    There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, without limit:

(a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)      whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c)      whether Defendants' statements omitted material facts that Defendants had a duty to disclose;

(d)      whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)      whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)      whether defendants acted with the intent to defraud class members regarding the true value of the WuXi Securities;

(g)      whether Defendants' fraudulent conduct depressed the price of WuXi Securities during the Class Period;

(h)      whether the Insider Trading Defendants were in possession of material non-public information at the time of the Merger;

(i)      whether Class members sold their WuXi securities contemporaneously with the Insider Trading Defendants' purchase of those shares;

(j)      whether the Individual Defendants were controlling persons of WuXi;

(k)      whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972); and

(l)     whether and to what extent WuXi Securityholders suffered losses due to Defendants' fraudulent conduct.

388.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

389.    Lead Plaintiff and Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

390.    In the alternative, Lead Plaintiff and Class members are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory because, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     WuXi's ADS were actively traded on the NYSE, an informationally efficient market, under the ticker symbol "WX," throughout the Class Period;

(d)     WuXi's ADS traded at high volumes during the Class Period;

(e)     as the sponsor of its ADS, which are registered with the SEC, WuXi filed periodic public reports with the SEC;

(f)     WuXi communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(g)     the WuXi Securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace;

(h)     the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the WuXi Securities; and

(i)     without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class sold WuXi Securities between the time Defendants misrepresented or failed to disclose material facts and the end of the Class Period, at which time the truth had not yet been revealed.

391.    As a result of the foregoing, the market for WuXi Securities promptly digested current information regarding WuXi from publicly available sources and reflected such information in WuXi's stock price.

392.    Lead Plaintiff is not only entitled to a presumption that it relied on the market price when deciding whether, and how, to vote its WuXi Securities, whether to sell its WuXi Securities, whether to hold those WuXi Securities, or whether to seek appraisal; Lead Plaintiff also in fact did rely on that market price when engaging in those activities.

393.    Under these circumstances, all sellers of WuXi Securities during the Class Period suffered similar injury through their sale of WuXi stock and ADS at artificially deflated prices and the presumption of reliance applies.

**COUNT I**

**(Violation of § 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants)**

394.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

395.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

396.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

397.    Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose (under both U.S. and Cayman Islands law) and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

398.    Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who sold WuXi Securities.

399.    Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially deflate and maintain the prices

of WuXi Securities; and (iii) cause Lead Plaintiff and members of the Class to sell WuXi Securities at artificially deflated prices.

400.    The Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

401.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying, directly or indirectly, on those statements or upon the integrity of the market price for WuXi stock and ADS, Lead Plaintiff and other members of the Class sold WuXi Securities at artificially deflated prices during the Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have sold WuXi Securities at such artificially deflated prices.

402.    The members of the Class that sold their WuXi Securities in the Merger would have avoided doing so either by voting against the Merger or objecting to and dissenting from the Merger and seeking their appraisal rights under Cayman Islands law.

403.    By selling the WuXi Securities at these artificially deflated prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

404.    By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**(Violation of § 20A of the Exchange Act
Against the Insider Trading Defendants)**

405.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

406.    This Count is asserted pursuant to Section 20A of the Exchange Act against the Insider Trading Defendants (*i.e.*, Defendants WuXi, Li, Zhao, Liu, and Zhang, and the Sponsor Defendants), on behalf of Lead Plaintiff and all members of the Class who sold WuXi Securities through the Merger and contemporaneously with these Defendants' purchase of those securities in connection with the Merger that was completed on December 10, 2015.

407.    As alleged herein, the Insider Trading Defendants bought the WuXi Securities while knowingly in possession of material positive and non-public information concerning the Company.  Among this information was the knowledge that the Proxy Materials understated WuXi's true value and omitted the fact that the Buyer Group was already planning to relist WuXi's subsidiaries following the Merger.

408.    Lead Plaintiff held many of its WuXi Securities until the close of the Class Period.  By doing so, it sold those WuXi Securities to the Insider Trading Defendants through the Merger.  These Defendants' purchase and Lead Plaintiff's sale were contemporaneous within the meaning of Section 20A of the Exchange Act. Numerous members of the Class also sold WuXi Securities contemporaneously with these Defendants' purchase in connection with the Merger.

409.    By virtue of possessing material non-public information, the Insider Trading Defendants had a duty to either disclose that information before trading on the basis of that information or abstain from trading. By trading while in possession of such information, they

violated this duty and infringed upon the relationship of trust and confidence that they had with WuXi's investors.

410. Accordingly, under Section 20A of the Exchange Act, these Defendants' purchase of the WuXi Securities while knowingly in possession of material, positive, and non-public information during the Class Period makes them liable to Lead Plaintiff and the Class for all profits gained and losses avoided as a result of such stock sales.

411. The Insider Trading Defendants are required to account for all such stock sales and disgorge their profits or ill-gotten gains.

### COUNT III

**(Violation of § 20(a) of the Exchange Act
Against the Individual Defendants)**

412. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

413. This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

414. As alleged above, WuXi violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by (i) making false and misleading statements and omitting material information in connection with the purchase and sale of the WuXi Securities and (ii) participating in a fraudulent scheme and course of business or conduct throughout the Class Period.

415. Also as alleged above, WuXi violated Section 20A of the Exchange Act by purchasing the Class members' WuXi Securities through the Merger and while in possession of material non-public information.

416.    This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period.  Thus, WuXi is primarily liable under Section 10(b) and Section 20(A) of the Exchange Act.

417.    As set forth above, the Individual Defendants were controlling persons of WuXi during the Class Period, due to their senior executive positions with the Company, positions on the Board, significant control over the Company's Securities, and control over the Merger.  Such positions meant that the Individual Defendants had direct involvement and influence over the Company's day-to-day operations and the Merger process.

418.    By virtue of the foregoing, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of WuXi, including the content of its public statements with respect to, among other things, the Merger.

419.    The Individual Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who sold WuXi Securities during the Class Period.

420.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for WuXi Securities, Lead Plaintiff and other members of the Class sold WuXi Securities at artificially deflated prices during the Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have sold WuXi Securities at such artificially deflated prices.  By selling the WuXi Securities at these artificially deflated prices the Class members

suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

421.    By reason of the foregoing, the Individual Defendants are liable to Lead Plaintiff and the members of the Class as controlling persons of WuXi in violation of Section 20(a) of the Exchange Act.

## XIII.   PRAYER FOR RELIEF

422.    **WHEREFORE**, Lead Plaintiff respectfully demands judgment against Defendants as follows:

(a)     Determining that this action is a proper class action maintained under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as the class representative, and appointing Pomerantz LLP as class counsel pursuant to Rule 23(g);

(b)     Determining and declaring that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

(c)     Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

(d)     Awarding Lead Plaintiff and the Class prejudgment and post-judgment interest, as well as their reasonable costs and expenses incurred in this action, including but not limited to reasonable attorneys' fees, expert fees, and other costs; and

(e)     Granting such other and further relief as the Court deems just and proper.

## XIV.   DEMAND FOR JURY TRIAL

423.    Lead Plaintiff demands a trial by jury of all issues so triable.

Dated:   August 5, 2019

**POMERANTZ LLP**

*/s/ Michael Grunfeld*
Jeremy A. Lieberman
Michael Grunfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 66108665
Email: jalieberman@pomlaw.com
Email: mgrunfeld@pomlaw.com

*Counsel for Lead Plaintiff*
*Altimeo Asset Management and*
*Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2019, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties whose counsel has appeared in this action, by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Michael Grunfeld*
Michael Grunfeld