**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| ALTIMEO ASSET MANAGEMENT, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>   v.<br><br>WUXI PHARMATECH (CAYMAN) INC., GE LI, EDWARD HU, NING ZHAO, XIAOZHONG LIU, ZHAOHUI ZHANG, G&C PARTNERSHIP L.P., ABG II-WX LIMITED, BOYU CAPITAL FUND II, L.P., HILLHOUSE CAPITAL FUND II, L.P., PING AN LIFE INSURANCE COMPANY OF CHINA, LTD., TEMASEK LIFE SCIENCES PRIVATE LIMITED, G&C IV LIMITED, YINFU CAPITAL MANAGEMENT CO., YUNFENG II WX LIMITED, SEQUOIA CAPITAL CHINA GROWTH FUND III, L.P., CONSTANT CYPRESS LIMITED, and SPDB INTERNATIONAL HOLDINGS LIMITED,<br><br>        Defendants. | CASE NO.:  1:19-cv-01654-AJN |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**WUXI PHARMATECH (CAYMAN) INC.'S MOTION TO DISMISS**
**THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

ARGUMENT .......................................................................................................................... 5

I.    THE HEIGHTENED PLEADING STANDARDS APPLICABLE TO THE AC ................ 6

II.   THE AC FAILS TO STATE A SECTION 10(b) CLAIM ................................................. 7

   A.   The AC Fails to Plead a Material Misrepresentation or Omission Based on the
      Alleged Failure to Disclose the Potential Re-Listing of the Company ............................ 7

     1.   The Proxy Fully Disclosed the Possibility of Re-Listing the Company's Equity
        on Asian Stock Exchanges Post-Merger ........................................................... 8

     2.   The Proxy Need Not Predict the Future or Disclose Indefinite Plans .............. 10

     3.   The AC Fails to Allege Particularized Facts Showing that the Challenged
        Statements Themselves Were Untrue ............................................................... 13

   B.   The AC Fails to Plead an Actionable Material Misrepresentation Based on the
      "Fairness" of the Merger and the Promotion of the Merger Price .............................. 14

   C.   Plaintiff Does Not Allege Particularized Facts Giving Rise to a Strong Inference
      of the Company's Scienter ........................................................................................... 15

     1.   The AC Fails to Sufficiently Plead Motive and Opportunity ........................... 16

     2.   The AC Fails to Plead the Company's Conscious Misbehavior or Recklessness –
        Directly or By Imputation ................................................................................ 17

     3.   When the Allegations Are Considered Holistically, the More Plausible Inference
        Is That the Company Acted in Good Faith ....................................................... 20

   D.   Plaintiff Fails to Sufficiently Allege an Economic Loss and Loss Causation ................ 21

   E.   Plaintiff Fails to Sufficiently Plead Reliance ............................................................... 23

III.  *MORRISON* PRECLUDES PLAINTIFF'S SECTION 10(b) CLAIM ............................... 23

IV.   THE AC FAILS TO STATE A SECTION 20A CLAIM ................................................. 25

CONCLUSION ..................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)...................................................................................24

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)........................................................................................23

*Alki Partners, L.P. v. Vatas Holding GmbH*,
    769 F. Supp. 2d 478 (S.D.N.Y. 2011).....................................................................19

*In re Alstom SA Sec. Litig.*,
    741 F. Supp. 2d 469 (S.D.N.Y. 2010)....................................................................24

*Ashcroft v. Iqbal*,
    556 U. S. 662 (2009)...............................................................................10, 19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..........................................................................6, 10

*Azurite Corp. v. Amster & Co.*,
    52 F.3d 15 (2d Cir. 1995)...............................................................................10

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).....................................................................................23

*Billard v. Rockwell Int'l Corp.*,
    526 F. Supp. 218 (S.D.N.Y. 1981) ................................................................8, 10

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)..............................................................................3

*Coronel v.Quanta Capital Holdings Ltd.*,
    2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .........................................................19

*Data Probe Acquisition Corp. v. Datatab, Inc.*,
    722 F.2d 1 (2d Cir. 1983),
    *cert. denied*, 465 U.S. 1052 (1984)...................................................................15

*Dura Pharms., Inc. v. Bruodo*,
    544 U.S. 336 (2005).............................................................................20, 21, 22

*ECA v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).............................................................................15

*Elec. Specialty Co. v. Int'l Controls Corp.,*
  409 F.2d 937 (2d Cir. 1969)..............................................................................12, 20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
  574 F.3d 29 (2d Cir. 2009)................................................................................22

*Foley v. Transocean Ltd.,*
  861 F. Supp. 2d 197 (S.D.N.Y. 2012)..........................................................17, 18

*Fort Worth Emp'rs Ret. Fund v. Biovail Corp.,*
  615 F. Supp. 2d 218 (S.D.N.Y. 2009)................................................................17

*Gagnon v. Alkermes PLC,*
  368 F. Supp. 3d 750 (S.D.N.Y. 2019)..................................................................2

*Ganino v. Citizens Utils. Co.,*
  228 F.3d 154 (2d Cir. 2000)............................................................................3, 16

*In re GeoPharma, Inc. Sec. Litig.,*
  411 F. Supp. 2d 434 (S.D.N.Y. 2006)................................................................17

*Gillis v. QRX Pharma Ltd.,*
  197 F. Supp. 3d 557 (S.D.N.Y. 2016)..................................................................7

*In re GMR Sec. Litig.,*
  2013 WL 3781509 (S.D.N.Y. July 19, 2013) ......................................................9

*Hershfang v. Citicorp,*
  767 F. Supp. 1251 (S.D.N.Y. 1991)......................................................10, 11, 18

*Kalnit v. Eichler,*
  264 F.3d 131 (2d Cir. 2001)..................................................................15, 19, 20

*Kocourek v. Shrader,*
  391 F. Supp. 3d 308 (S.D.N.Y. 2019)..........................................................19, 21

*Kramer v. Time Warner Inc.,*
  937 F.2d 767 (2d Cir. 1991)............................................................................2, 3

*Krauth v. Executive Telecard, Ltd.,*
  1994 WL 584556 (S.D.N.Y. Oct. 24, 1994) ................................................11, 12

*Lentell v. Merrill Lynch & Co.,*
  396 F.3d 161 (2d Cir. 2005),
  *cert. denied*, 546 U.S. 935 (2005)......................................................................6

*In re Magnum Hunter Res. Corp. Sec. Litig.,*
  26 F. Supp. 3d 278 (S.D.N.Y. 2014)....................................................................7

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ................................................................................................7

*In re MBIA, Inc. Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010) .................................................................19

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) .................................................................22

*Missouri Portland Cement Co. v. Cargill, Inc.*,
    498 F.2d 851 (2d Cir. 1974) .............................................................................9, 10

*Morrison v. Nat'l Australia Bank Ltd.*,
    130 S. Ct. 2869 (2010) .....................................................................................23, 24

*In re Neurotrope, Inc. Sec. Litig.*,
    315 F. Supp. 3d 721 (S.D.N.Y. 2018) .................................................................18

*In re New York Cmty. Bancorp, Inc. Sec. Litig.*,
    2006 WL 8433456 (E.D.N.Y. Sept. 18, 2006) ............................................9, 14, 17

*In re North Sea Brent Crude Oil Futures Litig.*,
    256 F. Supp. 3d 298 (S.D.N.Y. 2017) .............................................................24, 25

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 1998) ..................................................................... *passim*

*In re Omega Healthcare Inv'rs, Inc. Sec. Litig.*,
    375 F. Supp. 3d 496 (S.D.N.Y. 2019) ..................................................................8

*Omnicare Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*,
    135 S. Ct. 1318 (2015) .................................................................................13, 14, 15

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018) .................................................................17

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007) .................................................................25

*Pantry Pride, Inc. v. Rooney*,
    598 F. Supp. 891 (S.D.N.Y. 1984) .....................................................................12

*Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) ...........................................................................24, 25

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of*
    *Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) .................................................................19

*Podany v. Robertson Stephens, Inc.*,
  318 F. Supp. 2d 146 (S.D.N.Y. 2004)...................................................................6

*In re PXRE Grp., Ltd. Sec. Litig.*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009)...........................................................17, 18

*Reiss v. Pan American World Airways*,
  711 F.2d 11 (2d Cir. 1983).......................................................................10, 12, 13

*Ret. Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014)...............................................................8, 19

*Rodman v. The Grant Found.*,
  608 F.2d 64 (2d Cir. 1979)...............................................................................9

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)...............................................................................6

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007)...........................................................................2, 3

*S. Cherry St., LLC v. Hennessee Grp., LLC*,
  573 F.3d 98 (2d Cir. 2009).............................................................................16

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977)...............................................................................8, 14, 15

*In re Satyam Comp. Servs. Ltd. Sec. Litig.*,
  915 F. Supp. 2d 450 (S.D.N.Y. 2013)................................................................24

*In re Shanda Games Ltd. Sec. Litig.*,
  Case No. 1:18-cv-02463 (ALC) (S.D.N.Y. Sept. 30, 2019).........................15, 23, 25

*In re Sierra Wireless, Inc. Secs. Litig.*,
  482 F. Supp. 2d 365 (S.D.N.Y. 2007)................................................................11

*In re Société Générale Sec. Litig.*,
  2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010)....................................................23

*Staskus v. Rawplug Co.*,
  1993 WL 212736 (S.D.N.Y. June 11, 1993) .......................................................15

*Stoneridge Inv. Partners, LLC v. Sci-Atl.*,
  552 U.S. 148 (2008)........................................................................................23

*TCS Capital Mgmt., LLC v. Apax Partners*,
  2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) .....................................................9, 22

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008)....................................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................................................6, 19, 20

*Tiberius Capital, LLC v. Petrosearch Energy Corp.*,
    2011 WL 1334839 (S.D.N.Y. Mar. 31, 2011) .......................................................21

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993)...........................................................................................8

*Todd Shipyards Corp. v. Madison Fund*,
    547 F. Supp. 1383 (S.D.N.Y. 1982)..........................................................10, 11, 12

*Transcon Lines v. A.G. Becker, Inc.*,
    470 F. Supp. 356 (S.D.N.Y. 1979) ..........................................................................10

*In re Vivendi Universal, S.A., Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)......................................................................23

*Wallerstein v. Primerica Corp.*,
    701 F. Supp. 393 (E.D.N.Y 1988) .............................................................................5

## RULES & STATUTES

Fed. R. Civ. P. 9(b) .......................................................................................................6

15 U.S.C. § 78u-4(b)(1) ................................................................................................6

15 U.S.C. § 78u-4(b)(3)(A)...........................................................................................7

**PRELIMINARY STATEMENT**

This securities fraud case is based entirely on the fiction that WuXi PharmaTech (Cayman) Inc. ("WuXi" or the "Company") failed to disclose in a go-private transaction that it may later spin off subsidiaries and re-list on Asian stock exchanges.  In reality, the proxy statement stated, "The buyer group may consider re-listing the Company's equity on the Chinese or Hong Kong exchanges, which may have higher valuations."  AC ¶ 226 (the "Disclosure").  This case thus is predicated on a *disclosed* omission.

Plaintiff is a "highly sophisticated" French asset manager[1] that has filed several similar securities actions.[2]  In its Consolidated Amended Complaint ("AC"), it moves from a pretense of inadequate disclosure to the real purpose of this suit:  to partake of the increased value WuXi attained on Asian stock markets almost four years *after* the go-private merger, under the guise of an unfair price *at* the time of the merger.  At best, Plaintiff's claims are for an unasserted breach of fiduciary duty under Cayman law, not for fraud under the federal securities laws. Consisting of generalized, conclusory allegations, the AC proffers a theory of liability that cannot withstand scrutiny.  In addition to the lack of a misrepresentation or omission, the AC fails to plead an intent to defraud where, *inter alia*, the "fraud" *was revealed* in the proxy statement and WuXi's subsequent actions were consistent with its statements.  The "economic loss" is improperly based on the Company's *future* value as a private entity, which Plaintiff knowingly gave up when it chose not to exercise its dissenters' rights but cashed out its WuXi investment for merger consideration that was an all-time high price.  The federal securities laws are neither insurance for Plaintiff's investment nor a vehicle for double-dipping after WuXi's future value turned out to be positive.  The loss causation allegations fail where Plaintiff's

---

[1] In its motion for lead plaintiff, Plaintiff describes itself as "a highly sophisticated independent portfolio management company based in France and approved by the French Financial Authority, with significant assets under management." Dkt. No. 9 at 7.

[2] *See ODS Capital LLC v. JA Solar Holdings Co*., Case No. 1:18-cv-12083-ALC (S.D.N.Y.), filed June 14, 2019; *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, Case No. 2:19-cv-01619-JAK-JC (C.D. Cal.), filed Mar. 5, 2019; *ODS Capital LLC v. Qihoo 360 Tech. Co.*, Case No. 1:19-cv-00501 (S.D.N.Y.), filed Jan. 17, 2019; *Fasano v. Guoqing Li*, Case No. 1:16-cv-08759-KPF (S.D.N.Y.), filed Nov. 10, 2016.

losses are alleged to have resulted from the "well-known" equity carveout and other factors specific to Asian markets, unrelated to the alleged misrepresentations or omissions. That is, the increased value of which Plaintiff was allegedly deprived was caused by events that occurred *after* the merger – and by Plaintiff's theory, was only made possible *by* the merger of which it complains. Lastly, no actual reliance is pleaded and no presumption applies.

Independently, Section 10(b) does not apply to the foreign securities transaction here. And the insider trading claim under Section 20A of the Exchange Act fails because, *inter alia,* the Company did not purchase WuXi securities. The AC should be dismissed with prejudice.

## STATEMENT OF FACTS

WuXi is a leading contract research organization ("CRO") incorporated in the Cayman Islands with principal offices in Shanghai, China. AC ¶¶ 25, 46. WuXi offers a wide range of pharmaceutical, biotechnology and medical device R&D services to life-sciences customers. *Id*. ¶¶ 49, 51. Founded in 2000 by Dr. Ge Li and three other Individual Defendants, WuXi became a public company in 2007 when its American Depository Shares ("ADSs") were listed on the New York Stock Exchange. *Id.* ¶¶ 46, 48. Dr. Li served as the CEO since 2000 and Chairman since 2004. *Id*. ¶ 26. WuXi had business lines consisting primarily of Laboratory Services, Small Molecule Manufacturing Services, Biologics Services, and New Business. *Id.* ¶¶ 49, 169. In 2014, WuXi had total revenues of about $674 million. *Id.* ¶ 58.

On March 5, 2015, WuXi announced financial results for the fourth quarter and full year of 2014, with revenue growth exceeding guidance for both periods. *Id.* ¶ 120; Ex. A at 4.[3] Dr. Li stated that WuXi would continue to strengthen its core businesses but also would be "investing aggressively in 2015 in new businesses to seize opportunities for further growth." Ex. A at 5. The price of WuXi ADSs fell from $40.96 that day to close at $38.01 on March 6.

___

[3] All exhibits referenced herein are attached to the Declaration of Ignacio E. Salceda in Support of WuXi's Motion to Dismiss, filed concurrently herewith. The Court may take judicial notice of Exhibit A, WuXi's Form 6-K dated March 9, 2015, as a public record filed with the SEC. In considering a motion to dismiss, courts routinely take judicial notice of SEC filings for the fact that they contained certain information and that their contents were publicly disclosed. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir. 1991); *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir. 2007); *Gagnon v. Alkermes PLC,* 368 F. Supp. 3d 750, 763 (S.D.N.Y. 2019).

Ex. B at 5.[4]  This negative market reaction prompted Dr. Li to consider making a proposal to acquire WuXi.  AC ¶ 120; Ex. C at 21.[5]  Referring to that market reaction, Dr. Li later commented, "So I thought, this is terrible:  The more we do, the more we are penalized.  It's very disincentivizing to us to do something new.  So I said, that's about the time to delist the company."  *See* Ex. D at 2.[6]

**The Merger.**  On April 29, 2015, Dr. Li and Ally Bridge Group Capital Partners delivered to the WuXi Board of Directors a preliminary letter, proposing a going-private transaction by a buyer group to acquire WuXi for $5.75 in cash for each ordinary share.  AC ¶ 67.  As each ADS represented eight ordinary shares, the offer was for $46 per ADS.  *Id.* ¶¶ 25, 67.  The proposal represented a 16.2% premium over the closing price of the ADSs on the NYSE on April 28, 2015, a premium of 24.1% over the volume-weighted average closing price during the prior 180 trading days and a premium of 8.7% over the 52-week high closing price.  Ex. C at 21-22; AC ¶ 276.  The $46 offer was higher than WuXi ADSs had ever traded on the NYSE.  Ex. B.  The Board formed a Special Committee of three independent directors (who are not defendants here), to evaluate and, if appropriate, negotiate the proposed transaction or any other alternative transactions.  AC ¶¶ 70, 72.  The Special Committee retained its own legal and financial advisors, Willkie Farr & Gallagher LLP and Credit Suisse (USA) LLC, respectively.  Ex. C at 23; AC ¶ 71.  The Special Committee did not receive competing offers from either the nine potential purchasers identified as part of a market check or any other third party, even

---

[4] The Court may judicially notice Exhibit B, a table of the historical prices of WuXi ADSs.  *See Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 166 n.8 (2d Cir. 2000) (the "district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment.").

[5] The Court may take judicial notice of the Proxy as a public record filed with the SEC.  *See* n.3, *supra*; *see also Kramer*, 937 F.2d at 774 ("a plaintiff whose complaint alleges that such documents are legally deficient can hardly show prejudice resulting from a Court's studying of the documents.").  The Court's consideration of the Proxy is also appropriate under the doctrine of incorporation by reference (s*ee Roth*, 489 F.3d at 509; *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002)) and, because Plaintiff has relied on the terms and effect of the Proxy in drafting the AC, as a document "integral" to the pleading.  *See Chambers,* 282 F.2d at 153.

[6] The Court may consider Ex. D, an article entitled "In Li's Words," published in *Chemical & Engineering News* on March 14, 2016, under the doctrine of incorporation.  *See* n.5, *supra*; AC ¶ 139.

-3-

though it was empowered to consider superior proposals.  Ex. C at 26, 54.

On August 13, 2015, Credit Suisse issued its fairness opinion to the Special Committee, opining that "as of the date hereof, the applicable Merger Consideration . . . is fair, from a financial point of view, to such Unaffiliated Shareholders."  AC ¶ 258.  Based on the Special Committee's recommendation and other factors, the Board unanimously determined that the proposed merger was fair and in the best interest of the Company and Unaffiliated Holders.  Ex. C at 29-34; AC ¶ 105.  On August 14, 2015, WuXi announced it had executed a merger agreement, pursuant to which Parent would acquire WuXi for $46 per ADS.  AC ¶¶ 204-05.

**The Shareholders Approve the Merger.**  On September 1, 2015, WuXi filed with the SEC the Preliminary Proxy Materials, which would be amended four times.  *Id.* ¶¶ 213, 297, 301, 318.  Among other things, the Proxy[7] explained in detail the reasons for and effects of the proposed merger and Credit Suisse's analysis, and included financial projections, historical financial information, voting instructions and dissenters' rights.  *See* Ex. C.  The Proxy also disclosed that after the merger, "[t]he buyer group *may consider re-listing the Company's equity on the Chinese or Hong Kong stock exchanges*, which may have higher valuations."  *Id.* at 52 (emphasis added); AC ¶ 226.  Through the merger, the Unaffiliated Holders would receive $46 per ADS in cash but "will cease to have an interest in the Company and therefore, will no longer benefit from possible increases in the future revenues . . . growth or value of the Company."  Ex. C at 52; *id.* at 50.  All the risks and uncertainties would be borne by Parent and any potential future upside would inure to the benefit of Parent.  *Id.* at 52.

At the Extraordinary General Meeting of Shareholders held on November 25, 2015 in Shanghai, China, approximately 97.49% of all shares present and 97.33% of shares unaffiliated with the buyer group approved the Merger.  AC ¶ 135.  The transaction closed on December

---

[7] As used herein, the term "Proxy" refers to the Company's proxy statement dated October 20, 2015 and the Preliminary proxy statement filed on September 1, 2015 (which is quoted in the AC).  For the sake of simplicity and economy, this brief cites only to the October 20, 2015 proxy because that proxy subsumes the earlier preliminary proxy and was the operative proxy for the shareholder vote.  *See* AC ¶ 318 (noting that the October 20, 2015 proxy was the "final" proxy).

10, 2015, and WuXi ADSs were delisted from the NYSE at the close of trading that day. *Id.* ¶ 136. The Company did not receive any notice of objection from any shareholder prior to the vote, which was required under Cayman law for exercising any dissenters' rights. Ex. E at 2.[8]

**The Re-Listings and Financing of Some of the Company's Businesses Post-Merger.** On January 4, 2017, a portion of WuXi Biologics ("Biologics"), originally a business unit of WuXi, filed for listing on the Hong Kong Stock Exchange. AC ¶ 147. On June 6, 2017, Biologics began trading on that stock exchange at an alleged valuation of over $3 billion. *Id.* ¶¶ 61, 141. In September 2017, subsidiary WuXi NextCODE engaged in a financing round that valued the company at $1.2 billion. *Id.* ¶ 144. WuXi AppTec, a subsidiary, was listed on the Shanghai stock exchange on May 8, 2018, at an alleged $3.5 billion valuation. *Id.* ¶ 145.

**This Federal Securities Lawsuit.** Lead Plaintiff Altimeo Asset Management is an institutional asset manager (*id.* ¶ 23) whose WuXi securities "have now been paid in exchange for the Merger consideration." *Id.* ¶ 24. It filed this lawsuit on February 21, 2019, claiming that Defendants[9] failed to disclose the Company's plan to spin off and relist subsidiaries on Asian stock markets, in violation of Sections 10(b) and 20(a) of the Exchange Act. Plaintiff filed the AC on August 5, 2019, adding a claim under Section 20A of the Exchange Act. The Class Period runs from August 14, 2015 through December 10, 2015. *Id.* ¶ 380.

## ARGUMENT

"'[I]t makes a great deal of difference whether you start with an answer or with a problem.' That insightful remark is equally applicable to the reading of proxy statements." *Wallerstein v. Primerica Corp.*, 701 F. Supp. 393, 396 (E.D.N.Y 1988) (quoting Justice Frankfurter). This quote is an appropriate backdrop for the Court's review of the challenged Proxy, given the AC's incessant emphasis on WuXi's successful performance *years after* the

---

[8] The Court may properly consider Amendment No. 5 to Schedule 13E-3 as a SEC filing. *See* n.3, *supra*.

[9] The Defendants are WuXi, five of its officers and/or directors (the Individual Defendants), the Sponsors, Holdco, Parent and Merger Sub. AC ¶¶ 25-44. Plaintiff voluntarily dismissed Holdco, Parent and Merger Sub on July 26, 2019. Dkt. No. 34.

Merger.[10]  Surely this case would not have been brought had the post-Merger performance been mediocre or poor.  But "[t]he securities laws are not intended as investor insurance every time an investment strategy turns out to have been mistaken." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citation omitted).

## I.     THE HEIGHTEND PLEADING STANDARDS APPLICABLE TO THE AC

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-23 (2007).  A securities complaint must "state with particularity the circumstances constituting fraud or mistake" (Fed. R. Civ. P. 9(b)) and, as mandated by the Private Securities Litigation Reform Act, "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Plaintiff "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  In addition, a securities fraud complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind," *i.e.,* scienter.  *Tellabs*, 551 U.S. at 314 (emphasis added) (quoting 15 U.S.C. § 78u-4(b)(2)).  Scienter refers to a mental state embracing "intent to deceive, manipulate, or defraud." *Id.* at 319 (citation omitted).

In weighing scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24.  Courts consider scienter allegations holistically. *Id.* at 323.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.  The "strict" pleading requirements of the Reform Act are "applied assiduously" to securities fraud complaints. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005), *cert. denied*, 546

---

[10] *See, e.g.,* AC ¶¶ 16-17, 141, 143-45,148-51, 163, 192-94.

U.S. 935 (2005).  A complaint not meeting these high pleading standards "shall" be dismissed.

15 U.S.C. § 78u-4(b)(3)(A).  Despite its length, the AC fails to meet these strict requirements.

## II.    THE AC FAILS TO STATE A SECTION 10(b) CLAIM

To state a claim under Section 10(b), the AC must adequately plead "(1) a material

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives,*

*Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  These provisions "do not create an affirmative

duty to disclose any and all material information."  *Id.* at 44; *Gillis v. QRX Pharma Ltd.*, 197 F.

Supp. 3d 557, 576 (S.D.N.Y. 2016).  "Disclosure is required under these provisions only when

necessary to make … statements made, in the light of the circumstances under which they were

made, not misleading."  *Matrixx*, 563 U.S. at 44.  An alleged misstatement "must have been

false at the time it was made."  *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d

278, 290 (S.D.N.Y. 2014).  That is, "without contemporaneous falsity, there can be no fraud."

*Id.*  Pleading "fraud by hindsight" is impermissible.  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d

Cir. 1998).  The AC fails to plead particularized facts showing a material misrepresentation or

omission, scienter, reliance, economic loss and loss causation.  The Court should dismiss

Plaintiff's Section 10(b) claim on any of these grounds.[11]

### A.    The AC Fails to Plead a Material Misrepresentation or Omission Based on the Alleged Failure to Disclose the Potential Re-Listing of the Company

The gravamen of the AC is that through a false and misleading Proxy,[12] Defendants

engaged in a "scheme" to take WuXi private at an unfair price to "reap substantial profits" by

---

[11] WuXi joins in and adopts the statute of limitations argument made in the Sponsor Defendants' motion to dismiss the AC and any overlapping arguments to the extent applicable to the Company.

[12] The AC also challenges WuXi's August 14, 2015 press release announcing the Merger (AC ¶¶ 204-10), the earnings call that same day (*id.* ¶¶ 211-12), and the November 3, 2015 investor presentation.  *Id.* ¶¶ 305-17. Because these alleged misstatements are substantially similar to those alleged in the Proxy, this brief refers only to the Proxy for the sake of brevity and simplicity, but such references include the corresponding statements in the other challenged sources.

relisting its subsidiaries in Hong Kong and China.  AC ¶¶ 1-2.  The verbose 423-paragraph AC

asserts approximately sixty-five alleged misstatements, in five main categories: (1) an

"intention not to relist" (*id.* ¶¶ 216-27); (2) there were "no alternatives" to the Merger (*id.* ¶¶

228-36), (3) the "reasons" for the Merger (*id.* ¶¶ 211, 216-35, 278-85); (4) the fairness of the

Merger (*id.* ¶¶ 204-10, 237-71, 305-17); and (5) the promotion of the Merger price.  *Id.* ¶¶ 272-

77.  The statements in the first three categories (collectively, the "Plan Statements") are alleged

to be false or misleading by virtue of a single omission: the failure to disclose a plan or intent to

re-list WuXi or its subsidiaries on Asian exchanges.[13]  Yet this alleged omission was *disclosed*.

In addition, Plaintiff fails to plead facts showing that the statements themselves were false.

1.     The Proxy Fully Disclosed the Possibility of Re-listing the Company's
       Equity on Asian Stock Exchanges Post-Merger

An omission is actionable only "when the failure to disclose renders a statement

misleading."  *Monroe Cty. Emp.'s Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 349

(S.D.N.Y. 2014) (citation omitted).  Here, there was no failure to disclose, and hence no

statement was rendered misleading.  The Proxy stated, *"[t]he buyer group may consider re-*

*listing the Company's equity on the Chinese or Hong Kong stock exchange, which may have*

*higher valuations."*  Ex. C at 52 (emphasis added); AC ¶ 226.  This disclosure was full and fair.

The "'fundamental purpose' of the [Exchange] Act" is to "implement[] a 'philosophy of

full disclosure.'"  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 478 (1977).  In that vein, "[t]he

securities laws require only 'the disclosure of basic facts so that (others) may draw upon their

own evaluative expertise.'"  *Billard v. Rockwell Int'l Corp.*, 526 F. Supp. 218, 221 (S.D.N.Y.

1981) (citation omitted).  "[A] corporation is not required to disclose a fact merely because a

---

[13] *See* AC ¶¶ 217, 219, 221, 223, 225, 227 (statements concerning an intent not to relist were allegedly "false and misleading for the reasons stated in ¶ 202(a)," which alleges falsity because "the Buyer Group already planned to re-list WuXi's subsidiaries at far-higher valuations" in Asia); *id.* ¶¶ 230, 232, 234, 236 (statements concerning the lack of alternatives "were false and misleading for the reasons stated in ¶ 202(b)," which alleges that such statements "did not mention the alternative of including WuXi Securityholders in the Buyer's Group's plan to spin-off and relist WuXi's subsidiaries"); *id.* ¶¶ 280, 282, 284, 286, 316-17 (statements concerning the reasons for the Merger "were false and misleading for the reasons stated in ¶ 202(d)," which alleges falsity because the Buyer Group "planned all along to relist the Company in the public markets in Hong Kong and China").

reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). And "[t]here is no duty to disclose all information even tangentially related to the subject matter of a statement." *Monroe*, 15 F. Supp. 3d at 349 (citation omitted); *see In re Omega Healthcare Inv'rs, Inc. Sec. Litig.*, 375 F. Supp. 3d 496, 511 (S.D.N.Y. 2019) ("the requirement to be complete and accurate . . . does not mean that by revealing one fact . . . one must reveal all others that, too, would be interesting") (citation omitted).

Plaintiff's lynchpin assertion – "Defendants' most fundamental misleading action was hiding its plan to spin-off and relist WuXi's subsidiaries in Hong Kong and China following the Merger" (AC ¶ 115) – is refuted by the Disclosure, which explicitly informed shareholders of the potential of a re-listing, where that may occur, and that it may be at higher valuations. *See* Ex. C at 52. This disclosure was full and fair, particularly given Plaintiff's allegations of the information already in the public domain.[14] Plaintiff contends, "it is well-known that companies are often worth more when their subsidiaries are carved out from the main company" (AC ¶ 12; *see also id.* ¶¶ 166, 170) and that CROs are valued more in Asian markets. AC ¶¶ 13, 172. Based on the plain, simple and easily understandable language in the Disclosure (and public knowledge), a reasonable shareholder – and especially a "highly sophisticated" asset manager – can be expected to realize that post-Merger, WuXi may re-list some of its equity on Asian exchanges (*i.e.,* engage in an equity carve out) at a higher value.

In sum, the AC fails because what it alleges was omitted was in fact disclosed. *See In re GMR Sec. Litig.*, 2013 WL 3781509, at *3 (S.D.N.Y. July 19, 2013) (Nathan, J.) (dismissing Section 10(b) complaint; finding that SEC filings "*did* disclose weakening charter rates and their effect on GMC's revenue" which plaintiffs claimed were omitted) (emphasis in original); *see also TCS Capital Mgmt., LLC v. Apax Partners,* 2008 WL 650385, at *18 (S.D.N.Y. Mar.

---

[14] *See Rodman v. The Grant Found.*, 608 F.2d 64, 70 (2d Cir. 1979) ("In determining whether [the disclosure] constituted full and adequate disclosure, the district court properly took into account information already in the public domain and facts known or reasonably available to the shareholders") (citation omitted).

7, 2008) (dismissing Section 10(b) claim; "most of what TCS claims was not disclosed was in fact disclosed"); *In re New York Cmty. Bancorp, Inc. Sec. Litig.*, 2006 WL 8433456, at *12 (E.D.N.Y. Sept. 18, 2006) ("*Bancorp*") ("Plaintiffs cannot now claim they were unaware of the 'real' investment plan when that plan was based on disclosed facts.") (citation omitted).[15]

> ### 2.   The Proxy Need Not Predict the Future or Disclose Indefinite Plans

Plaintiff quibbles with the Disclosure because WuXi did not state that "relisting was not just a possibility . . . but rather, was the Buyer Group's pre-ordained plan and its whole reason for the Merger." AC ¶ 227. This contention is premised on the existence of a "pre-ordained plan," an assumption unsupported by *any* contemporaneous facts let alone specific ones. *See ATSI*, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient."). This conclusion thus is "not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

Plaintiff's theory also has no basis in the law. "[F]uture events," such as a possible relisting, are "matters of predication or speculation." *Billard*, 526 F. Supp. at 221. WuXi was not obligated to predict its future behavior. *See Missouri Portland*, 498 F.2d at 872 (offeror "is not required to make predictions of future behavior, however tentatively phrased"); *Todd Shipyards Corp. v. Madison Fund*, 547 F. Supp. 1383, 1387 (S.D.N.Y. 1982) ("there is no requirement to make predictions, for example, of future behavior").

Moreover, the federal securities laws do "not require . . . disclos[ure of] preliminary considerations, exploratory work or tentative plans." *Azurite Corp. v. Amster & Co.*, 52 F.3d 15, 16 (2d Cir. 1995); *see Reiss v. Pan American World Airways*, 711 F.2d 11, 14 (2d Cir. 1983) (finding no duty to disclose merger negotiations because "the eventual outcome is shrouded in uncertainty"). As explained in *Todd Shipyards*, "there is no requirement . . . to disclose tentative plans; or inchoate plans." 547 F. Supp. at 1387. Only "definite" or "firm"

---

[15] *Accord Missouri Portland Cement Co. v. Cargill, Inc*., 498 F.2d 851, 872 (2d Cir. 1974) (finding defendant's disclosure of plan to acquire plaintiff was adequate; "[u]ntil Cargill had decided how much it should seek to expand MP's business and by what method of financing, it would be impracticable to give the stockholders any meaningful information.").

plans need to be disclosed.[16]  Plaintiff does not allege that the "pre-ordained plan" was definite, firm or certain at the time of the Merger.  Instead, from scouring the internet, Plaintiff cobbles together various *post*-Merger news articles, to no avail.  *See Hershfang v. Citicorp*, 767 F. Supp. 1251, 1259 (S.D.N.Y. 1991) ("Plaintiffs have stitched together a patchwork of newspaper clippings and proclaimed the result a tale of securities fraud.").

First, all the articles cited were published after the Merger (one as late as December 11, 2018,[17] *over three years later*) and thus are nothing more than impermissible pleading fraud by hindsight.  *See Novak*, 216 F.3d at 309.  Second, nearly all the articles are journalistic speculation on the *possible* strategic direction of the privatized company; they are not statements by or attributable to the Company.[18]  *See Hershfang*, 767 F. Supp. at 1255 (news articles "represent the reporters' independent editorial commentary and accordingly can not provide the basis for a claim that *defendants* made fraudulent misrepresentations") (emphasis in original).  The one relevant article that quotes a corporate officer actually reinforces the tentative and preliminary nature of a re-listing option:  WuXi's COO stated, "[w]hether to return to the Chinese A-share market is something that the company's management level and new investment capital "*will be thinking about.  But all possibilities exist . . .*"  AC ¶ 154 (emphasis added).[19]  Lastly, the February 2016 news article identifying investment bankers for

---

[16] *Azurite*, 52 F.3d at 16 (Section 13(d) "only requires disclosure of definite plans."); *Todd Shipyards*, 547 F. Supp. at 1387, 1390 ("The applicable rule in the disclosure laws is that disclosure is to be made of all definite plans") (citation omitted); *Transcon Lines v. A.G. Becker, Inc.*, 470 F. Supp. 356, 376-77 (S.D.N.Y. 1979) (defendants need not disclose plans to make changes to business or structure unless those plans were "firm").

[17] AC ¶ 161.  Many of the articles merely report on the actual re-listings. *See, e.g., id.* ¶¶ 141, 143, 146-47.

[18] In most instances, Plaintiff quotes the *reporter's* words, not an authorized representative of WuXi. *See, e.g.,* AC ¶ 140 (alleging that March 14, 2016 *Chemical & Engineering News* article "*understood* Li as 'claim[ing] to have no intention of relisting WuXi in China'") (emphasis added); *id.* ¶ 347 (December 11, 2015 *Yicai* article); *id.* ¶ 350 (December 11, 2018 *Bio Space* article).  This is true of the statement attributed to Chris Chen, CEO of Biologics (AC ¶¶ 14, 349), who is not alleged to have been an officer of WuXi at the time and thus would not have been authorized to speak on its behalf, nor is he alleged to have been privy to WuXi's discussions. *See In re Sierra Wireless, Inc. Secs. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (discounting statement of defendant's subsidiary's founder because no allegation that he was privy to defendant's discussions).

[19] While a March 14, 2016 article purports to quote Dr. Li from an interview (*see* AC ¶ 139), the article notes that Dr. Li's responses were "cut . . . and lightly edited."  Ex. D at 1.  Although Dr. Li's responses were consistent with the Proxy disclosures (*see id.* at 2), fraud cannot be based on statements "lightly edited" by journalists.

-11-

a potential IPO of Biologics (AC ¶ 138) merely evidences exploratory or preliminary work.[20]

    *Krauth v. Executive Telecard, Ltd.*, 1994 WL 584556 (S.D.N.Y. Oct. 24, 1994), is instructive.  There, as here, plaintiffs claimed that a proxy was defective for failure to disclose plans to restructure the company and spin off a subsidiary.  *Id.* at *6-7.  Discussions regarding the spin off had been held, the spin off was approved by the company's board of directors, and the board had directed the company to obtain tax and securities advice regarding the spin off. *Id.* at *8.  Even on these facts, this Court held that the company "is not compelled to disclose in its proxy statement at this time the spin-off which remains marginally contingent."  *Id.* at *9. The spin-off plans "are still just plans, even though specific action had been taken . . . to implement the potential spin-off."  *Id.*  Here, Plaintiff's bare assertions of a "pre-ordained plan" pale in comparison to the "specific actions" in *Krauth*, which amounted to only a "marginally contingent" plan.  The conclusion in *Krauth* applies even more so here.  *See also Pantry Pride, Inc. v. Rooney*, 598 F. Supp. 891, 901 (S.D.N.Y. 1984) ("defendants have made ample disclosures by admitting the 'possibilities' of plaintiff's future scenarios" of selling off supermarkets/real estate, repurchasing stock, and selling plaintiff after proxy contest).

    Moreover, the disclosure Plaintiff insists should have been made is contrary to the Second Circuit's warning against premature disclosure of future behavior.[21]  This warning is particularly applicable here where the allegation is not the failure to disclose existing hard facts that definitely affected the Company's financial prospects.  Rather, this case centers on a tentative concept to re-list the Company's equity, years later, in foreign markets, that are highly volatile.  Such a complex and speculative business endeavor is clearly one "shrouded in uncertainty" "which may fail as well as succeed, or may succeed on terms which vary greatly

---

[20] *See, e.g., Todd Shipyards*, 547 F. Supp. at 1390 (memoranda evaluating "the potential investment potential of Todd" "did not represent fixed plans of the purchasing group" to take Todd private).

[21] *See, e.g., Elec. Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969) ("It would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them."); *Reiss*, 711 F.2d at 14; *see also Krauth*, 1994 WL 584556, at *24 ("it might be just as misleading to investors to disclose contingent plans as it might be to fail to disclose such plans.").

from those under consideration at the suggested time of disclosure." *Reiss*, 711 F.2d at 14.  In light of the admonition against premature disclosures, "[i]t is sufficient to merely identify those matters not fully determined." *Todd Shipyards*, 547 F. Supp. at 1387.  The Disclosure did just that.  To require WuXi "to 'confirm' what are only speculative options would be as egregious as pretending that they did not exist[.]" *Pantry Pride*, 598 F. Supp. at 901.  The AC fails to plead that any Plan Statement was false or misleading by virtue of the alleged omission.

        3.     The AC Fails to Allege Particularized Facts Showing that the Challenged <u>Statements Themselves Were Untrue</u>

**The Manufactured "Intention Not to Relist" Statements.**  The AC intones variations of the mantra that "Defendants falsely told the market that they had no plans at the time of the Merger to relist WuXi or any of its subsidiaries on any other stock exchange after the Merger." AC ¶ 2; *see also id.* ¶¶ 6, 118, 202(a); *id.* at 27, 64.  In reality, Defendants made no such statements.  Lacking a misstatement, Plaintiff invites the Court to *infer* one from *other* statements, primarily the statement that "the Company will continue its operations as a privately held company" post-Merger.  *Id*. ¶ 216.  The AC, however, fails to allege facts showing that the Company did *not* continue as a private entity after the Merger.  It did.[22]

**"No Other Alternative" Statements.**  Plaintiff also fails to plead facts showing the falsity of the Special Committee's "belief" that "the merger is more favorable to the Unaffiliated Holders" and that "no other alternative reasonably available to the Company and Company shareholders would provide greater value to Company shareholders within a timeframe comparable to that in which the merger is expected to be completed."  AC ¶ 233.  To plead falsity of opinion statements, Plaintiff must (but does not) allege particularized facts showing that (1) "the speaker did not hold the belief she professed," (2) "the supporting fact [the speaker] supplied were untrue," or (3) the belief omitted to mention facts that conflict with what a reasonable investor would take away from the statements themselves.  *Omnicare Inc. v.*

---

[22] Ex. C at 53 and A-1; Ex. E at 1 (surviving company is a wholly owned subsidiary of Parent).

*Laborers Dist. Council Constr. Ind. Pension Fund*, 135 S. Ct. 1318, 1327 (2015).

First, the AC is bereft of any facts showing that the Special Committee did not believe these statements.  Second, the AC does not allege that the facts underlying the Special Committee's belief were themselves false.  As the Proxy disclosed, that belief was based in part on a market check of nine alternative bidders, none of whom expressed interest, as well as Dr. Li's express intent to sell his shares or ADSs only to the Consortium.  Ex. C at 24-25, 31, 54. Plaintiff does not dispute the truth of either fact.  Third, the AC does not plausibly allege that the Special Committee's belief conflicted with facts not volunteered.  As shown above, all material facts concerning a possible re-listing were disclosed.  *See* Section II.A., *supra*. Notably, Plaintiff offers no alternatives that would have provided greater value to shareholders within the four-month timeframe in which the Merger was expected to be completed. Considering the all-time high Merger price and no competing offers, the Special Committee's belief was reasonable and well founded, and certainly not misleading or untrue.

**Reasons for the Merger.**  Similarly, Plaintiff fails to show the falsity of the Proxy's statements that the purpose of the Merger was to take WuXi private so to enable it to make business decisions focused on the long-term without the short-term pressures faced by public companies on the NYSE.  AC ¶¶ 279-83.  The AC alleges no facts showing that the Company did not genuinely hold these beliefs or that the underlying facts themselves were untrue.  *See Omnicare*, 135 S. Ct. at 1327.  To the extent Plaintiff suggests that WuXi must forever remain private because of the Merger, AC ¶ 202(d), that contention is meritless.[23]

## B.    The AC Fails to Plead an Actionable Material Misrepresentation Based on the "Fairness" of the Merger and the Promotion of the Merger Price

Although Plaintiff invokes the federal securities laws, its last two categories of alleged misrepresentations – those concerning the fairness of the Merger and promotion of the Merger

---

[23] *Bancorp*, 2006 WL 8433456, at *12 ("NYCB's stated intentions regarding deleveraging 'simply reflected company policy at the time; they were not promising to maintain that policy in the future, and thus were not rendered misleading by the company's subsequent consideration of an alternative plan.'") (citation omitted).

price – confirm that Plaintiff seeks redress for what it believes was an unfair Merger price. *See* AC ¶ 202(c) (the fairness and price promotion statements "conveyed that the consideration of $46.00 per ADS . . . was a fair price for the WuXi Securities when, in fact, the WuXi Securities were undervalued, causing the merger price to be unfair."); *see id.* ¶¶ 1, 127, 190.  But shareholders' claims of inadequate merger price alone are "neither deceptive nor manipulative and therefore did not violate either § 10(b) of the Act or Rule 10b-5." *Santa Fe*, 430 U.S. at 474.  Such claims "constitute no more than internal corporate mismanagement" that are "traditionally left to state regulation." *Id.* at 479-80.  Section 10(b) thus does not reach claims that "shareholders were treated unfairly by a fiduciary." *Id.* at 477.[24]  At bottom, this case is a state-law breach of fiduciary duty case dressed up in federal Section 10(b) clothing.  Plaintiff's redress was to exercise its appraisal rights (AC ¶¶ 129-32) or seek other remedies if any under Cayman law. *See Staskus*, 1993 WL 212736, at *3 ("Those rejecting the offered amount could then seek an appraisal pursuant to" New York law).  Section 10(b) provides no relief here.[25]

In addition, the fairness and price promotion allegations constitute inactionable statements of opinion as they fail to satisfy *Omnicare*. *See* Order at 13, *In re Shanda Games Ltd. Sec. Litig.*, Case No. 1:18-cv-02463 (ALC) (S.D.N.Y. Sept. 30, 2019) ("*Shanda* Order").

### C.    Plaintiff Does Not Allege Particularized Facts Giving Rise to a Strong Inference of the Company's Scienter

The Section 10(b) claim must be dismissed for the independent reason that it does not meet the Reform Act's strict requirements for pleading scienter.  Scienter may be pleaded by

---

[24] *See also Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 4 (2d Cir. 1983) (stating that "the fairness or unfairness to shareholders of a transaction engaged in by a control group is irrelevant" to the Exchange Act and refusing "to embark . . . on a course leading to a federal common law of fiduciary obligations"), *cert. denied*, 465 U.S. 1052 (1984); *Staskus v. Rawplug Co.*, 1993 WL 212736, at *3 (S.D.N.Y. June 11, 1993) (dismissing Section 10(b) complaint alleging that defendants misrepresented the fair value of plaintiffs' shares in a proposed redemption plan because the claims fall within the ambit of state law).

[25] Even if Section 10(b) provided redress for fiduciary claims, Plaintiff failed to plead particularized facts showing that the $46 Merger price – which exceeded the highest market price of WuXi ADSs *ever* (Ex. B) – was unfair at the time of the Merger. *See* Section II.D, *infra*.  By Plaintiff's own allegations, the "true value" of the ADSs could *not* be achieved had WuXi remained listed on the NYSE since the increased value was the result of the equity carve out and the valuation of CROs in Asian markets. *See* AC ¶¶ 164, 181.

alleging particularized facts showing either (1) that the defendants had "motive and opportunity to commit fraud," or (2) "strong circumstantial evidence of conscious misbehavior or recklessness" when they made such statements. *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Under the second option, "the strength" of the scienter allegations "'must be correspondingly greater' if there is no motive." *Id.* at 198-99 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001)). "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139. Conscious misbehavior is "deliberate illegal behavior." *Novak*, 216 F.3d at 308. Recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence[.]" *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009). To be reckless, the conduct must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Novak*, 216 F.3d at 308.

As shown below, Plaintiff's scienter allegations fail as to the Company because it has failed to plead the scienter of anyone at WuXi. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

1.    The AC Fails to Sufficiently Plead Motive and Opportunity

Plaintiff does not claim that WuXi had any motive to commit fraud. Instead, Plaintiff asserts that the Individual Defendants (Edward Hu excepted) "had a strong motive to commit fraud because they received substantial stakes in WuXi following the Merger" and "reap[ed] a windfall . . . by underpaying" for WuXi. AC ¶¶ 342, 344. This theory is flawed. "General allegations that the defendants acted in their economic self-interest are not enough" to plead motive. *Ganino*, 228 F.3d at 170. And the Proxy's full disclosure of these defendants' post-Merger ownership (Ex. C at 53) is antithetical to fraudulent intent. At best, the AC shows that these Defendants invested in the post-Merger company. All investors want their investment to succeed but that common motivation is insufficient to plead scienter. *See Novak*, 216 F.3d at

-16-

307 (no inference of scienter "based on motives possessed by virtually all corporate insiders, including . . . the desire . . . of the success of an investment").  Also, no specific facts are pleaded to support a plausible claim of "underpayment" (*see* Section II.D., *infra*), and allegations of a "windfall" are rooted in hindsight, the potential of which was disclosed.[26]  The scienter allegations are merely a repackaging of Plaintiff's other deficient pleadings under the banner of "motive and opportunity."  *See Novak*, 216 F.3d at 311 ("litigants . . . should not employ or rely on magic words such as 'motive and opportunity'" to plead scienter).

        2.      The AC Fails to Plead the Company's Conscious Misbehavior or
               Recklessness – Directly or By Imputation

**WuXi's Full Disclosure Undermines Scienter.**  As shown, WuXi had no duty to disclose beyond that which was revealed in the Disclosure.  *See* Section II.A., *supra*.  The failure to disclose information for which there is no duty to disclose does not constitute recklessness.  *See In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006) ("defendants had no clear duty to disclose the information . . . Thus, without more, the failure to disclose this information cannot constitute reckless behavior.").  And the absence of specific facts showing the existence of a definite firm plan to re-list (*see* Section II.A.2., *supra*) is lethal because WuXi cannot be said to have recklessly disregarded information that did not exist.[27]

**WuXi's Subsequent Actions Were Consistent with Its Disclosures.**  The intrinsic illogic of Plaintiff's case further highlights the thinness of its scienter allegations.  If, as Plaintiff contends, the Defendants intended to defraud shareholders by taking the Company private and later re-listing on Asian exchanges, why would the Disclosure be included in the Proxy? *See GeoPharma*, 411 F. Supp. 2d at 446 ("the tenuous plausibility of the alleged

---

[26] The Proxy stated, "each member of the buyer group will . . . enjoy the benefits from any future earnings and growth of the Company after the merger which, if the Company is successfully managed, *could exceed the value of their original investments.*").  Ex. C at 61 (emphasis added).

[27] *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 230 (S.D.N.Y. 2018) (defendants "cannot be said to have recklessly disregarded information to which they never had access."); *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 213-14 (S.D.N.Y. 2012) ("For obvious reasons, a showing of recklessness cannot be premised on information that was not reasonably available to the speaker at the time of the alleged misrepresentations.").

-17-

scheme substantially weakens the overall strength of plaintiffs' scienter allegations.").[28]  That
is, there can be no conscious or reckless misconduct because the Company's subsequent actions
were consistent with its disclosures.  *See Bancorp*, 2006 WL 8433456, at *12 (dismissing
Section 10(b) claim where, *inter alia*, the "company's investments were entirely consistent with
its prior statements, and certainly not misleading under the securities laws.").

       **Fraud by Hindsight: The Actual Re-Listings.**  Plaintiff points to the actual re-listings
as evidence of scienter.  *See, e.g.,* AC ¶¶ 6, 351.  That the re-listings ultimately *did* occur does
not show that the Company knew at the time that they *would*.  *See Fort Worth Emp'rs Ret.
Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 228 (S.D.N.Y. 2009) (finding plaintiffs' scienter
allegations insufficient where, *inter alia*, the "only support for plaintiffs [sic] assertion that [the
drug] could be approved without a single-dose study . . . *is the fact that this is what occurred.
Once again, plaintiff is relying on fraud by hindsight.*") (emphasis added).[29]

       **Fraud by Hindsight: The Chinese Articles.**  Plaintiff's reliance on articles as evidence
of scienter is also misplaced.  AC ¶¶ 347-50.  As shown above, these articles do not contain
conflicting contemporaneous statements by any Defendant and may be of questionable
authority and reliability.[30]  *See* Section II.A.2., *supra*; *see also PXRE*, 600 F. Supp. 2d at 544
(article failed to raise an inference of scienter where, *inter alia,* it "was published . . . weeks
after the date of Defendants' last allegedly false or misleading statement.").  These sources
"add nothing to support an inference that the Individual Defendants acted with scienter."  *In re
Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 736 (S.D.N.Y. 2018) (articles from online

---

[28] *See also id.* at 446 n.83 ("Courts often refuse to infer scienter . . . when confronted with illogical allegations"; collecting cases); *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 533-34 (S.D.N.Y. 2009) ("Plaintiff's inference of scienter is further belied by" defendants' updates to loss estimates originally alleged to be false).

[29] *See also Foley*, 861 F. Supp. 2d at 215 ("a finding of scienter based on the post-hoc assessments . . . would impute fraudulent intent to Newman based on information that he likely did not receive and the relevance of which is now being ascribed largely through a hindsight view.").

[30] *See, e.g.,* AC ¶ 155 (relying on a post by an "online blogger" named "Zhang Ji" who "commented on *Zhihu*, a popular website"); *id.* ¶ 139 (relying on purported statements of Dr. Li that were "cut . . . and lightly edited" by the reporting organization).

crowd-sourced service are "not authoritative or reliable[,]" "do not mention the Individual

Defendants" and "are vague and speculative").  Overall, the AC is similar to that considered in

*Hershfang*: "Read as a whole, the complaint creates the strong impression that when [the

defendant] announced a cut-in dividends, plaintiff's counsel simply stepped to the nearest

computer console, conducted a global Nexis search, and pressed the 'Print' button' and filed

the product as their complaint."  *Hershfang*, 767 F. Supp. at 1259.

**Fraud by Hindsight: The Pre-Class Period Restructuring of Biologics.**  Equally

uninformative of scienter is the allegation that the pre-Class "restructuring" of Biologics

indicated an intent to later spin it off.  AC ¶ 358.  Such allegation is complete conjecture,

unadorned with any supporting facts, and, like most of Plaintiff's allegations, pleaded with

hindsight.  "A plaintiff cannot base securities fraud claims on speculation and conclusory

allegations," *Kalnit*, 264 F.3d at 142, or on fraud by hindsight.  *Novak*, 216 F.3d at 309.

**Insufficient Imputation to the Company.**  Lacking direct evidence of corporate

scienter, Plaintiff attempts to impute the Individual Defendants' knowledge to the Company

(AC ¶ 337), but the AC is conspicuously devoid of any factual allegations specific to each

Individual Defendant's mental state.  *See Coronel v.Quanta Capital Holdings Ltd.*, 2009 WL

174656, at *27 (S.D.N.Y. Jan. 26, 2009) (to establish scienter, "facts must be alleged which

particularize how and why each defendant actually knew, or was reckless in not knowing, that

the statements were false at the time made"); *Tellabs*, 551 U.S. at 314.  Instead, Plaintiff

generally lumps the Individuals together and makes the generic boilerplate conclusions that the

"Individual Defendants acted with scienter" and the "Individual Defendants had actual

knowledge . . . or acted with reckless disregard . . . ."  AC ¶ 335.  "Lumping allegations in the

complaint against defendants in a claim for collective fraud is impermissible."  *Alki Partners,*

*L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 497 (S.D.N.Y. 2011).  Nor is "a formulaic

recitation of the elements" of a claim sufficient.  *Iqbal*, 556 U.S. at 681 (citation omitted).

Plaintiff's scienter allegations fail on these basic levels.  And generic scienter allegations based

-19-

on the Individuals' corporate "positions" (AC ¶ 331) are "entitled to no weight."[31]  Allegations based on their signatures on SEC filings (*e.g., id*.  ¶¶ 214, 287, 298-99) or alleged "access to material non-public information" (*id*. ¶ 331) are also insufficient.[32]  In short, Plaintiff's mantra that "Defendants" "plan[ned] all along" to spin-off and re-list (*see, e.g., id*. ¶ 346) "amounts to an unsupported allegation that is impermissible under the PSLRA."  *Kocourek v. Shrader*, 391 F. Supp. 3d 308, 330 (S.D.N.Y. 2019).  The total absence of specific facts showing conscious or reckless misconduct by the Company (or Individuals) dooms Plaintiff's claim.

> 3.  When the Allegations Are Considered Holistically, the More Plausible
> Inference Is That the Company Acted in Good Faith

In conducting a holistic review of scienter, courts must consider *all* inferences, including those "that could weigh against a finding of scienter."  *Tellabs*, 551 U.S. at 323. Here, the more plausible inference is that WuXi reasonably believed that (1) de-listing from the NYSE and going private was the best strategy to grow its business and improve long-term profitability, and (2) the prospect of re-listing in Asian markets was an option to be explored and assessed, depending on future conditions in those volatile markets.  *See* Ex. C at 29, 52. Nothing alleged indicates that WuXi (or any other Defendant) acted in a manner to constitute "an extreme departure from the standards of ordinary care," particularly where "[i]t would be as serious an infringement . . . to overstate the definiteness of the plans as to understate them." *Elec. Specialty*, 409 F.2d at 948.  As a whole, the scienter allegations are insufficient to raise *an* inference of fraud or an "extreme departure from the standards of ordinary care," *Kalnit*, 264 F.3d at 142, let alone one that is "cogent and compelling" under *Tellabs*.

---

[31] *See, e.g., Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) ("Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight.").

[32] *See, e.g., In re MBIA, Inc. Sec. Litig*., 700 F. Supp. 2d 566, 590 (S.D.N.Y. 2010) ("allegations that [defendants] signed MBIA's SEC disclosures and Sarbanes-Oxley certifications are insufficient to support a strong inference of recklessness"); *Monroe Cty.*, 15 F. Supp. 3d at 357 (allegations that all defendants knew of misstatements "because they were 'privy to confidential proprietary information'" and because the scheme could not have been perpetuated without the knowledge of "personnel at the highest levels of the Company" were "general allegations" that "fall far short of demonstrating" scienter).

### D.      Plaintiff Fails to Sufficiently Allege an Economic Loss and Loss Causation

Plaintiff also fails to allege facts showing that it (1) suffered an "economic loss" that was (2) proximately caused by the alleged fraud, and not by other factors. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Here, the economic loss alleged is the "deprivation" of the "fair value" of the ADSs when Plaintiff forewent the exercise of dissenters' and appraisal rights and sold its ADSs at a "depressed price" (*i.e.*, Merger price). AC ¶¶ 364-67; *see id.* ¶ 363 (alleging damage because it "sold [its] shares at prices lower than the true value of the Company."). This theory of economic loss is legally and factually untenable.

First, a "depressed" sale price alone does not constitute a relevant economic loss. *See Dura*, 544 U.S. at 343.[33] Second, the alleged economic loss is improperly based on the value of the Company *years after* the Merger and only *because* of the Merger.[34] But Plaintiff gave up all right to WuXi's future value when it cashed out in the Merger. *See* Ex. C at 52 (ADS holders "will cease to have an interest in the Company" and "will no longer benefit from possible . . . growth or value in the Company."). What Plaintiff now calls "economic loss" is really a backdoor attempt to reap the benefits of WuXi's post-Merger success risk-free, after already receiving a record price for its shares in the Merger – all with 20/20 hindsight.

Third, the alleged forfeiture of dissenters' and appraisal rights does not constitute an economic loss. *See Tiberius Capital, LLC v. Petrosearch Energy Corp.*, 2011 WL 1334839, at *7 (S.D.N.Y. Mar. 31, 2011) ("Losing the opportunity to claim dissenters' right is not itself a pecuniary injury."). Here, an appraisal was available only if the Merger was approved and only

---

[33] Under *Dura*, a bare allegation of an "artificially inflated purchase price" is "not itself a relevant economic loss" because a "tangle of [other] factors" "taken separately or together may account for some or all of that lower price." *Dura*, 544 U.S. at 343. While the Court did not consider a depressed sale price, it opined that "[t]he same is true in respect to a claim that a share's higher price is lower than it would otherwise have been." *Id*.

[34] AC ¶ 363 ("The far higher price that the Company was valued at in the relistings of its subsidiaries shows that the Class members did not receive fair value for their shares in the Merger."); *id*. ¶ 367 (WuXi ADSs "were worth more than the transaction price *as evidenced by the fact that WuXi has been valued at multiple times the Merger Price since the relisting of its subsidiaries in Hong Kong and China*.")(emphasis added).

for those who dissented.[35]  Plaintiff alleges that "[h]ad investors known [of the alleged fraud],
they would not have voted to sell their shares in the Merger for the price that Defendants
offered."  AC ¶ 15.  This Court recently considered a similar contention, finding that "we are
left with the inescapable result that had defendants' alleged fraud been known, the Transaction
would have been voted-down.  Consequently, there would have been no appraisal rights to
which [plaintiff] or any other class member could have availed themselves."  *Kocourek*, 391 F.
Supp. 3d at 334 (dismissing Section 10(b) claim for, *inter alia*, failure to allege damages).  The
same result follows here.  Lastly, even if an appraisal were viable, Plaintiff pleads no facts
indicating that it would have received a higher price had it exercised those rights.[36]

      In addition to economic loss, Plaintiff fails to plead loss causation.  "To establish loss
causation, *Dura* requires plaintiffs to disaggregate those losses caused by 'changed economic
circumstances, changed investor expectations, new industry-specific or firm-specific facts,
conditions, or other events,' from disclosures of the truth behind the alleged misstatements."  *In
Re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 37 (2d Cir. 2009) (quoting *Dura*, 544
U.S. at 343).  Here, the AC indicates that Plaintiff's alleged losses (*i.e.,* the deprivation of the
ADSs' "true value") were caused by factors unrelated to the alleged misconduct, namely, "the
nature of the CRO industry in China,"[37] the "well-known" equity carve out phenomenon (*see*
AC ¶¶ 12, 164, 170), and "how investors in those [Chinese and Hong Kong] markets would

---

[35] *See* Ex. C at v ("Shareholders who elect to dissent . . . will have the right to receive payment of the fair
value of their Shares if the merger is completed"); *id.* at 54 ("If the merger agreement is not authorized and
approved by the shareholders . . . the shareholders will not receive any payment for their Shares or ADSs").

[36] *See TCS Capital*, 2008 WL 650385, at *20 (squeezed out shareholders claiming inadequate stock
compensation do not have a federal securities claim unless "they were induced thereby to forgo a remedy that
would have *provided greater compensation*") (emphasis added).  Under Cayman law, the "fair value" of securities
in an appraisal proceeding is determined "at the point immediately before the merger approval," which is the date
on which the shareholders approved the transaction.  *In the Matter of Integra Grp.*, 2016 1 CILR 192, 205
(Cayman Grand Ct. Aug. 28, 2015).  The "fair value" excludes any synergies or benefits resulting from the
transaction.  *Id.* at 219 (dissenting shareholders "should not benefit from any enhancement in the value of their
shareholding attributable directly to the transaction from which they have dissented").

[37] AC ¶ 181 ("WuXi's higher valuation . . . was a *result* of the nature of the CRO industry in China and the
higher valuations that this type of company garnered in these markets.") (emphasis added); *see id.* ¶ 164.

-22-

value the Company[.]"  *Id.* ¶ 176; *see id.* ¶ 202(d).  Each of these factors existed independent of the alleged misconduct.  Thus, by Plaintiff's own allegations, the "true" or "fair" value of which it was deprived reflects, not an earlier alleged misrepresentation or omission, but "changed economic circumstances," "changed investor expectations," "new industry-specific" facts or conditions, and "other events" that occurred *in the future*.  *See Dura*, 544 U.S. at 343.[38] Plaintiff has pleaded itself out of the loss causation element of a Section 10(b) claim.

### E.    Plaintiff Fails to Sufficiently Plead Reliance

Lastly, Plaintiff does not plead actual reliance on the alleged misstatements and omission in selling its WuXi ADSs.  Instead, it invokes a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and fraud-on-the-market theory (AC ¶¶ 389-90), but neither is applicable.  The *Affiliated Ute* presumption does not apply because there was no material omission (*see* Section II.A., *supra*),[39] and the fraud-on-the-market" theory is of no avail because Plaintiff did not sell its WuXi ADSs "at the price set by the market"[40] but rather at the Merger price pursuant to the Merger agreement.  *See Shanda* Order at 17 (finding no presumption under fraud-on-the-market theory; "the forced sale of shares through a merger does not constitute an efficient market.").

### III.    *MORRISON* PRECLUDES PLAINTIFF'S SECTION 10(b) CLAIM

The Section 10(b) claim should be dismissed on another ground:  It does not apply to foreign transactions.  *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2883 (2010) ("there is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially, and we . . . conclude that it does not").  Plaintiff's claim arises solely from its sale of WuXi

---

[38] *See also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 360 (S.D.N.Y. 2008) (finding plaintiff failed to plead that losses resulted from liquidity problems "rather than from intervening causes, such as the collapse of the Internet sector.").

[39] The *Affiliated Ute* presumption is available only "if there is an omission of a material fact by one with a duty to disclose."  *Stoneridge Inv. Partners, LLC v. Sci-Atl.*, 552 U.S. 148, 159 (2008).

[40] Under the fraud-on-the-market theory, reliance is presumed when "[a]n investor who buys or sells stock *at the price set by the market* does so in reliance on the integrity of that price."  *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) (emphasis added).

ADSs, a "predominantly foreign securities transaction." *In re Société Générale Sec. Litig.*, 2010 WL 3910286, at *4 (S.D.N.Y. Sept. 29, 2010) ("Trade in ADRs is considered to be a 'predominantly foreign securities transaction'") (citation omitted). In fact, this entire case is overwhelmingly foreign; it is brought by a French Plaintiff against a Cayman company based in China and other Defendants, all based in Asia, over a Merger that closed in Hong Kong after a shareholder vote in China.

Under *Morrison*'s "transactional test," Section 10(b) reaches "only [1] transactions in securities listed on domestic exchanges, and [2] domestic transactions in other securities." 130 S. Ct. at 2885. The transactional test "turns on the territorial location of the subject transaction." *In re Vivendi Universal, S.A., Sec. Litig.*, 765 F. Supp. 2d 512, 530 (S.D.N.Y. 2011). The first category is inapplicable because Plaintiff admits that the transaction at issue – its *sale* of WuXi ADSs – occurred *in the Merger* (AC ¶¶ 15, 24), not on a domestic exchange. That WuXi ADSs "were listed and traded on the NYSE" (*id.* ¶ 25) is insufficient. *See City of Pontiac Policemen's and Firemen's Ret. Sys.*, 752 F.3d 173, 180-81 (2d Cir. 2014) (rejecting the "listing theory" as "irreconcilable with *Morrison* read as a whole.").[41] The key is that "the *transactions themselves* must occur on a domestic exchange to trigger application of § 10(b)." *In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469, 473 (S.D.N.Y. 2010) (emphasis added).

Nor do Plaintiff's sales of WuXi ADSs in the Merger qualify as "domestic transactions" under *Morrison*'s second category. A securities transaction is domestic "when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012). Plaintiff does not and cannot allege the latter, and the AC fails to allege facts showing that irrevocable liability was incurred within the United States. Here, such liability

---

[41] *See also Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014) (holding that "while a domestic transaction or listing is *necessary*" to state a § 10(b) claim, such finding "would not *suffice* to compel the conclusion that the plaintiffs' invocation of § 10(b) was appropriately domestic.") (emphasis in original). That Plaintiff allegedly sold its securities directly to the insider trading Defendants "through the Merger" (AC ¶ 371) further renders irrelevant the NYSE listing of WuXi ADSs. *See In re Satyam Comp. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 472 (S.D.N.Y. 2013).

was incurred in China at the shareholder meeting approving the Merger.  *See id.* at 68
(irrevocable liability is "the point at which the parties obligated themselves to perform what
they had agreed to perform even if the formal performance of their agreement is to be after a
lapse of time.") (citation omitted).  Lastly, even if a *Morrison* prong were satisfied (it is not),
the overwhelmingly foreign nature of Plaintiff's claims dictates that *Morrison* bars its Section
10(b) claim.  *See Parkcentral*, 763 F.3d at 215-16 (notwithstanding alleged domestic
transactions, the claims based on securities-based swap agreements were "so predominantly
foreign" that to apply § 10(b) "would seriously undermine *Morrison*'s insistence that § 10(b)
has no extraterritorial application"); *In re North Sea Brent Crude Oil Futures Litig.*, 256 F.
Supp. 3d 298, 309-10 & n.5 (S.D.N.Y. 2017) (*Morrison* rationale barred claims based on
commodities contracts that traded on the NYMEX where manipulative transactions occurred
abroad; "while the Trader Plaintiffs may have purchased or sold Brent futures and derivatives
on domestic exchanges . . . the crux of their complaints . . .  does not touch the United States).[42]

## IV.    THE AC FAILS TO STATE A SECTION 20A CLAIM

The insider trading claim under Section 20A fails because (1) WuXi is not alleged to be
a buyer, and thus no contemporaneous trading occurred between Plaintiff and WuXi, and
Plaintiff fails to sufficiently plead (2) the existence of material non-public information upon
which the trades were made and (3) a predicate violation of the Exchange Act.  *In re Openwave
Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255 (S.D.N.Y. 2007); Sections II. & III., *supra*.

**CONCLUSION**

For the foregoing reasons, the AC should be dismissed with prejudice.

---

[42] In finding that Section 10(b) is applicable to claims arising from a go-private merger of a China-based
company whose ADSs were listed on NASDAQ, this Court explained that "Defendant cites no other cases
involving securities listed on domestic exchanges that support its proposition that the transaction did not occur on
the domestic exchange." *Shanda* Order at 7.  *North Sea*, however, involved securities listed on a domestic
exchange where the transaction did not occur on the domestic exchange. The *Shanda* Order did not cite *North Sea*
or *Parkcentral*.

Dated:  October 7, 2019

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By: s/ *Gideon A. Schor*
     Gideon A. Schor
     Paul C. Gross
     Wilson Sonsini Goodrich & Rosati, P.C.
     1301 Avenue of the Americas, 40th Floor
     New York, NY 10019-6022
     Telephone:  (212) 999-5800
     Facsimile:  (212) 999-5899
     gschor@wsgr.com
     pgross@wsgr.com

     Boris Feldman, *admitted pro hac vice*
     Ignacio E. Salceda, *admitted pro hac vice*
     Wilson Sonsini Goodrich & Rosati, P.C.
     650 Page Mill Road
     Palo Alto, CA 94304
     Telephone:  (650) 493-9300
     Facsimile:   (650) 493-6811
     boris.feldman@wsgr.com
     isalceda@wsgr.com