UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/14/2020
```

Altimeo Asset Management,

                        Plaintiff,

        –v–

WuXi PharmaTech (Cayman) Inc., *et al.*,

                        Defendants.

19-cv-1654 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

      Lead plaintiff Altimeo Asset Management alleges that WuXi Phama Tech (Cayman) Inc. defrauded holders of WuXi securities by concealing plans to relist subsidiaries on foreign stock exchanges following a go-private merger.  Defendants WuXi, individual corporate officers, and companies that participated as investors in the merger move to dismiss.  Because Altimeo has not plausibly alleged a material misrepresentation or omission as required for a claim under § 10(b) of the Exchange Act, the Court grants the motions.

## I.     Background

      The following facts are based on Altimeo's Consolidated Amended Class Action Complaint ("FAC"), Dkt. No. 39, and judicially noticeable stock price information, taking as true all factual allegations and drawing all reasonable inferences in its favor.

### A.     The Merger

      WuXi is pharmaceutical technology corporation incorporated under the laws of the Cayman Islands with its headquarters in Shanghai, China.  FAC ¶ 25.  Its business consists primarily of contract research services.  *Id.* ¶ 51.  Until December 2015, WuXi's American

depository shares were traded on the New York Stock Exchange, which was the only public market for WuXi securities. *Id.* ¶¶ 25, 136. Altimeo held just under 300,000 WuXi securities at the time of the merger. *Id.* ¶ 24.

On March 5, 2015, WuXi announced its financial results for 2014. *Id.* ¶ 64. The market reacted negatively, and WuXi's ADS price tumbled by about 7% the following day. *Id.*; Declaration of Ignacio E. Salceda in Support of Motion to Dismiss ("WuXi Decl."), Dkt. No. 56, Ex. B.[1] WuXi's founder and CEO, Ge Li, began to discuss taking the company private with several investment companies. On April 27, Li and Ally Bridge group delivered letter to WuXi's Board of Directors proposing a going-private transaction by a buyer group led by Li and Ally Bridge Group. FAC ¶ 67. The proposal offered $46 in cash for each ADS and an equivalent amount for each ordinary share, totaling about $3.3 billion. *Id.* ¶¶ 67, 88. That price was higher than WuXi securities had ever traded for on the NYSE, and represented about a 15% premium over the opening trading price that day. WuXi Decl., Ex. B.

WuXi's Board formed a Special Committee to evaluate the transaction. FAC ¶ 70. The Special Committee engaged Credit Suisse to serve as its financial advisor. *Id.* ¶ 71. Credit Suisse analyzed the merger based on the merger agreement, financial information and forecasts provided by the corporation, discussions with management, and any other studies and market criteria it deemed relevant. *Id.* ¶ 99. It did not independently verify financial information provided by the corporation and did not evaluate alternative transactions or strategies. *Id.* ¶ 100. Credit Suisse concluded that the merger was "fair, from a financial point of view" to WuXi security holders unaffiliated with the buyer group. *Id.* 93.

---

[1] The Court takes judicial notice of WuXi's historical stock prices on the NYSE. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

The Special Committee unanimously determined that there were no viable alternatives to the merger and that the merger was in the best interests of the corporation and its shareholders. *Id.* ¶¶ 90, 94.  It recommended that the Board approve the merger.  *Id.* ¶ 94.  The Special Committee negotiated with the buyer group on only one occasion, and the final merger price was the same as that offered in the buyer group's initial proposal.  *Id.* ¶ 92.  The Board approved the merger.  *Id.* ¶ 105.

In proxy materials filed with the SEC between September 1, 2015, and November 20, 2015, WuXi laid out the procedures, reasons, and anticipated benefits of the merger.  The proxy materials touted benefits including that the corporation would no longer face pressure to meet short-term analyst forecasts and would have more flexibility in its strategic planning.  *Id.* ¶ 120. They stated that a "focus[] on improving the Company's long-term profitability . . . would be most effectively implemented in the context of a private company structure."  *Id.* ¶ 122.  The proxy materials also stated that "[t]he buyer group may consider re-listing the Company's equity on the Chinese or Hong Kong stock exchanges, which may have higher valuations."  *Id.* ¶ 226 (alteration in original).

In a November 25, 2015 shareholders meeting, 97.49% of WuXi shares voted in favor of the merger.  *Id.* ¶ 135.  Among shares not affiliated with the buyer group, 97.33% voted in favor of the merger.  *Id.*  WuXi completed the merger on December 10, 2015, and shares were delisted from the NYSE that day.  *Id.* ¶ 136.

B.      **The Spin-Offs**

Following the merger, news sources began reporting that WuXi was taking steps to spin off its biologics unit in February 2016.  *Id.* ¶ 138.  WuXi Biologics completed an Initial Public Offering on the Hong Kong Stock Exchange in June 2017.  *Id.* ¶ 141.  WuXi Biologics was

valued at $4.14 billion at the close of trading on June 13, 2017. *Id.* By June 2018, its market valuation had grown to about $12.3 billion, with the buyer group from the WuXi merger owning about 55% of the new corporation.

WuXi AppTec completed an IPO on the Shanghai Stock Exchange in May 2018 at a $3.5 billion valuation. *Id.* ¶ 145. WuXi AppTec became dual-listed in Hong Kong and China and by September 2018 has risen in value to about $13 billion. *Id.* ¶¶ 148–149.

WuXi also spun off WuXi NextCODE, which has not yet had an initial public offering. *Id.* ¶ 144. WuXi NetxCODE raised $240 million in a private series B financing round at a $1.2 billion valuation, and has since completed a series C financing round for $200 million. *Id.*

As of June 2018, a news article estimated that the total market value of the three WuXi subsidiaries spun off after the merger was $30.77 billion. *Id.* ¶ 151.

### C.    Allegations of an Undisclosed Relisting Plan

At the heart of Altimeo's claims is the allegation that WuXi and the buyer group had plans prior to the merger to spin off and relist WuXi's subsidiaries and concealed that fact from WuXi securities holders in order to depress the merger price. In support of that allegation, Altimeo cites the actual spin-offs that took place and news articles that discuss the merger, spin-offs, and surrounding circumstances.

Altimeo points to the speed with which WuXi spun off and relisted its subsidiaries and the high values they attained. It alleges that WuXi began "setting the stage" for relisting less than three months after the merger closed. *Id.* ¶ 138. WuXi Biologics completed an IP about nineteen months after the merger. *Id.* ¶ 141. WuXi AppTec completed an IPO about twenty-nine months after the merger. *Id.* ¶ 145. WuXi NextCODE has not completed an IPO, but began its series B financing round in September 2017, about twenty-two months after the merger. *See*

*id.* ¶ 144.  Altimeo also emphasizes that, by June 2018, the three subsidiaries WuXi spun off were worth over nine times the amount that WuXi was valued in the merger.  *Id.* ¶ 151.

Altimeo's complaint cites several news articles that it contends support an inference that WuXi planned to spin off and relist subsidiaries prior to the merger.  Most of these report analysis or comments from after the merger.  For example, two news articles in February and March 2016 quoted Li as denying that the WuXi went private in order to relist in China.  *Id.* ¶¶ 139–140.  A news release from Ally Bridge Group in May 2017 stated that the WuXi Biologics IP would be followed by an IPO for WuXi AppTec on a Chinese stock exchange and included both IPOs as part of a "Wuxi take private and relisting timeline."  *Id.* ¶¶ 146–147.  A blogger commented in July 2016 that WuXi's share structure and the composition of the buyer group suggested it planned to spin off WuXi Biologics.  *Id.* ¶ 155.  Another 2017 news article reported that WuXi Biologics' CEO stated that the merger "was part of a long-term strategy for the then parent company to spin off three separate entities with dedicated focuses."  *Id.* ¶ 160.

Only two of the news articles Altimeo cites reported comments from WuXi management from before or around the time of the merger.  A December 11, 2015 article in the Chinese publication *Yicai* reported that a WuXi senior manager stated in August 2015 that "after privatization [WuXi] intended to return to the Chinese A-share market."  *Id.* ¶ 153.  That article also stated that an insider close to WuXi's high-level management had told the journal that day—the day after the merger closed—that "it was extremely likely that the next step would be to spin off its subsidiary sectors into three major companies and separately relist them in China." Another article published December 16, 2015, in the Chinese publication *Sina Finance* quoted WuXi's COO Yang Qing stating that "[w]hether to return to the Chinese A-share market is something that the company's management level and new investment capital will be thinking

about.  But all possibilities exist, and at this time it is not appropriate to reveal to the media the next step."  *Id.* ¶ 154 (alteration in original).

D.     **Alleged Misrepresentations and Omissions**

Altimeo identifies four categories of alleged misrepresentations, all of which it alleges were false or misleading because the buyer group had an undisclosed plan to spin off WuXi's subsidiaries and relist them on foreign exchanges.  *Id.* ¶ 202.

1.   **Statements Concerning an Intention Not to Relist**

Altimeo alleges that the proxy materials contained statements that there were no plans in place for WuXi to change its corporate structure in any way.  *Id.* ¶ 202(a).  These include the statement that "If the merger is completed, the Company will continue its operations as a privately held company"; that "the buyer group does not have any current plans, proposals or negotiations that relate to or would result in . . . an extraordinary corporate transaction"; and that "[t]he buyer group may consider re-listing the Company's equity on the Chinese or Hong Kong stock exchanges, which may have higher valuations."  *Id.* ¶¶ 116, 216, 220, 226 (alterations in original).  It alleges these statements were false or misleading because the buyer group planned to relist its subsidiaries on foreign exchanges.  *Id.* ¶ 202(a).

2.   **Statements That There Were No Viable Alternatives to the Merger**

Altimeo alleges that the proxy materials contained statements that there were no viable alternatives to the merger.  These include the statements that "the Special Committee and the Board considered . . . the belief that no other alternative reasonably available to the Company and Company shareholders would provide greater value to Company shareholders within a timeframe comparable to that in which the merger is expected to be completed" and that "no party other than the members of the buyer group has contacted the Company or the Special

Committee expressing an interest in exploring an alternative transaction with the Company." *Id.*

¶¶ 233, 235.  It alleges that these statements were false or misleading because "they did not

mention the alternative of including WuXi Securityholders in the Buyer Group's plan to spin-off

and relist WuXi's subsidiaries or paying them fair value for that alternative plan." *Id.* ¶ 202(b).

### 3.  Statements Portraying the Merger as Fair

Altimeo alleges that statements describing the merger as fair were false or misleading,

because WuXi was actually worth more than its proxy statements and Credit Suisse's analysis

showed.  *Id.* ¶ 202(c).  These statements include both the bottom-line conclusions reached by

Credit Suisse, WuXi's Board, and the Special Committee, and elements of Credit Suisse's

financial analysis like its discounted cash flow analysis, selected transactions analysis, and

selected companies analysis.  *Id.* ¶¶ 238, 240, 248–250, 258, 261–262, 264.  Specifically,

Altimeo alleges WuXi was undervalued both because it would have been worth more as separate

entities and because it would have been more valuable when listed on foreign exchanges.  *Id.*

¶ 202(c).

First, Altimeo alleges that WuXi was undervalued because the proxy materials and Credit

Suisse analysis gave projections for the corporation as a whole, not how much it might have been

worth if subsidiaries were spun off as standalone entities.  *Id.* ¶ 168. Citing articles and academic

papers from 2012, 2015, and 2018, Altimeo alleges that "[i]t is well known that when companies

conduct IPOs for a portion of a subsidiary—also known as an 'equity carveout'—as WuXi did

with WuXi Biologics and WuXi AppTec following the Merger, the newly offered subsidiary is

worth more than when it was wholly owned by the parent company." *Id.* ¶ 166.  But WuXi

securities holders, Altimeo alleges, had no way to assess the value of each subsidiary

independently.  *Id.* ¶ 170.

Second, Altimeo alleges that WuXi was undervalued because it would trade at a higher value in the Hong Kong and Chinese markets. *Id.* ¶ 171. Credit Suisse used only U.S.-listed contract research firms to determine comparable price-to-earnings ratios for its valuation of WuXi. *Id.* ¶ 176. However, Altimeo alleges that contract research firms in China had significantly higher price-to-earnings ratios. *Id.* ¶ 174.

### 4. Statements Concerning the Reason for the Merger

Finally, Altimeo alleges that statements concerning the reasons for the merger were false or misleading. Specifically, Altimeo identifies statements in the proxy materials that WuXi preferred to be a private company so that it would not face the pressures associated with public markets and that the buyer group intended for WuXi to remain a private company. *Id.* ¶¶ 202(d), 281, 283. It alleges these statements were false because the primary reason for the merger was actually to relist WuXi's subsidiaries on foreign exchanges. *Id*. ¶ 202(d).

## II.   Legal Standard

"To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Litwin v. Blackstone Grp.*, L.P., 634 F.3d 706, 715 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When determining whether a complaint states a claim, a court ordinary accepts as true all allegations in the complaint and draws all reasonable inferences in favor of the non-moving party. *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337 (2d Cir. 2011). However, the Private Securities Litigation Reform Act "establishes a more stringent rule." *ECA, Local 134*

*IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).  "Under the PSLRA, the complaint must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading,' and 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Id.* (alteration in original) (quoting 15 U.S.C. § 78u-4(b)(1)).

## III.   Discussion

### A.   Material Misrepresentations or Omissions

"To maintain a private damages action under § 10(b) and Rule 10b–5, 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  A statement may give rise to liability under §10(b) if it is "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, No. 16-cv-3068 (AJN), 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24, 2017) (quoting *Litwin*, 634 F.3d at 715–16), *aff'd*, 735 F. App'x 11 (2d Cir. 2018).

"[T]he 'fundamental purpose' of the [Exchange] Act [is to] implement[] a 'philosophy of full disclosure'; once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute."  *Santa Fe Indus., Inc. v. Green*, 430

U.S. 462, 477–78 (1977) (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972)).  Consistent with that purpose, "[a] complaint fails to state a § 10(b) claim when the alleged omission has actually been disclosed."  *Debora v. WPP Grp. PLC*, No. 91cv1775 (KTD), 1994 WL 177291, at \*5 (S.D.N.Y. May 5, 1994) (citing *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 116–17 (2d Cir. 1982)).

Taking as true all allegations in the amended complaint and drawing all reasonable inferences in Altimeo's favor, WuXi's proxy materials disclosed that "[t]he buyer group may consider re-listing the Company's equity on the Chinese or Hong Kong stock exchanges, which may have higher valuations."  FAC ¶ 226 (alteration in original).  Altimeo further alleges that "[i]t is well known that when companies conduct IPOs for a portion of a subsidiary . . . the newly offered subsidiary is worth more than when it was wholly owned by the parent company" and that contract research firms were generally valued higher relative to their earnings on Chinese stock exchanges.  *Id.* ¶¶ 166, 173–174.  That is, WuXi disclosed that a future relisting at a higher valuation was possible, and reasonable investors would have understood that possibility.

In a thorough and thoughtful recent opinion, Judge Engelmayer addressed nearly identical claims brought by Altimeo alleging that a company concealed its plans to relist on a Chinese stock exchange following a go-private transaction.  *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, No. 19-cv-10067 (PAE), 2020 WL 4734989, at \*1 (S.D.N.Y. Aug. 14, 2020).  Because Qihoo disclosed "the possibility of relisting the Surviving Company or a substantial part of its business on another internationally recognized stock exchange," the Court held that Altimeo's complaint could survive a motion to dismiss only if it plausibly alleged "that defendants, at the time of the Merger, had already adopted—but did not disclose to the public— an actual, concrete plan to relist in China."  *Id.* at \*9.  Altimeo cited reports of a confidential

witness and newspaper articles—including a pre-merger article stating "that Qihoo planned to return to the Chinese [stock] market through a backdoor listing." *Id.* at *14–*16. The Court concluded that these allegations supported only an inference that Qihoo was considering relisting as "a potentially lucrative course," not an inference of a "concrete plan to relist." *Id.* at *16. The complaint therefore fell short of establishing that the proxy materials, which disclosed the possibility of relisting, were misleading. *Id.*

This case is on all fours with *Qihoo*. WuXi disclosed in its proxy materials both that it might relist on the Chinese or Hong Kong stock exchanges and that relisting might result in a higher valuation. FAC ¶ 226. The vast majority of news articles Altimeo contends support an inference of a concrete plan to relist consist of speculation by analysts or comments made long after the merger. *See, e.g.*, *id.* ¶¶ 138–140, 146 155. Only the December 2015 articles reported comments from company insiders from around the time of the merger. The December 16 *Sina Finance* article quoted WuXi's COO stating that the company "will be thinking about" whether to return to Chinese markets. *Id.* ¶ 154. The December 11 *Yicai* article reported that an unnamed senior manager said that WuXi "intended to return to the Chinese A-share market." *Id.* ¶ 153. These statements do not describe anything like a concrete plan.

The closest Altimeo comes to alleging a concrete plan is the June 13, 2017 article in the *South China Morning Post*, which quoted WuXi Biologics' CEO as stating that privatization "was part of a long-term strategy for the then parent company to spin off three separate entities with dedicated focuses." *Id.* ¶ 161. This statement describes a "long-term strategy" for spin-offs, but does not mention relisting. It also comes over eighteen months after the merger from an individual whose role in the merger Altimeo does not allege. Like the allegations in *Qihoo*, "the allegations in these articles . . . are far too conclusory, insufficiently particular, and devoid of

details confirming their reliability" to support a plausible inference that WuXi had concrete plans to relist before the merger. *Qihoo*, 2020 WL 4734989, at *16. None of the categories of alleged misrepresentations Altimeo identifies can support a § 10(b) claim absent such an inference.

First, statements that WuXi had no plans to relist are, on their face, true if WuXi had no plans to relist. What is more, several of the statements Altimeo identifies would be true even assuming WuXi had concrete plans to relist at the time of the merger. Altimeo alleges that WuXi falsely stated that it would continue operations as a private company after the merger. *See* FAC ¶ 216. But despite listing on public exchanges two subsidiaries in which WuXi retains an ownership stake, WuXi itself *has* remained a privately held company. Similarly, WuXi's post-merger activities do not call into question its statements that it would benefit from greater flexibility free from short-term shareholder expectations. *See id.* ¶ 281. Considering WuXi's disclosure that the buyer group might consider relisting, the statements that the company would be privately held after the merger or touting the benefits of private ownership cannot be understood as a pledge never to list a subsidiary on a foreign exchange.

Second, Altimeo alleges that statements that there were no viable alternatives to the merger were false or misleading only because WuXi "did not mention the alternative of including WuXi Securityholders in the Buyer Group's plan to spin-off and relist WuXi's subsidiaries or paying them fair value for that alternative plan." *Id.* ¶¶ 202(b), 230, 232, 234, 236. Absent such a plan, Altimeo fails to allege that these statements were false or misleading.

Finally, Altimeo fails to state a claim based on WuXi's statements as to the merger's fairness. Under § 10(b), the perceived unfairness of a transaction is actionable only insofar as that unfairness stems from a failure of disclosure. *Santa Fe Indus.*, 430 U.S. at 477–78. Altimeo alleges that WuXi disclosed both the possibility of relisting and that relisting might result in a

higher valuation.  FAC ¶ 226.  Altimeo also alleges that it was "well known" that equity carveouts increase value and that contract research firms command higher valuations relative to earnings in Chinese markets.  *Id.* ¶¶ 166, 173–174.  Absent a concrete plan to relist, there are no facts not obvious to a reasonable investor that Altimeo alleges WuXi failed to disclose.  Altimeo was not entitled to projections for every possible subsidiary that could be spun off or valuations based on every possible market in which WuXi could relist.  WuXi's bottom-line opinion that the merger was fair "'fairly align[ed] with the information in [its] possession at the time,'" including price-to-earnings ratios of comparable companies in the same market and that the merger price exceeded the highest ever closing price for WuXi ADSs on the NYSE.  *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) (first alteration in original) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015)); *see* FAC ¶¶ 7, 172; WuXi Decl., Ex. B.

The Court agrees with WuXi that this case is predicated on a disclosed omission.  The factual allegations in the amended complaint do not support an inference of anything more than a possibility that WuXi would relist on the Chinese or Hong Kong exchanges at the time of the merger, and WuXi's proxy materials disclosed exactly that possibility and its foreseeable consequences for the corporation's value.  Altimeo has therefore failed to plausibly allege a violation of § 10(b).

## B.  Insider Trading

"Section 20A provides a cause of action against 'Any person who violates any provision of this chapter or the rules or regulations thereunder by . . . selling a security while in possession of material, nonpublic information . . . .'"  *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994) (alterations in original and emphasis omitted) (quoting 15 U.S.C. §

78t-1(a)).  It therefore requires an independent violation of the Exchange Act.  *Id.* at 703–04.

Because Altimeo has not plausibly alleged a concrete plan to relist prior to the merger, it has not

alleged a predicate violation of the Exchange Act or the existence of material nonpublic

information.  *See Qihoo*, 2020 WL 4734989, at *17.

C.     **Control Person Liability**

Altimeo finally asserts a claim for control person liability against the corporate officer

defendants under § 20 of the Exchange Act.  "In order to establish a prima facie case of

controlling-person liability, a plaintiff must show a primary violation by the controlled person."

*ECA, Local 134*, 553 F.3d at 207 (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472

(2d Cir. 1996)).  Because Altimeo has not stated a claim for any primary violation, its claim for

control person liability also fails.

D.     **Leave to Amend**

Under this Court's individual rules, plaintiffs have an opportunity following a motion to

dismiss to amend their complaint to cure any defects made apparent by the motion or to rest on

their existing pleadings and oppose the motion.  Altimeo acknowledged this rule and declined to

amend its complaint following the motions to dismiss.  *See* Dkt. No. 59.  Altimeo has therefore

waived any right to amend to correct defects made apparent by the motions to dismiss.  *See*

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC.*, 797 F.3d 160, 190 (2d Cir. 2015)

(leaving "unaltered the grounds on which denial of leave to amend has long been held proper,

such as undue delay, bad faith, dilatory motive, and futility").  The Court also finds that

amendment would be futile, because Altimeo's pleadings establish that WuXi disclosed the

possibility of relisting on foreign exchanges at a higher valuation.  The Court therefore denies

leave to amend.

**Conclusion**

Altimeo has failed to plead any material misrepresentations or omissions as required to state a claim under § 10(b) and Rule 10b-5, and has therefore failed to establish a primary violation necessary for liability under § 20A or § 20(a).  The Court therefore GRANTS the motions to dismiss (Dkt. Nos. 53, 54) and dismisses all claims with prejudice.  The Clerk of Court is respectfully directed to close the case.

SO ORDERED.


Dated: October 14, 2020
     New York, New York                       _____
                                        ALISON J. NATHAN
                               United States District Judge